# EXHIBIT A

Plaintiff's Opposition to Defendant's Motion for Summary Judgment

Page 17

1      Q.   Okay.  And we'll talk about that in a little

2   bit.

3               Have you ever served in any sort of

4   military before?

5      A.   No.

6      Q.   Do you currently suffer from a disability?

7      A.   Yes.  My injury.

8      Q.   Are you referring to your finger?

9      A.   Yes, my finger injury.

10     Q.   And just so we're clear, that's the finger

11  injury that occurred in January of 2022?

12     A.   Yes.

13     Q.   And it's -- you still consider that a

14  disability?

15     A.   I don't get the right -- I don't get the

16  right grip I get with this that I used to get before.  I

17  have to like work on it.

18     Q.   It affects your grip?

19     A.   Yes.  My grip, and to hold something like when

20  I'm working at work, when I'm pulling stuff, I pull

21  more -- I cannot use -- like use it to pull that much,

22  and when I do, it just start shaking.

23     Q.   It starts shaking?

24     A.   Yes.

25     Q.   Have you ever gone to any sort of therapy for

Page 18

1    it?

2        A.   Yes.  I went to -- I went to therapy because at

3    first I was afraid because I wasn't feeling nothing.  I

4    couldn't -- I couldn't tell it what to do.

5        Q.   When did you go to therapy?

6        A.   I think in 2022.  In the middle of 2022.

7        Q.   And just so we're clear, that's physical

8    therapy?

9        A.   Yes.  For my fingers.

10       Q.   Where was that?

11       A.   In Garland.

12       Q.   Do you remember the name of the physical

13   therapist?

14       A.   I don't remember the name of the therapist

15   because it was -- the therapist, I don't remember her

16   name.

17       Q.   Or the organization or where -- what was the

18   hospital or place that you went to?

19       A.   It was -- I don't -- I forgot the name.  The

20   clinic, it's -- it's on Broadway.

21       Q.   On Broadway?

22       A.   Yes.  Broadway in Garland.

23       Q.   For how long did you attend physical therapy?

24       A.   For a couple of months.

25       Q.   Was it once a week?  How often did you go?

Page 19

1        A.   It was like -- no.   It was -- sometimes it
2    would be three days a week.
3        Q.   For an hour each time or how long?
4        A.   For -- it used to be for up to three hours
5    sometimes.
6        Q.   Three days a week up to three hours each time?
7        A.   Yes.   I think, yes.
8        Q.   And this was in mid 2022?
9        A.   Yes.
10       Q.   For just a few months?
11       A.   A couple months, yes.
12       Q.   Did it improve your grip?
13       A.   It did -- it did improve it a little bit, but
14   they said I was going to have issues with it.   I have to
15   keep working on my own.
16       Q.   Okay.   So who released you from physical
17   therapy?   Did you decide not to go anymore?
18       A.   They -- they did.   They did.
19            I also saw a specialist, a finger
20   specialist, that would measure my -- she would -- she
21   would measure my -- the -- like how far my finger went
22   down, and -- and she would help -- she helped me do
23   exercise.
24       Q.   Who was the finger specialist?
25       A.   I forgot -- I forgot her name, too.   But she

Page 20

1     was in -- she was in Dallas.

2           Q.   When did you see this doctor?

3           A.   Like in June.

4           Q.   Of what year?

5           A.   2022.

6           Q.   Do you recall where the -- this clinic was?

7           A.   I think it was in -- I know -- I know it was by

8     a highway.  I think it was in Duncanville or Lancaster.

9     I'm not remembering.

10          Q.   How often did you see this finger specialist?

11          A.   I only saw her like every two weeks or month.

12          Q.   For how long?

13          A.   For, I think it was three months.

14          Q.   And why only three months?

15          A.   Because they wanted to see the rating, I think

16    that the rating on -- the therapy send me there so she

17    can check the -- how -- if my finger was improving.

18          Q.   The physical therapist sent you to the finger

19    specialist?  Is that --

20          A.   Not her but the doctor in charge.  The -- at

21    the clinic I saw a doctor, and then I got the therapy

22    from a different lady.  But the doctor that I was

23    seeing, she referred me to the finger specialist.

24          Q.   For only three months?

25          A.   I think it was around three months or four.  I

Page 21

1    don't remember.  But it was separate.  It was like -- I

2    will go -- I went one week and then I wait another two

3    weeks to see and then three weeks.

4         Q.  And when in -- you said this was in June of

5    2022?

6         A.  Yes.  In between June -- it started like around

7    June.  June something.

8         Q.  So June, July, August through September?

9         A.  Yes.

10        Q.  Did you attend all of your appointments?

11        A.  Yes, I did.

12        Q.  Did you attend all of your other physical

13   therapy appointments?

14        A.  Yes, I did.

15        Q.  And after you saw the finger specialist, did

16   your finger improve?

17        A.  It was -- it was improving.  But she said I was

18   going to have pain during the cold, because that's --

19   the cold, the winter it bothers me sometimes.

20        Q.  So during the wintertime it bothers you?

21        A.  Sometimes I get like a pain.

22        Q.  And what about in the summer, like right now?

23        A.  The summer just not -- I just -- sometimes

24   the -- it bothers something, but I'm getting used to it,

25   you know.  It just -- while I'm working, you know.

Page 22

1      Q.   Does it prevent you from performing your job

2   duties?

3      A.   I'm able to work, but I have to like make it

4   work, you know, but I don't get the same -- the same

5   grip I used to get.

6      Q.   But are you able to perform --

7      A.   Yes.  I'm able to perform my work, yes.

8      Q.   Okay.  Let me just ask the question so it's

9   clear.

10          Are you able to perform your job duties as

11   an assembler?

12      A.   Yes.

13      Q.   Have you ever seen a psychiatrist or

14   psychologist or clergy or anything -- or anyone else for

15   any mental or emotional problem?

16      A.   Yes.  I'm seeing a psychiatrist.

17      Q.   Who is that?

18      A.   Julia.  I forget her -- I forget her last name.

19   But I know her name is Julia.

20      Q.   And you said she's a psychiatrist or a

21   psychologist?  Does she prescribe medication?

22      A.   No.  She doesn't prescribe medication.  She

23   just gives me therapy.

24      Q.   Okay.  How long have you been seeing Julia?

25      A.   Since, I think, for a -- two or three months I

Page 23

1     think.

2          Q.   Since early 2024?

3          A.   Early -- yes.  I think so, yes.

4          Q.   What was the reason you saw -- started seeing

5     Julia?

6          A.   For my stress and anxiety and depression.

7          Q.   Relating to what?

8          A.   Work related.

9          Q.   All work related?

10         A.   All work related.

11         Q.   There is nothing in your personal life that

12    causes you stress?

13         A.   No, ma'am.

14         Q.   Before Julia, did you ever see any other

15    psychologist, psychiatrist?

16         A.   Yes.  The psychiatrist that referred me to her.

17         Q.   Who is that?

18         A.   Healing -- Healing Soul -- Healing Souls in

19    Garland.

20         Q.   Sorry.  What was the name?

21         A.   Healing minds.  I think Healing Souls in

22    Garland.

23         Q.   Can you spell that for me?

24         A.   Healing, H-E-A-L-I-N-G, Souls, Healing Souls.

25         Q.   Oh, Healing Souls.

Page 24

1           MS. COLE:   S-O-U-L-S.

2      Q.   (BY MS. ASHTON)   Oh, okay.   Sorry.   That's the

3  name of the clinic?

4      A.   Yes.

5      Q.   Okay.   Okay.

6      A.   Psychiatrist.

7      Q.   Okay.   So when did you go to -- start seeing

8  Healing Souls?

9      A.   Latest I think in March 2022.

10      Q.   And you don't recall who you saw there?

11      A.   It's two ladies that -- Eunice.   I think her

12  name is Eunice.

13      Q.   Eunice is one of the psychiatrists?

14      A.   Yes.

15      Q.   How often did you go to Healing Souls?

16      A.   I will go like -- I started going twice a week

17  and then once a week and then I would go like every

18  three weeks.

19      Q.   So it started out twice a week?

20      A.   Yes, sir.

21      Q.   And then you reduced it to once a week?

22      A.   I think -- I'm not -- but I think so, yes.

23      Q.   And then it was every three weeks?

24      A.   Yes.   And then every time it -- if I would get

25  worse, he would schedule me back to two weeks.

Page 25

1          Q.   Okay.   Okay.   So you started going to

2     Healing Souls in March of '22; correct?

3          A.   Uh-huh.

4          Q.   At that time were you prescribed any

5     medications?

6          A.   Yes, I was.

7          Q.   What were you prescribed?

8          A.   I think it's -- it's for anxiety.  I don't

9     recall -- I have the generic names.  I haven't been -- I

10    think it's -- one of them starts with T and then with an

11    H.

12         Q.   So you were put on two medications?

13         A.   It's -- it's three or four I think.

14         Q.   You were put on three or four medications?

15         A.   Yes.

16         Q.   All relating to what?

17         A.   Like -- like anxiety and stress and I couldn't

18    sleep at night.

19         Q.   Okay.  And you said today that you're not

20    on any --

21         A.   I'm not on any today.

22         Q.   Okay.  Let me finish my sentence.  Okay.

23              Today you're not taking these three or four

24    medications; is that correct?

25         A.   Yes.  Today.

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                    www.veritext.com

Page 26

1     Q.   When did you stop taking these medications?

2     A.   I just stopped I think -- I just stopped I

3     think two days ago.  I didn't take them.

4     Q.   Two days ago?

5     A.   Three days ago.  Yes.

6     Q.   You stopped taking these three medications

7     three days ago?

8     A.   I was -- I told the therapist I wanted to see

9     if the therapy was helping me without the medication.

10    Q.   Okay.  Typically when you get off of depression

11    or anxiety medications, they have you do it -- you know,

12    they stagger the amount.

13         So did you just stop taking them entirely

14    or are you weaning off of them?

15    A.   I was -- I had called the doctor saying that I

16    had a headache one time.  And I was afraid it was from

17    side effects.  He told me to hold on, you know,

18    and let -- then I talked to the therapist, I asked the

19    therapist, can it work -- can we work, you know, because

20    I don't -- I don't want to keep taking medication for

21    the rest of my life.  Can we --

22         So she's helping with the therapy, like

23    to -- to see -- because he said sometimes you need to

24    medicate, but the therapy that she gives me, it's giving

25    me -- she's helping me a lot.

Page 27

1      Q.   So the therapy that you're getting with Julia

2  is helping you the same way that the meds were helping

3  you?

4      A.   She kind of makes me how to -- I was -- I was

5  shocked how she show me whatever my mind was saying.

6      Q.   Okay.  But as of three or four days ago you're

7  not on any medication?

8      A.   I stopped because I had -- I told the doctor I

9  had a headache, you know, and already it was a side

10  effect.

11      Q.   Of which one?

12      A.   There's one or two of them.  Yes.

13      Q.   But you stopped all of them?

14      A.   I stopped all of them, yes.

15      Q.   And what was the dosages of these medications?

16      A.   One -- two of them -- two of them was once a

17  night.  And Tramadone, it was with a T, that was three

18  times depending on my anxiety.

19      Q.   Is it Tramadone?

20      A.   Yes.  Tramadone.

21      Q.   Okay.  So you -- do you know what the dosage

22  was of each pill?

23      A.   Like -- I think I'm recalling maybe 10 or

24  20 milligrams.

25      Q.   Okay.  So you would take that up to three times

Page 28

1    a day?

2         A.   If I had anxiety, but I never took that much

3    amount.  But that's -- that's what the bottle says.

4         Q.   It is that you could take --

5         A.   That you could, yes.

6         Q.   But you did not?

7         A.   I never took the three ones.  I would just take

8    one.

9         Q.   Okay.  And what about the other medications?

10        A.   I think it was just one.  I just did one.  But

11   I will make sure I took them like two hours separate at

12   night.

13        Q.   Okay.  Since March of 2022 through three days

14   ago, was there ever a time period when you stopped

15   taking the medications?

16        A.   She -- she told me, like you said, she told me

17   to -- she reduced the dosage.  She told me to slow down

18   like that --

19        Q.   When was that?

20        A.   Like in, I think in August.

21        Q.   August of 2023?

22        A.   2022.  '22.  Yes.

23        Q.   Okay.  So from March 2022 through August 2022,

24   you were on a higher dosage?

25        A.   Yes.

Page 29

1          Q.   Effective August of 2022, how did she reduce

2     it?

3          A.   She reduced the milligram, I think.

4          Q.   Okay.  Did you still take them every day or was

5     there ever a time where you would skip them?

6          A.   I would -- I wouldn't take it.  But she did the

7     first time.  She gave me -- I forgot.  She gave me --

8     she told me to -- to I think not -- not -- not every

9     day.  To like once to three days.

10         Q.   Sorry.  Can you say that one more time?  She

11    told you....

12         A.   Not -- not as prescribed.  But she prescribed

13    them but she told me not to -- not like -- because I was

14    supposed to -- because you have to let your body absorb

15    the, I think, the milligrams.  Yeah.

16         Q.   So you did not take them every day beginning in

17    August of '22?

18         A.   Not -- not every day like I was before.  Not

19    like the first time.

20         Q.   Were things improving stress-wise in August of

21    '22, which is why she suggested --

22         A.   Yes.  I told her I was improving, but the one

23    thing I was not it was -- my OCD was not improving a

24    little bit.

25              THE REPORTER:  Was improving?

Page 30

1              THE WITNESS:  It was -- wasn't.  It was but

2     it wasn't -- in some occasions.

3          Q.  (BY MS. ASHTON)  Do you also have OCD?

4          A.  Yes, related to my work.  I started doing OCD

5     at work, because I didn't want Jackie to come at me.

6          Q.  Okay.  We'll talk about this in a second.

7              Okay.  So we talked about 2022.  So from

8     August of 2022 through three days ago, did the amount of

9     medication you were taking ever change?

10         A.  What do you mean?

11         Q.  So from August of 2022 when she reduced the

12    dosages and you didn't take them every single day, was

13    that the regimen that you were on through the present?

14         A.  I don't -- I don't remember.

15         Q.  Was there ever a time between August '22 and

16    three days ago when you didn't take them at all?

17         A.  No, there was never a time.

18         Q.  You always took a little bit?

19         A.  I always took some, yes.

20         Q.  Okay.  What is the OCD medication?  Do you know

21    what it's called?

22         A.  It's -- it's all for the same thing, they told

23    me.  It's the same medicine.

24         Q.  Do you remember which one it's called though

25    specifically for OCD?

Page 31

1       A.   No.   But I'm -- I'm -- I'm taking medicine for

2   OCD, but it's the same medicine for my OCD, my PTSD.

3   It's -- it's all for the same thing.

4       Q.   Okay.   Let me just make sure I'm understanding

5   what the medications are for.

6            So we said anxiety, stress, sleep and then

7   OCD and PTSD?

8       A.   Yes.

9       Q.   Is there anything else that you're taking them

10  for?

11      A.   No.

12      Q.   Okay.   And the three to four medications that

13  you were -- you were talking about, one of which is

14  Tramadone; correct --

15      A.   Uh-huh.

16      Q.   -- that treats all of these issues?

17      A.   There's -- there's some other ones but I forgot

18  the names.

19      Q.   Okay.   If you remember the names sometime

20  today, will you remember to tell me?

21      A.   Okay.

22      Q.   Okay.   Are any of them like Prozac, Lexapro?

23      A.   I think so.   But it's the generic brands,

24  that's why I don't --  I don't --

25      Q.   Okay.   The PTSD, what is that?

Page 32

1      A.   It's -- I get the PTSD -- whenever I went to

2   the therapist, I told her that I went back to the people

3   I used to work with because that -- that department that

4   I'm on -- I'm one -- I'm one of the most

5   knowledgeable -- they're seeing my knowledge there.  And

6   I'm one of the most knowledgeable there that drives the

7   machines with -- with the engine being on, with the -- a

8   machine called the mule, which we have to hook up to the

9   tracks so we can maneuver out.

10              And -- and that rig that I needed -- they

11  wanted me to work on was in the other department where I

12  used to get hassled.

13              And I told my lead -- my new leadman, I

14  said it was going to be hard for me to go back in that

15  area.

16              And whenever my leadman introduced me to

17  the new manager saying, "This is Edgar Reyna.  He's the

18  one -- he's of the knowledgeable guys we got.  He's

19  going to be the one driving the machine out, the rig out

20  in a safe way."

21              But somehow when my -- guy that -- the

22  other lead Thang Nguyen --

23              THE REPORTER:  The other....

24      A.   The other leadman that I used to work under

25  before, he was the one giving me orders.  So whenever I

Page 33

1    was about to drive the machine, he started yelling.

2                You know, I heard his voice whenever he --

3    he's giving me directions, he brought me back flashbacks

4    and memories and I froze.  I couldn't move the machine.

5    And I apologized to my new leadman.

6                I told him, "I -- I can't do it.  I'm

7    sorry."

8                I wasn't able to -- to control the machine.

9    I felt -- I felt -- I felt like I failed, I told him,

10   and I couldn't move the machine.

11       Q.  (BY MS. ASHTON)  The PTSD is -- what was the

12   origin of it?  What did it -- how did it start?

13       A.  I didn't -- I told the therapist I didn't know

14   I had PTSD until I went in to her.  I told her my frozen

15   moments, and when I got -- when I get flashbacks and

16   when I freeze and when I get fear.

17               And that's when she told me -- she

18   introduced me to PTSD.  I didn't --

19       Q.  But I guess my question is:  Is it -- is it

20   something that occurred at work or is it something that

21   occurred outside of work?

22       A.  At work.

23       Q.  It's all work related?

24       A.  It's all work related.

25       Q.  And what about your OCD?  What is -- what is

Court Reporting Cost Containment    1-866-318-1233
A Veritext Company    www.veritext.com

Page 34

1    the OCD?

2         A.   It's work related.

3         Q.   But what is -- what is the --

4         A.   Whenever I repeat things twice.  I have to

5    repeat things twice.

6         Q.   And when did that start?

7         A.   Every time that I work -- I would -- I would do

8    my work twice to make sure I didn't -- I didn't want

9    Jackie to come at me.  I didn't want to give him a

10   reason to attack me.  So I had to make sure my work was

11   done perfect.

12             Because he would tell, "Make sure it's

13   right.  I don't want to come back."

14             So every -- every job that I did I had to

15   do it twice.  If it was not the same day, I would come

16   back the next day and do the same thing.  I would take

17   it and redo it.

18        Q.   When did that start though?

19        A.   Like around 2018.

20        Q.   2018 is when the OCD started?

21        A.   Yes.

22        Q.   Okay.  Prior to March of 2022, had you ever

23   taken any medication for anxiety, stress, for sleep?

24        A.   I haven't.  I was so afraid to seek help.  I

25   didn't want to seek help.

Page 35

```
 1         Q.   So you've never taken --
 2         A.   No.
 3         Q.   -- medications for those issues?
 4         A.   Only -- not for -- no.  One time it happened in
 5    2022 whenever I was taken to the ER, they gave it to me
 6    at the hospital.
 7         Q.   Okay.  I -- I meant prior to 2018 --
 8         A.   No.  I never took those, no.
 9         Q.   You were never prescribed --
10         A.   I never seek help.  I never seek -- I didn't --
11    I didn't -- I was so afraid to seek help.
12         Q.   My question though is, prior to 2018, just to
13    make sure I'm clear, you were never prescribed anxiety,
14    depression medications?
15         A.   No.
16         Q.   Okay.  And I'm sorry.  How often did you say
17    you see Julia?
18         A.   It's once a week, but she made it now twice a
19    week.
20         Q.   Okay.  And before Healing Souls, did you see
21    any other psychiatrist, mental health provider?
22         A.   No, I didn't.
23         Q.   Have you ever been fired from a job before?
24         A.   No, ma'am, not that I recall.
25         Q.   Where did you work before Epiroc?
```

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

Page 36

1          A.   Before Epiroc, I think I was working at the --

2     an AC company, Robert & Sons.

3          Q.   How long were you there?

4          A.   It was just --

5               THE REPORTER:   What's the name of it?

6               THE WITNESS:   Robert & Sons.

7               THE REPORTER:   Robert.

8               THE WITNESS:   And Sons.

9          Q.   (BY MS. ASHTON)   How long were you there?

10         A.   For -- it was -- it was temporary.   A couple of

11    months.

12         Q.   Why did you leave?

13         A.   It was -- it was -- it slows down during the

14    winter.   I didn't leave -- that's when I got a call from

15    Epiroc, and I went to the interview.

16         Q.   Okay.   And before Robert & Sons, where did you

17    work?

18         A.   Before Robert & Sons.   I think I worked at CBR.

19         Q.   CBR?

20         A.   Yes, I think.

21         Q.   What do they do?

22         A.   They build the machines for the oil, for the

23    oil rig, for the oil industry.

24         Q.   What did you do for them?

25         A.   Assembler.

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company          www.veritext.com

Page 37

1      Q.   Was it assembler similar to what -- what you do

2   now at Epiroc?

3      A.   It was -- it was -- it was not -- not big

4   machines like them.  Smaller machines like semi-trucks,

5   like Peterbilt.

6      Q.   But other than that, was it a similar job?

7      A.   It was a similar job, yes.

8      Q.   How long were you at CBR?

9      A.   I think for a year and something.  A year and

10   something each -- each of them.

11      Q.   And that's when you went to Robert & Sons?

12      A.   I think -- I don't recall, but I think I did,

13   yes.

14      Q.   Did you ever make any -- at any other

15   employment outside of Epiroc, have you ever made any

16   complaints?

17      A.   I don't recall, ma'am.  I don't recall.  I

18   have -- I had never made complaints.  I never recall.

19      Q.   You've never complained of discrimination or

20   retaliation before?

21      A.   Not -- not that I recall.

22      Q.   Have you ever had, other than your finger, have

23   you had any other disabilities?

24      A.   I did have a -- my -- my injury I had on my

25   other job in 2007.

Page 38

1      Q.  What was that?

2      A.  International.

3      Q.  The job was called -- it was -- the company was

4   International?

5      A.  Yes.

6      Q.  Was it called something other than

7   International, like --

8      A.  It was SST Trucking, I think.

9          THE REPORTER:  It was what?

10         THE WITNESS:  SST Trucking.

11     Q.  (BY MS. ASHTON)  SST Trucking.

12     A.  Yes.

13     Q.  What was your injury in 2007?

14     A.  My -- my finger.

15     Q.  The same finger?

16     A.  No.  It's the middle finger.  It's the finger.

17   My index finger is Epiroc, and my middle finger was the

18   other place.

19     Q.  Okay.  So index finger on which hand?

20     A.  Left hand is from Epiroc, and the middle finger

21   left hand is from International.

22     Q.  What was that injury, the middle finger injury?

23     A.  The line -- the line got jammed.  The line

24   while I'm working, the line got jammed, and it jerked

25   and wherever I was working, fell on my finger.

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

Page 39

1     Q.   What fell on your finger?

2     A.   The drive shaft.

3     Q.   The what?

4     A.   The drive shaft.

5     Q.   What is that?

6     A.   The drive shaft is the drive shaft that

7     connects the -- to the axles, differentials together,

8     binds them together.

9     Q.   Is that heavy?

10    A.   It's heavy.  Yeah, it's heavy, yes.

11    Q.   Okay.  I assume that's what -- was it a crush

12    injury also?

13    A.   It -- it was crush, yeah.  It cut -- it cut the

14    tip off my finger.

15    Q.   It cut the tip of your finger.  Off?

16    A.   Yes, it cut it off.

17    Q.   Okay.  Because you don't have a fingernail on

18    that finger.

19    A.   It cut the tip off, and they were able to put

20    it back, whatever it had left.

21    Q.   Okay.  And so -- but it was a similar injury

22    crush -- because it was a crush injury than on your

23    index finger from Epiroc?

24    A.   It was -- I don't know if it was similar, but

25    it was -- was -- what do you mean similar?

Page 40

1       Q.   They were both crush injuries; correct?

2       A.   Yes.   Crush injuries.

3       Q.   And it looks like the middle finger injury was

4    more severe; is that correct?

5       A.   It just -- it just cut -- it just missed the

6    tip.   That's it.

7       Q.   Well, looking at your fingers, you still have

8    your nail on your index finger from -- correct?

9       A.   Yes.

10       Q.   But your middle finger is missing the tip;

11    correct?

12       A.   Yes.   It's missing the tip.

13       Q.   Okay.   And from your middle finger injury, did

14    you have any function issues with your hand?

15       A.   I -- I do -- what do you mean "function"?

16    Like --

17       Q.   Following your injury to your middle finger in

18    2007, did you have any issues using your left hand?

19       A.   No.   I didn't have -- I was -- I'm able to --

20    it moves better than this finger.

21       Q.   Your middle finger moves better than your index

22    finger?

23       A.   Yes.

24       Q.   From after the injury?

25       A.   Yes.

Page 41

1      Q.   Okay.

2      A.   It took -- it took years probably but now it

3   moves better than I first --

4      Q.   It took years for your middle finger to heal?

5      A.   Yeah.  At first it wasn't -- at first it

6   wasn't, but now this time, it moves better than my left

7   hand.

8      Q.   Okay.  And just -- let me just finish this

9   sentence so I make sure the record is clear.

10                 It took years for your middle finger to

11   heal so that you could regain usage in your hand; is

12   that correct?

13      A.   I didn't know how -- how long but now I can

14   maneuver it more than before.

15      Q.   Okay.  When you were at SST Trucking when that

16   injury occurred, did you request any sort of medical

17   accommodations following your accident?

18      A.   No.  I didn't do nothing.  I just -- they gave

19   me -- go to a doctor.  And that was it.  I went to the

20   doctor.

21      Q.   I assume you weren't able to use your left hand

22   for some period of time?

23      A.   Oh, yes.  They gave me light duty, light-duty

24   work.  Yes.  They gave me --

25                 THE REPORTER:  Excuse me?

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 42

1      A.   Paperwork.  I was -- I was in an office doing

2   paperwork.

3      Q.   (BY MS. ASHTON)  You were on light-duty work --

4      A.   Yes.

5      Q.   -- following your middle finger injury?

6      A.   Yes.

7      Q.   Do you recall for how long?

8      A.   For almost -- for a while.  I remember it was

9   for a while.

10      Q.   When did you leave SST Trucking?

11      A.   In 20 -- they shut down in 2013.  20 -- March.

12   I can't remember.  March 2013.

13      Q.   Is that when you left?

14      A.   Yes.  Everybody left at that time.  And that's

15   when they send us to college.  That's when I got my

16   certificate after that.

17      Q.   Okay.  So you -- the reason you left

18   SST Trucking is because the company shut down?

19      A.   Shut down, yes.

20      Q.   Okay.  From 2007 through 2013, what was your --

21   were you -- did you say you were an assembler there?

22      A.   Yes, assembler.

23      Q.   You were in a similar role than at Epiroc?

24      A.   It's -- it's -- over there I was assembler,

25   floater, leadman.

Page 43

1      Q.   Did you ever make any complaints of

2   discrimination at --

3      A.   Not that I recall.

4      Q.   -- SST Trucking?

5      A.   Yes.  Not that I recall.

6      Q.   Okay.  So you've never filed any --

7      A.   To the EEOC, no.

8      Q.   Let me just ask the question.

9      A.   Okay.

10      Q.   You never filed any charges with any

11   administrative agency?

12      A.   No.  No.

13      Q.   Other than the injury in 2007 and the injury at

14   Epiroc, have you had any other injuries?

15      A.   No, ma'am.

16      Q.   No other disabilities?

17      A.   My -- not work related, but I had an issue with

18   the -- my back.  I had a pinched nerve.

19      Q.   When was that?

20      A.   I don't really recall the year, but I think it

21   was -- I don't know if it was '21 or '20, 2020 or '21.

22      Q.   Okay.  And what did you do about it?

23      A.   I had a procedure with stem cells.  I took FMLA

24   from work for a month and a half, I think.

25              THE REPORTER:  You took off a month?

Page 44

1           THE WITNESS:  And a half.  For that

2    procedure.  FMLA.

3           Q.  (BY MS. ASHTON)  You took FMLA for about a

4    month and a half in either 2020 or 2021?

5           A.  Yes.

6           Q.  And that was while you were at Epiroc?

7           A.  That was at Epiroc, yes.

8           Q.  And the purpose of that was to get back

9    treatments?

10          A.  It was -- I had a pinched nerve, so they put

11   stem cells.

12          Q.  Did it work?

13          A.  It worked, yeah.

14          Q.  And did you take that leave without any issue?

15          A.  Yes, I didn't have -- I didn't have issues.

16          Q.  When you returned from that leave, did you need

17   any sort of accommodation?

18          A.  No, I didn't.  I was able to -- I was ready to

19   get, you know, get going.

20          Q.  When you returned from that leave, you went

21   straight back into your assembler role?

22          A.  Yes, I did.

23          Q.  Any other disability injury that we haven't

24   talked about?

25          A.  No.  No.  Huh-uh.

Page 45

1      Q.  All right.  You signed your offer letter for

2   Epiroc in November of 2017.

3                  Is that what you recall?

4      A.  I think it was -- yes.  I think -- I got

5   hired -- I know I got hired in, yes, in November

6   something.  Yes.

7                  (Exhibit No. 1 marked.)

8      Q.  (BY MS. ASHTON)  I'll hand you Exhibit 1.  Does

9   this document look familiar to you?

10     A.  I think it does, yes.

11     Q.  Is that your eSignature at the bottom?  It says

12  your name in the red box.

13     A.  Yes.  It says my name.

14     Q.  And it's dated November 17th of 2017?

15     A.  Uh-huh.

16     Q.  Is that correct?

17     A.  Yes.

18     Q.  And it says, "Atlas Copco Drilling Solutions is

19  pleased to extend to you the opportunity to join its

20  Garland facility as an assembler in the mid-range

21  department reporting to Jackie Gudgel on second shift."

22  Correct?

23     A.  Uh-huh.

24     Q.  Is that correct?

25     A.  Yes.

Page 46

1    Q.   Okay.  All right.  So do you recall your first

2    day on the job?

3    A.   My first day was December the 4th, I think.

4    Q.   Of 2017?

5    A.   2017.  Yes.  That's when I started.

6    Q.   Prior -- immediately prior to Epiroc, you were

7    employed but at the temporary Robert & Sons; is that

8    right?

9    A.   I think so, yes.

10   Q.   And your salary at the time you were hired,

11   according to the offer letter, was $43,700.80; is that

12   right?

13   A.   Yes.

14   Q.   And you got a shift differential?

15   A.   Differential.  Yes.

16   Q.   Since then, have you received any pay

17   increases?

18   A.   Yes.  I think I have, but I really don't, you

19   know, pay attention to -- I just, yes, I think I have.

20   I might have.  It's my shift -- I'm already maxed, my

21   salary, I think, at work.

22   Q.   You're maxed out at work?

23   A.   I think, yes.

24             After five years, you're already

25   reached the -- you don't get raised no more.

Page 47

1      Q.  After five -- after you're employed by five

2   years, you're not eligible for any more raises?

3      A.  No.  I think it's three -- I think it's

4   three -- thirty-something months, as I recall.

5                 THE REPORTER:  Three?

6                 THE WITNESS:  Three, three years, which

7   is 32 -- is a -- it's three years, yes.

8      Q.  (BY MS. ASHTON)  So right now you're not

9   eligible for any increases?

10      A.  That we did get the new -- they did give us a

11   new raise for cost of living and some other stuff, I

12   think, for everybody.

13      Q.  Do you know what your total take-home salary is

14   right now?

15      A.  It's -- I get paid 28 something as I recall.

16      Q.  Twenty-eight something an hour?

17      A.  Yes.

18      Q.  Do you know annually what that comes out to?

19      A.  I don't know, ma'am.

20      Q.  And you participated in an orientation when you

21   were first hired; is that right?

22      A.  Yes.

23      Q.  Do you remember who ran the orientation?

24      A.  Reagan.

25      Q.  Reagan?

Page 48

1       A.  Reagan.  HR, Reagan.

2       Q.  Reagan was in HR at the time?

3       A.  Yes.  HR representative.  Reagan -- Reagan --

4  Reagan Francis.

5       Q.  Representative.  HR representative.

6            Do you recall what you went over during

7  orientation?

8       A.  I think what -- the stuff they do there in

9  their harassment and discrimination policy and

10  everything and health policy.

11      Q.  That's a great segue.

12           So you received a copy of Epiroc's Equal

13  Opportunity Employment policy?

14      A.  Uh-huh.

15      Q.  Is that a yes?

16      A.  Yes.

17           (Exhibit No. 2 marked.)

18      Q.  (BY MS. ASHTON)  I'm going to hand you

19  Exhibit 2.

20           Does this policy look familiar to you?

21      A.  I think it does.  It's been so many years.

22  But, yeah, I think it does.

23      Q.  The last page of the Exhibit, Epiroc 23, this

24  is the acknowledgment of receipt and review of the EEO

25  policy; correct?

Page 49

1          A.   Yes.

2          Q.   And is this your signature on this page?

3          A.   Yes, ma'am.

4          Q.   You understand that Epiroc has a policy of

5     equal employment opportunity relating to all terms and

6     conditions of your employment; correct?

7          A.   Yes.

8          Q.   And you're aware of Epiroc's complaint

9     procedure?

10         A.   Yes.

11         Q.   And you've used the complaint procedure many

12    times during your employment; right?

13         A.   Yes, I did.

14         Q.   You are aware that Epiroc has a policy

15    prohibiting retaliation against anyone who makes a good

16    faith complaint?

17         A.   Yes.

18              (Exhibit No. 3 marked.)

19         Q.   (BY MS. ASHTON)  I'm going to hand you

20    Exhibit 3.  This is the anti-harassment policy.

21              Again, I assume this looks familiar to you.

22         A.   Yes.

23         Q.   The last page of the exhibit is the

24    acknowledgment of receipt and review of the

25    anti-harassment policy; is that right?

Page 50

1      A.   Yes.

2      Q.   And this is your signature on that page?

3      A.   Yes, ma'am.

4      Q.   And you understand that Epiroc has a policy

5   prohibiting harassment; correct?

6      A.   Uh-huh.

7      Q.   Is that a yes?

8      A.   Yes.  Yes.

9      Q.   You understand Epiroc has policy prohibiting

10  retaliation against anyone who makes good faith

11  complaint of harassment?

12     A.   Yes.

13     Q.   How did you find out about the assembler

14  position at Epiroc?

15     A.   How did I find out?

16     Q.   Yes.

17     A.   We -- we applied to -- well, me and a couple of

18  people that worked at International, we applied to

19  Epiroc in 2013.  And then they -- we didn't get called

20  until 2017 one by one.

21     Q.   You submitted your application --

22     A.   Application in 2013.

23     Q.   In 2013?

24     A.   Yes.

25     Q.   But you weren't called?

Page 51

1      A.   Until 2017.

2      Q.   Between 2013 and 2017, did you apply again or

3  you just applied that one time?

4      A.   I think just that one time, I think.

5      Q.   And you said you and a couple of guys.  The

6  guys that you applied with, were any of them also hired?

7      A.   Yes.  Jeff, I think -- well, I found out that

8  -- I know me and me and Luis Martinez did at the same

9  time.  But there -- we got interviewed, and another guy

10 that we knew from International, Jeff Perkins he said he

11 applied around the same year, but he wasn't with us.

12     Q.   Luis Martinez worked at International with you?

13     A.   Yes.

14     Q.   And he also applied at the same time as --

15     A.   Yeah.  Same time, 2013.

16     Q.   Just try to wait until I'm done.

17          THE REPORTER:  I'm having a hard time.

18     Q.   (BY MS. ASHTON)  Just -- she is -- when you see

19 the transcript, it's going to read Jamie, Edgar, Jamie,

20 Edgar, and it's -- it's just hard if we talk over each

21 other.

22     A.   I'm sorry.

23     Q.   You said Luis Martinez was also hired by

24 Epiroc?

25     A.   Yes.

Page 52

```
 1        Q.  At the same time as you?

 2        A.  I think a month earlier than me.

 3        Q.  Do you recall what position he was hired for?

 4        A.  Assembler.

 5        Q.  Do you recall who he reported to?

 6        A.  Jackie Gudgel.

 7            THE REPORTER:  What's Jackie's last name?

 8            MS. ASHTON:  It's G-U-D-G-E-L.

 9        Q.  (BY MS. ASHTON)  Anyone else -- oh, sorry --

10   you said Jeff Perkins; is that right?

11        A.  Yes.

12        Q.  Jeff also worked at International?

13        A.  Yes.

14        Q.  And what was Jeff hired to do at Epiroc?

15        A.  Assembler too.

16        Q.  Also reporting to Jackie?

17        A.  Yes.

18        Q.  Anyone else you recall who was hired around the

19   same time as you?

20        A.  No, ma'am.

21        Q.  Did you interview for the position?

22        A.  Yes.  With Jackie.

23        Q.  Did you interview with anybody else other than

24   Jackie?

25        A.  No.
```

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

Page 53

1      Q.   How did that interview go with Jackie?

2      A.   At first it went good.  Yeah.

3      Q.   Do you know who made the decision to hire you?

4      A.   I don't know, ma'am.

5      Q.   Would you assume it's Jackie considering he

6   interviewed you?

7             MS. COLE:  Objection; form.

8             You may answer.

9      A.   I don't know, ma'am.

10     Q.   You did report --

11            THE REPORTER:  I don't know?  Is that you

12   said?

13     A.   I think, yes, either -- because he said he was

14   going to report to his manager, I think.  I don't

15   know if he --

16     Q.   (BY MS. ASHTON)  Following the interview, he

17   said he was going to talk to --

18     A.   Yeah.  Or go over whoever interview, and I

19   would get letter, offer letter, email.

20     Q.   Which is what we saw; correct?

21     A.   Yes.  Yes.

22     Q.   Exhibit 1.

23     A.   Uh-huh.

24     Q.   Okay.  You reported directly to Jackie;

25   correct?

Page 54

1      A.   Yes.

2      Q.   And you reported directly to Jackie until

3  Jackie retired; is that right?

4      A.   Yes.

5      Q.   Okay.  Do you know when Jackie retired?

6      A.   I think it was, as I recall, maybe I think

7  2022.

8      Q.   Like in the summer or something?

9      A.   Yeah, in the summer of 2022.

10     Q.   When you were first hired in December of 2017,

11  you got along with Jackie; correct?

12     A.   Just job related.  Just not like --

13          THE REPORTER:  Just what?

14          THE WITNESS:  Like work related, like job,

15  but nothing else.

16     Q.   (BY MS. ASHTON)  But you got along with him at

17  work?

18     A.   Yes.  Just --

19     Q.   And throughout your employment until Jackie

20  retired, he never gave you any disciplinary counseling;

21  is that right?

22     A.   Verbally only.  Only verbally but nothing in

23  signature.

24          THE REPORTER:  Nothing in....

25          THE WITNESS:  Signature.

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company              www.veritext.com

Page 55

1          Q.  (BY MS. ASHTON)   Jackie never gave you any

2     written counseling?

3          A.  No.  No.

4          Q.  Do you think Jackie is a good person?

5          A.  No, not a good person.

6          Q.  Do you think he's an honest person?

7          A.  He's not honest.

8                    (Exhibit No. 4 marked.)

9          Q.  (BY MS. ASHTON)   I'm going to hand you

10    Exhibit 4.   This is a copy of the assembler job

11    description.

12                    I assume this document looks familiar to

13    you?

14         A.  Yes.

15         Q.  Is this an accurate description of your

16    assembler job duties?

17         A.  Yes.

18         Q.  Okay.  In the middle of the first page under

19    the box called "Principal Responsibilities," do you see

20    in bold where it says "Occasional comma Infrequent"?

21                    Right here.  Do you see that?

22         A.  Oh, occasional?  At the bottom?

23         Q.  Yes.

24         A.  Yes.

25         Q.  And it says "train new hires" is the first

Court Reporting Cost Containment                    1-866-318-1233
A Veritext Company                    www.veritext.com

Page 56

1    bullet point; right?

2        A.  Uh-huh.

3        Q.  Sorry.  Is that a yes?

4        A.  Yes.

5        Q.  So what does training entail?

6        A.  Training?  What do you mean?

7        Q.  What do you -- when you're training new hires,

8    what do you do?

9        A.  You -- you train them.  You train them like --

10   you have to train them like good, you know.

11       Q.  Let me ask this way.  So let's say there's a

12   new hire.  What part of your job day --

13            Let me ask you this:  When did you work?

14   What were your hours?

15       A.  What do you mean?  Because I know it says

16   training new hires, but not everybody at work is allowed

17   to train new -- they have -- they come and ask you.  You

18   have to have knowledge.  Not everybody trains at work.

19            Like I'm training again, because I'm one of

20   the knowledgeable guys on first shift right now.  So

21   there's other people there than me, but they don't

22   have -- they chose -- leadmen chose me because of the

23   knowledge that I have.  But it's not everybody -- not

24   everybody trains people at work.  I know it's here.

25       Q.  Okay.  And since your hire, you've been on the

Page 57

```
 1    second shift; correct?
 2         A.   I've been on first.  Yes, second, yes, since I
 3    hired, yes.  Since.
 4         Q.   You're on the second shift?
 5         A.   Yes.
 6         Q.   And what are those hours?
 7         A.   It was 3:30 to 12:00.
 8         Q.   3:30 PM to 12:00 AM?
 9         A.   Yes.
10         Q.   Have those hours been consistent throughout
11    your employment?
12         A.   Yes.
13         Q.   And Jackie is the supervisor of the second
14    shift; is that right?
15         A.   Yes.  Uh-huh.
16         Q.   Yes?
17         A.   Yes.
18         Q.   So is Jackie there 3:30 PM to 12:00 AM?
19         A.   Yes.
20         Q.   Is that Monday through Friday?
21         A.   Monday through Friday, yes.
22         Q.   And how many assemblers are on the second shift
23    typically?
24         A.   Like four, five or six.
25         Q.   Including you?
```

Page 58

```
1          A.   Including me, yes.

2          Q.   Do you recall at the time you were hired the

3     names of the assemblers on the second shift with you?

4          A.   Billy Poe, my trainer.

5          Q.   I'm sorry.  His name is --

6          A.   Billy Poe.

7          Q.   Billy Poe.

8          A.   Yes.

9               THE REPORTER:  Poe?

10              THE WITNESS:  P-O-U -- P-O-E.

11         Q.   (BY MS. ASHTON)  Poe.

12         A.   Yes.  He was my mentor.

13         Q.   Who else?

14         A.   Johnny Sanders.

15              THE REPORTER:  Say it again.

16              THE WITNESS:  Johnny Sanders.

17         Q.   (BY MS. ASHTON)  Okay.

18         A.   He -- after Billy left, he -- Johnny mentored

19    me.

20         Q.   Okay.

21         A.   And Kevin, Scott, Jamie.  And who else?

22    Fernando Valdez.

23         Q.   What is Fernando's last name?

24         A.   Valdez.

25         Q.   Valdez.  Okay.
```

Page 59

1        A.   And who else was there?  I don't remember.
2    There was other people.
3        Q.   I guess the person who was hired with you, Luis
4    Martinez --
5        A.   Luis Martinez, yes.
6        Q.   Okay.  Are any of these individuals still
7    assemblers with you now today?
8        A.   No.  Let me see.  Who -- no.  Not -- no.  Only
9    Luis.  Luis is a tester.  He works outside.
10       Q.   Luis is a tester?
11       A.   He works outside.
12       Q.   He works outside?
13       A.   Yes.
14       Q.   On the second shift?
15       A.   Not with -- not everybody on first shift.
16   We're all on first shift now.
17       Q.   Oh, you're on first shift now.
18       A.   Yes.
19       Q.   When did you move to first shift?
20       A.   October.  I think October.
21       Q.   October of '23?
22       A.   Yes.
23       Q.   Well, why did you move to first shift?
24       A.   It was -- I didn't move.  Everybody got moved
25   because they shut down second shifts.

Page 60

1     Q.   Oh, there's no second shift anymore?

2     A.   There's no second shift anymore.

3     Q.   What are the hours for first shift?

4     A.   7:00 AM to 3:30.

5     Q.   So there's only one shift?

6     A.   It's only one shift, yeah.

7     Q.   Okay.

8     A.   Yes.

9     Q.   And who's your supervisor now?

10    A.   Juan Tamez.

11    Q.   Juan...

12    A.   Tamez.

13    Q.   Tamez?

14    A.   Yes.   T-A-M-E-Z.

15    Q.   E-Z.

16    A.   Yes.   Juan Tamez.

17    Q.   And do you know the names of the assemblers

18    currently with you now?

19    A.   Yes.   I think it's Mauricio.

20    Q.   Mauricio.

21    A.   Mauricio, Freddie, Ryan, Tim.   Ryan, Tim,

22    Alexis, Rudy.

23    Q.   Rudy?

24    A.   Rudy.   Joshua and Diana.   And who else?   Juan.

25    Q.   Do you know Juan's last name?

Page 61

1        A.   Galyon.

2        Q.   Galyon?

3        A.   Galyon and -- let me see.  Damon and Aaron, the
4    guy that I'm training.

5        Q.   There's a lot more assemblers on the first
6    shift with you now than there were on the second shift?

7        A.   Yes.

8        Q.   Okay.  Did they just consolidate everybody?

9        A.   What do you mean, consolidate?

10       Q.   They got rid of the second shift so did -- when
11   they did that, did they just like bring everybody
12   together on the first shift?

13       A.   Did they -- everybody that's -- that used to be
14   on second, it's -- it's in the Station 1 to 5.

15            Everybody that's on first shift, it's on
16   Station 6 to 11, which is where I'm as, 6 to 11.

17       Q.   Okay.  The people that we named were the
18   assemblers.  And then I understand there's leadmen;
19   correct?

20       A.   Uh-huh.

21       Q.   How many leadmen are there per shift?

22       A.   Oh, I have Ricky.  Ricky is my new leadman.
23   Ricky and Long.

24       Q.   Right now?

25       A.   Yes.  And Skip.

Page 62

1       Q.  So you have Ricky.  What was the second name?

2       A.  Ricky.  Long.

3       Q.  Ricky, Long?

4       A.  No.  Ricky -- Ricky Sanchez is his last name.

5       Q.  Okay.

6       A.  But Long is -- is the other leadman,

7    electrician/leadman.

8       Q.  His name is Long?

9       A.  Long, yes.

10      Q.  Okay.

11      A.  And then the other leadman is Skip.

12      Q.  Skip?

13      A.  Skip.  Yes.

14      Q.  Do you know Long's last name?

15      A.  No.  I don't know, ma'am.

16      Q.  And what about --

17      A.  Skip.  I don't know Skip.

18      Q.  All right.  Go ahead.

19      A.  I don't Skip's last name either.

20      Q.  Okay.  When you were still on the second shift,

21   what were -- who were your leadmen?

22      A.  Peter Chung and Thang Nguyen.

23              THE REPORTER:  Say it again.  Peter Chung?

24              THE WITNESS:  Peter Chung, yes.

25              MS. ASHTON:  It's C-H-U-N-G, Chung.

Page 63

1              THE WITNESS:  And Thang Nguyen.

2              MS. ASHTON:  It's T-H-A-N-G and then

3     Nguyen, N-G-U-Y-E-N.

4              THE WITNESS:  And Mark.

5        Q.  (BY MS. ASHTON)  What's Mark's last name?

6        A.  I forgot.  I don't -- I forget Mark's last name

7     because he -- he -- he walked out.  He quit.

8        Q.  Okay.  All right.  We're going to get back to

9     this in a second.

10             So when you were on second shift and you

11    were working 3:30 PM to 12:00 AM and somebody came to

12    you and said, Hey, we have a new hire.  I need you to

13    train them.  What -- what would you do?  How would you

14    train them?

15       A.  How would I train them?

16       Q.  Uh-huh.

17       A.  I would show them the process book.  And back

18    then we used to use the process book and prints.  So I

19    would start off with the -- showing them the tools,

20    because some of them had never been familiar with tools,

21    so I would start showing them the basic tools.

22       Q.  Okay.

23       A.  And then the name of the -- describe to them

24    the parts because whenever I started, nobody -- I

25    didn't -- at first, you know, it was -- it was -- it

Page 64

1    was -- yeah.  Because a lot of people don't know the --

2    the book doesn't show you the parts.

3         Q.  Okay.

4         A.  So I kind of would go through the book.  I read

5    it with them, and I would show them the parts before

6    we grabbed them.

7         Q.  Okay.

8         A.  And then we go to the BOM book, which is the --

9    once you get the print, you get the BOM because you have

10   to look at the print and look at the -- at the -- the

11   bubbles.  It gives you the items and how many items you

12   need.  And then you go to the BOM and you find the --

13              THE REPORTER:  What is that?  BOM?

14              THE WITNESS:  The BOM.  Building material.

15              MS. ASHTON:  It's an acronym.  BOM.

16              THE WITNESS:  BOM.

17        Q.  (BY MS. ASHTON)  What is it -- do you know what

18   it stands for?

19        A.  It's building material.  It's -- it's --

20   it's -- I don't know, but I know it's building -- it's

21   called building material.

22        Q.  Okay.

23        A.  It's where you have -- you get all the -- you

24   get all the parts, all the part numbers from the print

25   there.  And you get all the part numbers.  You get the

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 65

1    part numbers for -- some of them they're warehouse, and

2    some of them are floor locations.

3              So if they're -- they're warehouse, they're

4    going to be in a different pick.  If they're floor

5    items, they give you a location for it.  And they give

6    you that amount, the amount of hardware that you're

7    going to need, a correct amount.

8              THE REPORTER:  Of hardware?

9              THE WITNESS:  Yes.  Because you need

10   hardware to install some of the parts.

11       Q.   (BY MS. ASHTON)  Okay.  So that's sounds like

12   your first day.

13              So how long is training?  Like is it a

14   week-long process?  Is it a couple of days?

15       A.   Oh, to train somebody?

16       Q.   Yes.

17       A.   It's -- it's -- it takes time.  It takes time

18   because sometimes it takes -- the first week, I think

19   right now with this new guy, the first week it's been

20   like learning the -- because he never had a background

21   with mechanical, so, you know, he's learning the tools

22   first, and you get him familiar with the machine.

23              At first you get familiar with the machine,

24   and then you -- you get familiar with the -- with the

25   parts.

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

Page 66

1       Q.   Generally, though -- because you said you're
2    training somebody named Aaron right now; correct?
3       A.   Yes.
4       Q.   So how long is that going to take you to train
5    Aaron?
6       A.   I just -- because -- it wasn't just -- just me.
7    It was Mauricio.  They gave it to me like for one week
8    only.  Because Mauricio had it for another week.  But
9    now the last week that I have him, this -- this week
10   would have been my last week to him but he's going --
11   now they're doing it different.
12              Every three weeks in one department, and
13   after three weeks, they go to a different department and
14   then --
15       Q.   To learn that department?
16       A.   To learn that department.  And they send him
17   back and then like that.
18       Q.   Okay.  Before you were on first shift, while
19   you were on second shift, when you were training an
20   individual, how would you get chosen to train them?
21       A.   How would I get chosen to train them?
22              The leadman would ask around who wanted to
23   train.
24       Q.   They would ask the assemblers who would be
25   interested --

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 67

1        A.   Do you feel like training?  Do you feel you can

2   train somebody?  Yes, they'll ask.

3        Q.   So was it a voluntary thing?

4        A.   Sometimes it was voluntary.  Sometimes they

5   would just give it to you.

6        Q.   Sometimes they would ask if you wanted to train

7   and other times they would say, Hey, you're training

8   this person?

9        A.   You have to train, yes.

10        Q.   Okay.  And was there ever a time when you could

11   say no, I don't want to train?

12        A.   Yes.  But I never said no.  Just -- I just -- I

13   never like -- I said, "Okay."  I never -- I never said

14   no.

15        Q.   Is training the same thing as mentoring?

16        A.   I don't know.  What do you mean, like same

17   thing?  Almost -- like mentoring and training?  It's

18   almost the same thing, because you're showing somebody

19   how -- what to do, and would usually -- with mentoring

20   it's different, because mentoring is just verbally.  You

21   tell them what -- you just come and tell them, grab

22   this, grab that.  And you don't --

23        Q.   The reason I'm asking is we're going to go

24   through the charges that you filed and things.

25        A.   Okay.

Page 68

1    Q.   And some of the issues you raise involve

2    mentoring.  And I'm just curious what mentoring is and

3    how it's different, if it is at all, from training.

4    A.   It's almost the same thing.  Yes.

5    Q.   Okay.  On the job description, Exhibit 4, I

6    don't see anything on here on mentoring; is that

7    correct?

8    A.   No.  There's nothing here because the

9    mentoring, they -- they -- they gave it to us.  But

10   right now that I'm training, they call it mentoring.

11   Q.   So it's interchangeable, mentoring and

12   training?

13   A.   It's interchangeable at work, yes.  Because

14   Juan asked me, "You're going to mentor somebody."

15            "Okay."

16            "Do you mind?"

17            I said, "No, I don't mind."

18   Q.   How often do you get new hires in order to

19   train them?

20   A.   It all depends if the company is -- like has a

21   lot of work, I think.

22   Q.   Have you ever had to train two people at one

23   time?

24   A.   Yes.  Yes, I have.

25   Q.   Does training take up a full day, or are you

Page 69

1    able to still perform your assembler job duties?

2         A.   You -- you can perform your assembler job, like

3    you do before.  It's -- it's time consuming.

4         Q.   Training is?

5         A.   Yes.  Because you have to go slow.  You can't

6    go at the pace that you go when you're by yourself.

7         Q.   Okay.  And is that why some people don't like

8    to do it?

9         A.   Yes.  Some -- some people don't want to because

10   it stops them from getting whatever they want to get

11   done.

12        Q.   And how is your job performance measured?  I

13   mean, why is that -- is it a problem if it takes

14   somebody slower to do it?

15        A.   Yes.  Because some -- some -- I notice

16   people -- some people work -- they -- they don't --

17   because some -- you run into people that had never hold

18   tools before, like never in the life --

19             THE REPORTER:  Have never....

20             THE WITNESS:  Never had a tool in their

21   hand.

22             MS. ASHTON:  Held tools before.

23        A.   They had never like grabbed -- some of them had

24   grabbed needles, because they were nurses.  They never

25   had like a wrench or impact in their hand.

Page 70

1            And -- and some people don't -- at work

2     don't want to -- don't have the patience to, you know,

3     to have somebody from the beginning like that.

4            Q.   (BY MS. ASHTON)   And you're working on a rig;

5     is that correct?

6            A.   Yes.  On a rig.

7            Q.   What is the primary job that you're doing?

8     What is the goal of -- as an assembler on a rig?

9            A.   Your goal is to finish wherever first shift

10    left off.  We go by a task.  They give us a task

11    wherever first shift left off, so we have to finish what

12    they left off.

13           Q.   And what -- generally what is the task?  What

14    are you --

15           A.   Like -- let's say we're on Station 1, and

16    what -- and in Station 1 you have the -- you set the

17    frame on the rig mover, and then you -- you put your --

18    your fuel tank, your yoke, and a couple of other

19    components.

20            And first shift didn't complete it, so

21    that's when they give us a pass down, and they tell us

22    what first shift left off, and then we go see where they

23    left off, whatever is not signed off, we check on the

24    rig, if it's there, if it's not there.  And if it's not

25    there, we complete what they didn't finish.

Page 71

1      Q.  So by the end of the second shift is there an

2   expectation of how far you'll get --

3      A.  Yes.

4      Q.  -- before first shift then comes back?

5      A.  You -- our goal is to finish one station per

6   day.

7      Q.  One station per day?

8      A.  Per day, yes.

9      Q.  And what is a station?

10     A.  A station is -- back then it was different when

11  I started, but now I was doing everything stationary.

12  They -- they want to do it kind of like production line.

13  They want it to be moving line, like they want -- one

14  day Station 1, next day Station 2, next day Station 3.

15          And back then it was different.  When I

16  started, it was different.  The machine was in one --

17  one station.  We'll finish the machine all the way

18  through the end when we drive it out.

19          But now since they got -- I think they

20  want it -- they have a lot of work, and they want like a

21  flowline.

22     Q.  Okay.

23     A.  So whatever you get done on Station 1, which is

24  one of the heaviest components, you go first.  And then

25  from there you go to smaller components and then the

Page 72

1    hosing and the wiring.

2              So you have to work with electricians and

3    assemblers at the same time, welders.

4         Q.   Okay.  If there's not any new hires, there's no

5    training duties; is that right?

6         A.   There's no new hires?  `Yes.

7         Q.   There's no one to train; correct?

8         A.   Uh-huh.

9         Q.   Is that yes?

10        A.   Yes.

11        Q.   Okay.  Who is Matt Buttacavoli?

12        A.   That's my -- our production manager.

13        Q.   He's still your production manager today?

14        A.   He's still our production manager, yes.

15        Q.   Did you ever report directly to Matt?

16        A.   What do you mean, report to Matt?

17        Q.   The supervisors report to Matt; is that

18   correct?

19        A.   Yes.  Yes.

20        Q.   So Jackie reported to Matt?

21        A.   Yes.  Uh-huh.

22        Q.   Yes?

23        A.   Yes.

24        Q.   And your supervisor right now is --

25        A.   It's Juan Tamez.

Page 73

1      Q.  Juan Tamez.

2      A.  Yes.

3      Q.  And Juan reports to Matt?

4      A.  Yes.

5      Q.  Okay.  Do you think Matt is an honest person?

6      A.  At this time, no, he's not an honest person.

7      Q.  Did you ever think he was?

8      A.  At first I thought he was, to be honest, I

9  thought he was and then when --

10     Q.  When did that change?

11     A.  Whenever I go -- whenever they would take me to

12  HR.

13     Q.  Do you have a -- is there a specific time?

14     A.  HR?  No.  It was a lot of times.

15     Q.  My question is:  Do you have a specific time or

16  something that happened that made you believe Matt is

17  not an honest person?

18     A.  Honest?  Let me see.  Honest because -- when he

19  walked me out.

20     Q.  And you're referring to the light-duty ending?

21     A.  Yes.

22     Q.  Okay.  We'll talk about all of that.

23          Who is Tim Choate?  And I could be

24  pronouncing these names incorrectly.  But it's

25  C-H-O-A-T-E.

Page 74

```
 1        A.   Tim Choate is the supervisor.

 2        Q.   Is he still there?

 3        A.   He's still there.

 4        Q.   Did you ever report directly to Tim?

 5        A.   No, ma'am.

 6        Q.   He's the supervisor over what area?

 7        A.   Small subs.

 8        Q.   Small subs?

 9        A.   And towers.

10        Q.   And towers?

11        A.   Yes.

12        Q.   On the second shift?

13        A.   On second shift, yes.

14        Q.   Do you think Tim is an honest person?

15        A.   No.

16        Q.   Who is Scott O'leske?  O comma -- not comma --

17   L-E-S-K-E.

18        A.   Scott O'leske was an assembler.  He retired.

19        Q.   Was he on the second shift?

20        A.   Second shift, yes.

21        Q.   When did he retire?

22        A.   I think in 2022.

23        Q.   2022?

24        A.   Yes.

25        Q.   Did you think Scott was an honest person?
```

Court Reporting Cost Containment                1-866-318-1233
A Veritext Company                    www.veritext.com

Page 75

1          A.   Sometimes.   Sometimes he was racist.
2     Sometimes --
3                    THE REPORTER:   Sometimes he was....
4                    I can't hear you.
5                    THE WITNESS:   Honest but not really because
6     he was -- no.
7          Q.   (BY MS. ASHTON)   And Peter Chung, we had talked
8     about Peter was a leadman?
9          A.   Uh-huh.
10         Q.   Is that correct?
11         A.   Yes.
12         Q.   Is Peter still there?
13         A.   Peter's still there.
14         Q.   Is Peter -- he's not your leadman anymore; is
15    that right?
16         A.   He's supervisor.
17         Q.   Peter is the supervisor now?
18         A.   He -- he stepped in when Jackie retired.
19         Q.   Oh, okay.   So Peter took over Jackie's job?
20         A.   Yes.
21         Q.   But Juan Tamez is now your supervisor, so --
22         A.   Yes.
23         Q.   Who does Peter supervise?
24         A.   Mostly people that were on second shift.
25         Q.   That would have been you; right?

Page 76

1      A.   Yes.

2      Q.   But he doesn't supervise you?

3      A.   He doesn't supervise no more.

4      Q.   But he still works first shift?

5      A.   Still works first shift, yes.

6      Q.   Do you ever report to Peter?

7      A.   Yes.

8      Q.   When he was your leadman?

9      A.   When he -- he was my supervisor in the last

10   months that we moved.  Yes.

11      Q.   Okay.  So after Jackie retired and before they

12   eliminated the second shift, Peter was your supervisor?

13      A.   Yes.  Supervisor.

14      Q.   Do you think Peter is an honest person?

15      A.   At first he was, and then after -- then he

16   changed.

17      Q.   Do you -- what -- what was the time that you

18   believe he changed?

19      A.   I think it was in 2022.

20      Q.   Do you recall what happened?  Was there a

21   specific event?

22      A.   He -- he told me to stop complaining about

23   Jackie, that it was only going to get worse.  It was

24   never going to be fixed.

25      Q.   Was this one of the recorded calls that you

Page 77

1    did?

2         A.   At first he asked me if I -- that same thing

3    that I need to stop complaining about Jackie, but I told

4    him I didn't know what he was talking about because I

5    haven't done a complaint, me thinking that me going to

6    HR complaining about Jackie was confidential with me

7    and Madison.  I didn't know that the next day Peter was

8    going to find out and approach me.

9         Q.   And you think he found out because he said

10   don't make any complaints?

11        A.   I -- I don't know how -- I sent an email back

12   to Madison asking her, how did Peter find out, if the

13   complaint was about Jackie.

14        Q.   Did Peter tell you, I know you made a

15   complaint, or did he just say --

16        A.   I just kept saying, "I don't know what you're

17   talking about.  I haven't -- I don't know -- I don't

18   know what you're saying."

19             He said -- he just said, "You need to stop

20   complaining."

21             Because Peter was one of the guys that used

22   to help me a lot back then whenever I was not allowed to

23   go to the restrooms.

24        Q.   Let me -- let me just ask the question so that

25   it's clear.

Court Reporting Cost Containment
A Veritext Company

1-866-318-1233
www.veritext.com

Page 78

1          Did Peter tell you that he knew you made a

2     complaint the day before?

3          A.   They didn't tell me he knew -- he just said to

4     stop.

5          Q.   Okay.  You took FMLA leave, we talked about, in

6     September of 2020; correct?

7          A.   I think so for my -- during the -- the

8     procedure I had done.

9          Q.   That was for your back?

10         A.   Yes.

11         Q.   Because you also took FMLA leave in March of

12     2021; right?

13         A.   2021?  I don't know which one is for my back.

14     Because I took FM -- I took a month.  I don't recall

15     which one was for the pinched nerve.

16         Q.   If it wasn't for the pinched nerve, what was

17     the other reason to take FMLA leave?

18         A.   Let me see.  I don't recall, ma'am.

19         Q.   You don't recall why you --

20         A.   I don't remember.  I don't know -- I don't know

21     when the back -- my pinched nerve was.  I don't know if

22     it was 2021 or 2020.  I don't want to --

23              (Exhibit No. 5 marked.)

24         Q.   (BY MS. ASHTON)  I'll show you an Exhibit 5.

25     This is a document from your September 2020 FMLA leave.

Page 79

1          A.  If you show me maybe --

2          Q.  You can look at that and see if it looks

3     familiar.

4          A.  Yes.  This is -- this is 2020?

5          Q.  The second page -- the second page are the FMLA

6     documents, and it says last day -- start date,

7     September 17, 2020, return to work date, September --

8     oh, leave approved through March 17, 2021.

9               Do you see that?

10         A.  March 17?  I've never been off that long.

11         Q.  Well, it says, if you look down the page, it

12    says intermittent that was approved.

13              MS. COLE:  It might help if you look at the

14    first page.

15         Q.  (BY MS. ASHTON)  Yeah.  Yeah.  You can look at

16    the first page, too.

17              So let me ask you this:  The first page of

18    this document titled -- or dated September 17, 2020, is

19    from Pain Treatment Institute; correct?

20         A.  Uh-huh.

21         Q.  Can you just answer verbally?

22         A.  Yes, ma'am.

23         Q.  And it's signed by Sameer Syed, a doctor, board

24    certified interventional pain management and

25    anesthesiology.

Page 80

1               Was this your back doctor?

2      A.   Yes.  But I didn't go with this particular

3  because it was dangerous.  I went with the stem cells.

4  I think the stem cells happened in 2021.

5      Q.   Okay.  So it says, "Edgar is a patient of mine

6  and had a procedure on September 17."

7               What was that procedure?

8      A.   I think they injected -- they gave me steroids

9  on my -- I think on my back.

10     Q.   Okay.  Then it said "...the patient had to miss

11  work on September 17 through 18 and can return to work

12  on Monday, September 21."  Right?

13     A.   Let me see.   September 17, 18 and September 21.

14  Yes.  It was only two days, I think.

15     Q.   Okay.  And then the second paragraph is, "Due

16  to continuous flare-ups walking or standing for any

17  length of time can cause a severe exacerbation of...."

18               I think it should be of "his pain."

19               "...therefore, must be treated

20  immediately."

21               Did I read that correctly?

22     A.   Yes.

23     Q.   All right.  And then it says, "It is required

24  for Edgar to be seen monthly for reevaluation of his

25  pain and also needs procedures done every two to four

Page 81

1    weeks."  Right?

2         A.  Yes.

3         Q.  Did you do the procedures every --

4         A.  I did the procedures --

5         Q.  Let me finish the question.

6              Did you do the procedures every two to four

7    weeks?

8         A.  I don't recall how often I went, but I did do

9    the procedures on my back that they gave me.  They used

10   to put me to sleep and gave me injections.

11        Q.  Would that require time off of work?

12        A.  Not all the time, I think.

13        Q.  But sometimes?

14        A.  Sometimes, I think.

15        Q.  For how long did you receive that treatment?

16        A.  For a couple of months I think, and then that's

17   when a new doctor that I met introduced me to

18   stem cells.

19        Q.  Okay.  And then you had that procedure done?

20        A.  I had that procedure done.

21        Q.  Did you have any issues taking FMLA leave in

22   September of 2020?

23        A.  Not that I -- not that I -- no.  Maybe just for

24   that one when I took -- because it -- maybe it's been a

25   while.  Yes, I think so.

Page 82

1      Q.  All right.  Hold on.  We went from no to yes.

2  Let me ask you again.

3           Did you -- did you take FMLA leave in

4  September of 2020?

5      A.  I think the reason we turned FMLA because it

6  was more three days --

7           THE REPORTER:  I think....

8           You said it too fast.

9           I think....

10     A.  Because if it falls under three days, you have

11 to fall under --

12     Q.  (BY MS. ASHTON)  I'll object as nonresponsive.

13          My question is:  You took FMLA leave in

14 September of 2020; correct?

15     A.  Uh-huh.  Yes.

16     Q.  Did you have any issues taking that leave?

17     A.  No.  I didn't have issues.

18     Q.  Did you have any issues returning from that

19 leave?

20     A.  Oh, no.  I was -- I was able to walk inside of

21 the plant like nothing.

22     Q.  And it says in the second paragraph of this

23 Exhibit 5 that standing or walking for any length of

24 time can cause severe exacerbation of his pain and it

25 must be treated immediately.

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 83

1           Did you have any issues, or do you have any
2     issues with these restrictions while you were at Epiroc?
3           A.  The restrictions?  No, because they sent me to
4     Occumed before I -- before I -- I think that I was sent
5     to Occumed for evaluation.
6           Q.  Let me object as nonresponsive.
7               My question is:  Did you have any issues
8     with continuous flare-ups, walking or standing, that
9     exacerbated your pain following this leave?
10          A.  The day I returned to work?
11          Q.  When you returned to work, did you have any
12     issues?
13          A.  No.
14          Q.  And Jackie was your supervisor during this
15     time; correct?
16          A.  Yes.
17          Q.  And then you said you took another leave in
18     March of 2021; right?
19          A.  I think that's -- that's the one that I
20     remember, yes.
21          Q.  That's the stem cell leave?
22          A.  Yes.  Stem cell leave.
23          Q.  And do you remember for how long you were out
24     at that point?
25          A.  Out for a month, almost a month, a month or

Page 84

1    month and a half as I recall.

2                    (Exhibit No. 6 marked.)

3        Q.   (BY MS. ASHTON)   This is Exhibit 6.

4                    THE REPORTER:   I'm having a really hard

5    time hearing you, the end of your answers.

6                    MS. COLE:   Speak up.

7                    THE WITNESS:   Oh, speak up.   Okay.

8                    MS. COLE:   Speak louder.

9                    THE REPORTER:   Especially at the end.

10                   THE WITNESS:   Okay.   Sorry.

11                   THE REPORTER:   Because your voice is

12   trailing off and I'm not hearing the end of your answer.

13                   THE WITNESS:   I'm sorry.

14       Q.   (BY MS. ASHTON)  All right.   This is Exhibit 6.

15   And it says you are approved for continuous FMLA leave

16   beginning March 26, 2021.

17                   Do you see that?

18       A.   March 26, 2021.   Start date?

19       Q.   Start date.

20       A.   Yes.

21       Q.   And you believe this was a leave that you took

22   relating to your back issue?

23       A.   Stem cells, I think.

24       Q.   Stem cells.   Okay.

25       A.   Yes.

Page 85

1    Q.  All right.  And when you returned from this

2    leave, did you require any accommodations relating to

3    your back?

4    A.  No.  But they -- they send me to Occumed to see

5    how I was.

6    Q.  Who did?

7    A.  I think Jackie.

8    Q.  He sent you -- so you came back from the leave

9    and he sent you to Occumed?

10   A.  Occumed.

11   Q.  It's O-C-C-U-M-E-D, is Occumed.

12       Why did he send you to Occumed?

13   A.  To see how I was with my lifting, you know,

14   able to -- if I was able to do my assembly work.

15   Q.  Okay.  Okay.  Did you have any issues taking

16   this FMLA leave?

17   A.  No.  I didn't have any issues.

18   Q.  Did you have any issues returning from this

19   FMLA leave?

20   A.  No.  I was able to walk in the company like

21   nothing.

22   Q.  And how did your appointment with Occumed go?

23   A.  I passed the -- I passed the -- everything,

24   every -- if I -- if I didn't pass, I was not going to be

25   allowed to go to work.

Page 86

1      Q.  Okay.  So I'm going to look after -- the second

2    and third page of this exhibit.  So this is an email

3    chain, if you want to flip your page.  It's dated

4    May 4th of 2021.

5              Is that about when you returned after your

6    leave?

7      A.  When was it?

8      Q.  May 4th of 2021.

9      A.  May 4.  The other one started when?  3-26,

10   March, April.  Yes.  March, April.  Yes.  It was a

11   month.

12     Q.  Okay.  And I'm going to just refer you to the

13   middle email of this -- the second page of the exhibit.

14   And it's an email from Reagan Francis to Jackie Gudgel.

15   Do you see that?

16     A.  Reagan Francis.  Yes.

17     Q.  Okay.  And it says, "Matt says he's fine with

18   Edgar working.  Please make sure to stress the following

19   to Edgar.  Regardless of what the test says, if it is a

20   heavy lift, he must get help.  Even if it isn't close to

21   60 pounds, he should make sure to get help if it is over

22   probably 30 pounds."

23              Did I read that correctly?

24     A.  Yes.

25     Q.  And why is Reagan telling this to Jackie?

Page 87

1     A.  I know at work they don't let us lift more than
2  30 pounds by yourself.  We use the crane for everything.
3  Even little small components like 10, 20 pounds, we have
4  to use the crane.
5     Q.  They were concerned that you would hurt your
6  back again?
7     A.  Yes.  But I never -- I guess hurt but I wasn't
8  aware, yes.
9     Q.  Okay.  And Jackie responds and says, "Yes, sir.
10  I told him not to strain himself in any fashion earlier
11  this afternoon."  Right?
12     A.  Yes.
13     Q.  You didn't have any issues with your back
14  following this leave?
15     A.  No.
16         MS. COLE:  When you get to a good stopping
17  point, can we take a break?
18         MS. ASHTON:  Let's do it now.
19         THE VIDEOGRAPHER:  Off the record at
20  10:58 AM.
21         (Recess taken from 10:58 until 11:12.)
22         THE VIDEOGRAPHER:  We are back on the
23  record at 11:12 AM, media two.
24     Q.  (BY MS. ASHTON)  Mr. Reyna, you understand
25  you're still under oath?  You're still under oath to

Page 88

1    tell the truth?

2         A.   Yes.  Yes.  I understand, yes.

3         Q.   You're under penalty of perjury?

4         A.   Yes, ma'am.

5         Q.   Okay.  What is your race?

6         A.   Hispanic.

7         Q.   What is your national origin?

8         A.   Mexican.

9         Q.   I think there were a couple of times in your

10   charges you checked the box for color discrimination.

11   So what color do you associate yourself with?

12        A.   Brown.

13        Q.   And Mr. Gudgel, Jackie Gudgel, what is his

14   race?

15        A.   Caucasian.

16        Q.   What is his national origin?

17        A.   American.

18        Q.   And how do you know that?

19        A.   How do I know that?

20        Q.   Yes.

21        A.   How do I know?

22        Q.   Correct.

23        A.   Because he -- they -- I think he -- he told us

24   he was from -- he told one of the employees he was

25   from -- from somewhere here in Texas.  Let me see.

Page 89

1    Amarillo.  Yes.  Because one of the co-workers is from

2    Amarillo, and he told him he was from Amarillo, too, as

3    well when he was -- that's where he was raised.

4         Q.  So let me just make sure I'm understanding.

5              It is your belief that Jackie Gudgel is a

6    Caucasian American because he told somebody else he was

7    from Amarillo?

8         A.  He said he was -- he was an American from

9    Amarillo.  That's what he told my co-worker.

10        Q.  And you heard this conversation or --

11        A.  Yes.  I heard --

12        Q.  Let me finish my question.

13        A.  Okay.

14        Q.  You heard the conversation, or you -- or you

15   were told the conversation?

16        A.  I heard.  I heard Jackie telling him.

17        Q.  You heard Jackie telling --

18        A.  Telling, Noe, yes, that he was also from -- he

19   grew up in Amarillo.

20        Q.  Okay.  Peter Chung, what is his race?

21        A.  He told me at one time he was from China.

22        Q.  So is that also his national origin?

23        A.  I don't know, ma'am.  But he -- that's what he

24   told me.  He was from China.

25        Q.  Thang Nguyen, T-H-A-N-G, N-G-U-Y-E-N.

Page 90

1          A.   Thang Nguyen?

2          Q.   Yes.

3               What is his national origin?

4          A.   He has told a couple of us he's from Vietnam.

5          Q.   Matt Buttacavoli, what's his national origin?

6          A.   I don't know, ma'am.  But he has -- he has told

7     us he comes from New York, but I don't know anything.

8          Q.   What about Tim Choate?  Or however you

9     pronounce that.

10         A.   Tim Choate.  He had told us he comes from

11    Colorado, but that's all I know.

12         Q.   What about Scott O'leske?

13         A.   Scott, I think he comes from Wisconsin.  He

14    told me one time, where they make cheese, as I remember.

15         Q.   We talked about the names of the assemblers on

16    the second shift with you.

17              Billy Poe, down his national origin?

18         A.   What do you mean, national origin?  Like --

19    Billy Poe, he told me he's American.  Billy Poe.  Yes.

20         Q.   What about his race?

21         A.   He told me he's -- he's Caucasian.

22         Q.   What about -- I don't know if you said Johnny

23    Sanchez or Johnny Sanders.

24         A.   Johnny Sanders.

25         Q.   Sanders.  What is his national origin?

Page 91

1        A.   He's African-American.

2        Q.   What's his national origin?

3        A.   I don't know.  What do you mean, like --

4        Q.   What do you believe his national origin is?

5        A.   American.

6        Q.   What about Kevin?  Do you know Kevin's last

7   name?

8        A.   I don't know his last name.

9        Q.   What is his race?

10        A.   He told me straight he said he was Caucasian.

11        Q.   And what about his national origin?

12        A.   He said it was -- I don't want to say, but he

13   said it was straight -- he said -- he said it was

14   American, yeah.  Caucasian, yeah, but -- yes.

15        Q.   Scott, do you know Scott's last name?

16        A.   O'leske.

17        Q.   Oh, that's Scott O'leske?

18        A.   Uh-huh.

19        Q.   Okay.  Jamie.  What's -- do you know Jamie's

20   last name?

21        A.   I think it's Tamez.

22        Q.   What is his national origin?

23        A.   I think he's American.  American.

24        Q.   What's his race?

25        A.   He told me he was Caucasian.

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 92

1        Q.   Jamie Tamez is Caucasian?

2        A.   Yes.

3        Q.   What about Fernando Valdez?

4        A.   He's Hispanic.

5        Q.   What's his national origin?

6        A.   I think he's from Mexico.  He's Mexican.

7        Q.   And then Luis Martinez, what is his race?

8        A.   Hispanic.  Salvadorian.

9        Q.   Salvadorian?

10       A.   Yes.

11       Q.   Okay.  And your current supervisor is Juan

12   Tamez; is that correct?

13       A.   Uh-huh.  Which is Jamie's brother.

14       Q.   Jamie's -- okay.

15       A.   Yes.

16       Q.   So Juan is -- what is his national origin?

17       A.   American.

18       Q.   What about Ricky Sanchez?

19       A.   Ricky Sanchez is Hispanic, but he says he's

20   Chicano, like he doesn't know Spanish.

21       Q.   What does Chicano mean?

22       A.   Like you -- he's born -- he was born and

23   raised, his mom and dad were born and raised here.  He

24   don't -- he don't know -- he don't know Spanish.

25       Q.   Okay.  But he's Hispanic?

Page 93

```
 1        A.  Yes, Hispanic, yes.

 2        Q.  Do you know his national origin?

 3        A.  Mexican.  Yes.  Mexican.

 4        Q.  And Long?

 5        A.  Long is from Vietnam, I think, told us.

 6        Q.  Mauricio?

 7        A.  Mauricio is from Mexico.

 8        Q.  He's Hispanic?

 9        A.  Hispanic, yes.

10        Q.  Freddie?

11        A.  Hispanic, too.

12        Q.  From where?

13        A.  Mexico.

14        Q.  Ryan?

15        A.  Ryan is American.

16        Q.  What is his race?

17        A.  Caucasian.

18        Q.  Tim?

19        A.  That's a hard one.  Tim.  Tim is -- he's mixed,

20   I think.

21        Q.  He's what?

22        A.  He's mixed.

23        Q.  Mixed with what?

24        A.  Hispanic and Caucasian.

25        Q.  Alex?
```

Page 94

```
 1          A.  Alexis?

 2          Q.  Alexis.

 3          A.  Yes.  Hispanic.

 4          Q.  From?

 5          A.  From Texas, I think.  I haven't asked him all

 6     that, but I think he's from Texas.

 7          Q.  Is Alexis a man or a woman?

 8          A.  A man.

 9          Q.  Rudy?

10          A.  Rudy is Hispanic.

11          Q.  From?

12          A.  Texas, I think.

13          Q.  Joshua?

14          A.  Joshua is African-American.

15          Q.  From?

16          A.  From Texas.  From Texas.

17          Q.  Diana?

18          A.  Hispanic.

19          Q.  From?

20          A.  She's from here.  She's from Texas.  Mexican.

21          Q.  I don't know what I wrote.  Joe Galyon?

22          A.  Juan Galyon.

23          Q.  Juan Galyon.

24          A.  Hispanic, Salvadorian.

25          Q.  Damon, Darien?
```

Page 95

```
 1        A.   Damon is African-American.

 2        Q.   From?

 3        A.   Mississippi.

 4        Q.   And then Aaron, the new hire?

 5        A.   Aaron, he's African-American.  He's from Dallas

 6   I think.

 7        Q.   Do you enjoy working at Epiroc?

 8        A.   It's hard to what I've been through.  So I

 9   mean --

10        Q.   I'm going to object as nonresponsive.

11             Do you enjoy it?

12        A.   No.  I don't enjoy it.  Through all the stuff

13   I've been through, no.

14        Q.   When did you stop enjoying it?

15        A.   Ever since I start, you know, going through all

16   the stuff that I went through.

17             At first -- at first I wanted -- you know,

18   I thought it was going to be fixed but it never got

19   fixed.  It just got worse.

20        Q.   We're going to talk about this in a second.

21   But the events -- your complaints began in July of 2018;

22   correct?

23        A.   Yes.

24        Q.   So at what point did you stop enjoying working

25   at Epiroc?
```

Page 96

1      A.   It will go off and on.  It was an off and on
2   thing.
3      Q.   And for right now you don't?
4      A.   No, not after what I've been through.
5      Q.   Even though Jackie is no longer there?
6      A.   Yes.  It's -- yes.  Even though he's not -- but
7   he comes around my work area sometimes.
8      Q.   Is there anything that you like about it?
9      A.   Huh?
10      Q.   Is that a yes?
11      A.   Anything I like about what?
12      Q.   Is there anything that you like about Epiroc?
13      A.   The -- no.  If we would have had different
14   management, I think it would be good.
15      Q.   Since you started --
16           Let me ask you this:  Since July of 2018,
17   have you applied for any positions outside of Epiroc?
18      A.   No, ma'am.
19      Q.   Why?
20      A.   I just -- it hasn't crossed my mind.
21      Q.   Well, if you have been feeling like you haven't
22   enjoyed working at Epiroc since July of 2018, why
23   wouldn't you just even try to find another job?
24           MS. COLE:  Objection; asked and answered.
25           You may answer.

Page 97

1          A.   I don't know, ma'am.  I just -- I haven't.

2          Q.   (BY MS. ASHTON)  You haven't applied for

3     anywhere?

4          A.   I haven't applied nowhere.

5          Q.   What's the easiest part of your job?

6          A.   The easiest part of my job?

7          Q.   Yes.

8          A.   The easiest part of my job is -- right now that

9     I'm on first shift?

10         Q.   Yes.

11         A.   My easiest part of my job is -- there's nothing

12    easy in my job.  Everything is hard.

13         Q.   Everything is hard?

14         A.   Yes.

15         Q.   Has it always been that way?

16         A.   Yes.  Everything is hard, yes.

17         Q.   All right.  We're going to start talking about

18    this complaint and charges you have filed.

19              You charged nine charges of discrimination

20    with the EEOC in the past two-ish years; correct?

21         A.   Yes.

22         Q.   And the first complaint you ever made to Epiroc

23    occurred on March 14th of 2021; is that right?

24         A.   First complaint?

25         Q.   Correct.

Page 98

1       A.   In -- I don't recall, but it's been a lot of

2   complaints.

3       Q.   Okay.  But the first one involved the July 2018

4   picnic incident; is that correct?

5       A.   Oh, yes, yes, yes.

6       Q.   Okay.  The incident that occurred with Jackie

7   in July of 2018, why did it take you until March of 2021

8   to raise that issue with Epiroc?

9       A.   I was scared.

10      Q.   Of ---

11      A.   Jackie.

12      Q.   That didn't stop you from making subsequent

13  complaints though; right?

14      A.   I was -- I have never made a complaint.  I

15  think -- I didn't -- I took -- I remember the time that

16  I went.  It was one time that Jackie was off.  And I

17  felt comfortable going to HR talk to Reagan.

18      Q.   But that was in March of '21; right?

19      A.   I don't know when it was.  But I remember I

20  went to talk to Reagan one time.  I recall the day that

21  I went to talk to Reagan, but I don't remember the date.

22      Q.   What do you recall about it?

23      A.   That I went to talk to Reagan, and I told him

24  everything that I had been through with Jackie.  And he

25  said that Jackie was not doing what the policy says to

Page 99

```
 1    do.

 2              And it was wrong.  And he was going to talk

 3    to him.  And he was going to try to work with me on some

 4    of this stuff.

 5         Q.  Okay.  Do you know when Reagan stopped working

 6    at Epiroc?

 7         A.  No.  Somehow they said he just quit.  I don't

 8    remember --  but I went to -- I know I sent him an email

 9    about a complaint that I had.  And I guess it was 2021

10    when I went to the conference meeting.

11              And I sent him an email.  But when I try to

12    go back a couple of weeks later, I find out he was not

13    there no more.

14              (Exhibit No. 7 marked.)

15         Q.  (BY MS. ASHTON)  I'm going to mark Exhibit 7.

16    This is the first charge that you filed.

17              Take a look at that and let me know if

18    everything looks true and correct to you.

19              Does it looks true and correct to you?

20         A.  Yes.

21         Q.  It's signed by you digitally October 22nd of

22    2021; correct?

23         A.  Yes.

24         Q.  Did you go in person to submit this?

25         A.  No, I didn't -- I didn't go in person.
```

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

Page 100

1      Q.   How did you submit the charge?

2      A.   Online I think.

3      Q.   Were you represented by counsel at the time?

4      A.   Let me see.  No, I wasn't.

5      Q.   When was the --

6      A.   I don't recall.  I don't recall.

7      Q.   Okay.  When was the first time you hired

8   counsel that you recall?

9      A.   I think -- I don't recall the year, but I

10  think -- I don't recall the year, but I wasn't -- I

11  didn't have counsel at this time.

12     Q.   The first counsel you hired, was it

13  Ms. Ventress?

14     A.   Yes.

15     Q.   All right.  So looking at this charge, it says

16  on July -- excuse me -- strike that.

17          "On July 2018, I was yelled at by Jackie

18  Gudgel, supervisor, for going to get more tickets for

19  the company picnic.  I asked for a witness to go to

20  supervisor's office and asked to go to HR.  Gudgel told

21  me that I could only use one restroom, worry about

22  myself, and if I go to HR, it will get worse.

23          "Since this incident, I have been

24  constantly harassed by Gudgel.  I have been denied

25  training, pulled away from my normal job duties,

Page 101

1      restricted from walking down certain aisles, and not

2      hired for job positions.  Gudgel has promoted another

3      employee who I have trained.  I asked HR what could be

4      done, and I was asked to write a statement.  Gudgel

5      still continues to harass me."

6                     Did I read that correctly?

7           A.   Uh-huh.

8           Q.   Is that a yes?

9           A.   Yes.

10          Q.   What training were you denied?

11          A.   Training was the electrical training.

12          Q.   And you were not an electrician; correct?

13          A.   Huh-uh.  No.

14          Q.   You were an assembler?

15          A.   Assembler.

16          Q.   Okay.  So the training was for electrician?

17          A.   Basic electrical, to learn electrical.

18          Q.   What makes you think you were denied that

19     training?

20          A.   What makes me think?

21          Q.   Yeah.

22          A.   Because Peter showed me the evidence.

23          Q.   What is the evidence?

24          A.   He sent an email to Jackie with my name, and

25     Jackie sent an email back without my name.

Page 102

1       Q.   And that's the evidence that you have that you
2   were denied the training?
3       A.   I don't -- yes.  That's when Peter told me that
4   it was not him.  It was Jackie, the one who that took me
5   off the list.
6       Q.   Do you have -- did you produce a copy of that
7   email to your counsel?
8       A.   No, ma'am.
9       Q.   Why?
10      A.   I don't have the copy.  Peter showed it to me
11  at that time.  At that time I didn't -- I didn't tell
12  him nothing.  I was just -- Peter just -- because I got
13  to work and I didn't see -- that's when Peter showed
14  me --
15           He said, "Look, I've put your name on the
16  list.  But this is what I gave back from Jackie."
17      Q.   You were unfamiliar about the availability for
18  the training, how many spots were available; correct?
19           MS. COLE:  Objection; form.
20           You may answer.
21      A.   There was -- it was -- it was assemblers going
22  there, too.  You don't have to be -- there was no spot
23  that was -- what do you mean, there --
24      Q.   (BY MS. ASHTON)  I'm going to object as
25  nonresponsive.

Court Reporting Cost Containment                    1-866-318-1233
A Veritext Company                                  www.veritext.com

Page 103

1          My question is:  How many -- you don't know

2     how many spots were available for the training; correct?

3               MS. COLE:  Objection; form.

4               You may answer.

5          A.  I did not but when -- I didn't -- I didn't know

6     but there was -- whenever I applied, there was still

7     spots.

8          Q.  (BY MS. ASHTON)  How do you know that?

9          A.  Because Peter told me.  It was the first time.

10         Q.  The training did not pertain to your job

11    duties; right?

12         A.  No, but it will help you.

13         Q.  I'm going to object to everything after no.

14         A.  No.

15         Q.  At the time of the training Jackie was on

16    vacation; was he not?

17         A.  At the time -- no, he was -- he was there.

18         Q.  Jackie was there?

19         A.  He was on vacation at the time of my training

20    when I went.

21         Q.  At the time that you -- so you eventually did

22    the electrical training?

23         A.  Because Reagan told me that those classes were

24    for everyone.  And he doesn't know what -- he -- he -- I

25    told him what happened.  He said it wasn't right.

Page 104

1          So Reagan told me from now on you're not

2     going to get to ask -- I'm going to send an email to

3     Jackie for every training with your name on it.  That's

4     how I started going --

5          Q.  I'm going to object as nonresponsive.

6               You eventually took this basic electrical

7     training; correct?

8          A.  Yes.

9          Q.  When was that?

10         A.  I don't recall the date, but it was after I

11    talked to Reagan.

12         Q.  Do you remember approximately the year?

13         A.  Maybe 2020 or 2019.

14         Q.  Okay.  Was there any other training that this

15    charge is referring to that you believe you were denied?

16         A.  He stopped other training, but I -- I can't

17    remember.

18         Q.  The charge also says "pulled away from my

19    normal job duties."

20               How were you pulled away from your normal

21    job duties?

22         A.  He put me from my -- the rig that I was working

23    on, he put me off to go clean.  He would take me to

24    another department.

25         Q.  Can you say that again?

Page 105

1        A.   He would put me off the machine to go clean or

2    to a different department.

3        Q.   And why would he do that?

4        A.   Because -- I don't know.  Because the people

5    that I was working with, they were Caucasian.  They

6    didn't feel comfortable working next to me.

7        Q.   It's your testimony Jackie pulled you off the

8    rig because you were working with Caucasians who did not

9    feel comfortable working with you?

10       A.   Yes.  They would tell me.  People would --

11       Q.   Who were the Caucasians who did not feel

12   comfortable working with you?

13       A.   Kevin and Scott.

14       Q.   Kevin and Scott told you, "I don't feel

15   working --"

16       A.   They was -- they was --

17       Q.   Let me finish my question.

18            Kevin and Scott told you, "I don't feel

19   comfortable working with you"?

20       A.   They would say comments.

21       Q.   What comments?

22       A.   Racist comments.

23       Q.   Like what?

24       A.   Wetbacks, and saying they had racist tattoos in

25   their -- in their body.

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 106

1                    THE REPORTER:  They had what?

2                    THE WITNESS:  Racist ink in their body.

3        Q.   (BY MS. ASHTON)  Tattoos?

4        A.   Yes.

5        Q.   Did they call you that name directly?

6        A.   They just -- they would just say it when I'm

7   working on the machine.

8        Q.   All right.  I'm going to object as

9   nonresponsive.

10                    Did they --

11       A.   Not to me directly.

12       Q.   Is -- is it your testimony that cleaning is not

13  part of your job duties?

14       A.   It is not -- only your work area but not the

15  shelves and the walls.

16       Q.   So when Jackie pulled you off this rig to

17  clean, what was he asking you to clean?

18       A.   The shelves and another machine that I was not

19  working on.

20       Q.   The cleaning machines are part of your job

21  duties?

22       A.   Yes.

23       Q.   Okay.  Is there any other time that this --

24  your charge is referring to where he pulled you away

25  from -- from your job duties?

Court Reporting Cost Containment                1-866-318-1233
A Veritext Company                              www.veritext.com

Page 107

1      A.  He would take me to the tower department.

2      Q.  To do what?

3      A.  Just -- just to go there and see what I can do.

4      Q.  What would you do in the tower department?

5      A.  I was scared because I didn't know how to use

6   the crane in that department.  It's -- you use -- you

7   have to -- you have to get trained to use the crane in

8   that department.

9      Q.  Did you use the crane?

10     A.  At one time I did, but I -- I was -- had to go

11  ask for help.  Another guy that was in another tower.

12     Q.  How many times did Jackie take you to the tower

13  department?

14     A.  A couple of times.

15     Q.  Out of those couple of times, you used the

16  crane one time?

17     A.  A couple of times, yes.

18     Q.  But you had help using it?

19     A.  I just -- I asked -- I had to ask a co-worker

20  because I told him I didn't feel safe because I was not

21  trained to pick that properly.

22     Q.  And the co-worker helped you?

23     A.  Yeah, he helped me.

24     Q.  When Jackie pulled you off the rig, when you

25  say pulled you away from your normal job duties, how

Page 108

1    long were you off for?

2         A.  The whole day.

3         Q.  But then the next day you'd go back on?

4         A.  I would go back in.

5         Q.  Okay.  Let me go back to the denying training.

6             For the electrical training, you check in

7    your charge you believe you were discriminated against

8    based on your national origin; correct?

9         A.  Yes.

10        Q.  What makes you think that Jackie denied you

11   training because you are Mexican?

12        A.  Why?

13        Q.  Uh-huh.  Yes.

14        A.  Why do I think he -- he did it?

15        Q.  Why did Jackie deny you training because you're

16   Mexican?

17        A.  I don't know.  I just -- because I heard him --

18   not him, but he has laughed at jokes, racist jokes.

19        Q.  Any other reason?

20        A.  No.

21        Q.  Why do you believe Jackie pulled you away from

22   your normal job duties because you're Mexican?

23        A.  Because the co-workers didn't feel comfortable

24   around me.

25        Q.  Because the co-workers, you believe based on

Page 109

1    their comments, not said directly to you, did not feel

2    comfortable working with you.

3         A.   Yes.

4         Q.   Is there any other reason?

5         A.   Because they would call Jackie and talk to

6    Jackie, and then that's when Jackie would come grab me.

7         Q.   Any other reason?

8         A.   No.

9         Q.   You then say "restricted from walking down

10   certain aisles."

11              What does that mean?

12        A.   He restricted me from walking through --

13   through the engine and through the -- I had to work --

14   and through -- I couldn't walk through the engine

15   department, and I couldn't use the other restroom, one

16   restroom.

17        Q.   When Jackie pulled you off of a rig to go clean

18   or go to the tower department, did he ever do that to

19   any other employees?

20        A.   Yes.

21        Q.   Who?

22        A.   Lonnie Robison.

23        Q.   What's -- who's Lonnie?

24        A.   Lonnie Robison.

25        Q.   Is he an assembler?

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

Page 110

1        A.  He's an electrician.

2        Q.  But did he report to Jackie?

3        A.  At first he report to Jackie.

4        Q.  And what is Lonnie's race?

5        A.  African-American.

6        Q.  What's his national origin?

7        A.  What do you mean, like --

8        Q.  Where is Lonnie from?

9        A.  Texas.

10       Q.  So why do you think he would also pull Lonnie

11   off?

12       A.  Lonnie told me because his -- because he was

13   racist.

14       Q.  He would pull Lonnie off, too, because he's --

15   because Jackie is racist?

16       A.  That's what Lonnie told me.

17       Q.  Okay.  We talked about other -- did -- did

18   Jackie pull anyone else off of -- away from normal job

19   duties that you're aware of?

20       A.  Just -- it was just me and Lonnie that I'm

21   aware of.

22       Q.  So we talked about other Hispanic assemblers on

23   your group when Jackie was a supervisor.  Why didn't

24   Jackie do that to them?

25       A.  I wasn't -- I was -- maybe I was not around

Page 111

1    them.  But I remember Juan -- Fernando used to --

2    because I used to translate to Fernando Sanchez because

3    he didn't know English.

4                He used to tell me that Jackie did stuff to

5    him, but I was never like -- I only saw one time when

6    somebody call him a wetback, and that person was with

7    Jackie, and Jackie just laughed and kept walking.

8         Q.   One time -- let me make just sure I'm

9    understand.

10               One time you heard a co-worker call

11   Fernando that name?

12        A.   Yeah.

13        Q.   And Jackie was there?

14        A.   Yes.

15        Q.   And who was the co-worker?

16        A.   I think it was -- I forgot her name.  It was

17   this lady.  It was a lady, but I forgot her name.

18        Q.   A lady who called Fernando that name?

19        A.   Uh-huh.

20        Q.   And is that a yes?

21        A.   Yes.

22        Q.   And when was that?

23        A.   I think it was maybe 2019.

24        Q.   Okay.  And you never made any complaint about

25   that; is that correct?

Page 112

1          A.   No.   Because somehow he ended up getting fired.

2          Q.   The person who --

3          A.   Fernando, yes.

4          Q.   Let me just finish my question.

5          A.   Yes.

6          Q.   Fernando got fired?

7          A.   Uh-huh.

8          Q.   When was Fernando fired?

9          A.   I'm thinking 2018, '19.  I don't recall, but I

10   think it was 2019.

11         Q.   Why -- do you know why Fernando was fired?

12         A.   Just -- I know he had complaints about Jackie,

13   but they told us he broke the policy.  That's all.

14         Q.   Do you know anyone else who was denied training

15   other than you?

16         A.   No.

17         Q.   What about the other Mexican Hispanic

18   assemblers?  Do you know if any of them were denied

19   training?

20         A.   No.

21         Q.   All right.  We're at "restricted from walking

22   down certain aisles."

23              And I believe you said you were -- you were

24   restricted to go through engineering; is that correct?

25         A.   No.  Engine department.

Page 113

1          Q.   Engine department.

2          A.   Uh-huh.

3          Q.   You were restricted from going through there?

4          A.   Yes.

5          Q.   And you said you were -- engine.  You were

6      restricted from using a restroom?

7          A.   Yes.

8          Q.   Okay.  So relative to where you usually work,

9      where is the engine department?

10         A.   The engine department is across from us.

11     Sometimes -- it depends on what station you get that

12     day.  If you're on Station 1 to 5, you're across from

13     it.  If you're on Station 6 or 7, you're not across from

14     it.

15         Q.   And when were you restricted from going through

16     the engine department?

17         A.   Because not -- not every computer works to

18     clock in.  You have to clock in to the system.  So the

19     only system that was working was the engine department.

20     But I couldn't follow all my co-workers like they were

21     coming, going.  I had to go through a different aisle.

22     I had to all the way through, like I'm going to the

23     warehouse, come back and went through the aisle, through

24     the engineering aisle, and then go straight through the

25     aisle.

Court Reporting Cost Containment        1-866-318-1233
A Veritext Company        www.veritext.com

Page 114

1           I couldn't pass through where the workers

2   were working.  I had to avoid the work area and go

3   through.

4           Q.   Who gave you that instruction?

5           A.   Jackie.

6           Q.   Do you know why he gave you that instruction?

7           A.   He -- he just said -- he didn't tell me why,

8   but one of the co-workers told me that somebody from

9   Power Pack thought I was stealing from him.

10          Q.   Somebody from -- sorry -- what?

11          A.   Some -- somebody from that department thought I

12  was stealing from them.

13          Q.   And that's why Jackie wouldn't let you go

14  through the engine department?

15          A.   Yeah.  And he didn't feel -- that guy didn't

16  feel comfortable with me walking through that area.

17          Q.   And that's just something you heard from a

18  co-worker?

19          A.   Co-worker that that guy told him that he told

20  Jackie, but Jackie never approached me the reason.  He

21  never told me the reason why.

22          Q.   How many times were you restricted to go

23  through the engine department?

24          A.   For a long time.  I didn't -- I never wanted --

25  I didn't want to make Jackie upset, so I did it for a

Page 115

1    long time.

2         Q.  So one time Jackie told you, don't go through

3    the engine department.  And then did he ever repeat that

4    after the one time?

5         A.  No, he didn't.

6         Q.  So you decided on your own because you didn't

7    want to upset Jackie, that you weren't going to go

8    through the engine department?

9         A.  Before that he had take me to his office and

10   told me it was going to get worse.

11        Q.  All right.  Let me object as nonresponsive.

12             Jackie told you one time?

13        A.  One time.  Yes.

14        Q.  Okay.  And after that one time, you on your own

15   decided to not go through the engine department; is that

16   correct?

17        A.  Yes.

18        Q.  Okay.  The colleagues that you said, the

19   co-workers that you said, did go through the engine

20   department, who were they?

21        A.  I think Jamie, Scott, Kevin.  I don't know.

22        Q.  Jamie, Scott, Kevin --

23        A.  And who else was it?  Kevin, Scott, Jamie,

24   Scott --

25        Q.  Was Fernando allowed to go through there?

Page 116

1      A.   Fernando was working a different area.

2      Q.   What about Luis Hernandez?

3      A.   Different area, too.

4           I think it was for me -- at that time

5  working right there, was only -- we didn't have a lot of

6  people there because Fernando and them, they're outside

7  in test -- they're like at the end of -- at the end of

8  the line.

9      Q.   Okay.  And then you said you were restricted

10 from using a restroom.  Tell me about that.

11     A.   I couldn't use the -- one of the restrooms

12 that's by the -- the more nice-looking restroom.

13     Q.   Where is that located?

14     A.   It's located in -- by rubber tires.

15     Q.   It's located by Robert tires?

16     A.   It's another department, yes.

17     Q.   It's -- oh, the restroom is in a whole

18 different department?

19     A.   It's in a different area, but you -- when

20 you're coming in, you pass it.

21     Q.   Is there a closer restroom to where you worked?

22     A.   If I worked on Station 1, yes, there's one.

23 But if I work on the other six, the other one is close.

24     Q.   That -- the restroom, the nice restroom, is

25 closer?

Court Reporting Cost Containment        1-866-318-1233
A Veritext Company                      www.veritext.com

Page 117

1       A.   Yes.

2       Q.   Well, what percentage of time were you working

3   on Station 1?

4       A.   Not every -- not all the time.  Like let's say

5   three days out of a week I worked there, and the next --

6   the next two days of the week I worked on the other

7   side.

8       Q.   Okay.  And other than the nice restroom, was

9   there any other restroom that was closer to rigs two

10  through six --

11      A.   No, that was just --

12      Q.   -- or Stations 2 through 6?

13      A.   No, there was just the one.  There's only --

14  there's only two restrooms.

15      Q.   Okay.  And when you say that you were

16  restricted from using the restroom, what did that -- how

17  did that conversation go?

18      A.   It didn't go well because it happened after the

19  tickets.  That's when he took him to the office.

20      Q.   So this occurred in 2018?

21      A.   Yes.

22      Q.   And what did Jackie say that you couldn't use

23  the restroom, how did he frame that?

24      A.   He said, "From now on, you're not allowed to

25  use that -- that restroom over there, or either go get

Page 118

1    gloves.  You're not allowed to leave your work area for

2    anything.  If you need -- if you need to use the

3    restroom, you have to wait for me or Peter, or if you

4    need gloves, ask Peter."

5                When I told him, is it just for me or

6    for -- are you going to do this to everybody?

7                He said not to worry about nobody.  Worry

8    about myself.

9        Q.  Okay.  And for how long did you not use the

10   nice restroom?

11       A.  For a long time.

12       Q.  For how long?

13       A.  For a couple of months.

14       Q.  Okay.  And then you started using it again?

15       A.  When I -- and after I went to HR and I told

16   them.

17                He said everybody is allowed to use any

18   restroom.  This is the HR representative told me,

19   anybody in the company is allowed to use any restroom in

20   the plant no matter where you're at.

21       Q.  Well, you went to HR for the first time in

22   2021; correct?

23       A.  Yes.

24       Q.  Okay.  And so --

25       A.  No.  I had gone a couple of times to Reagan,

Page 119

1    but somehow they don't have that on record.

2         Q.  So it's your testimony that you went to HR

3    prior to March 2021?

4         A.  I think I went a -- to my understanding, I did

5    go to Reagan.

6              Because at first I told Jackie -- in that

7    room I told Jackie, "Let's go to HR, please."

8              Because I didn't feel comfortable the way

9    he was getting.

10             He said, "If you go to HR, it was going to

11   get worse."

12        Q.  But then you did go to HR; correct?

13        A.  One other time when he was not there.

14        Q.  I object as nonresponsive.

15             You did go to HR?

16        A.  Yes.  I did go, yes.

17        Q.  Okay.  And you -- it's your testimony that you

18   went prior to March of 2021?

19        A.  I think.  I don't remember.  But I know -- I

20   know I did went before.  It was one day that I felt

21   brave and comfortable going to HR.

22        Q.  So after that you, you started using the other

23   restroom?

24        A.  Yes.

25        Q.  Okay.  And what makes you believe that Jackie

Page 120

1      told you not to go through the engine room and not to

2      use that restroom because you're Mexican?

3            A.   Because the engine department is -- is -- it's

4      known to be racist.

5            Q.   And the whole department is known to be racist?

6            A.   Yes.

7            Q.   In what way?

8            A.   If you're different color, you can't even work

9      there that -- for that long.

10           Q.   Is it your testimony that only --

11           A.   Yes.

12           Q.   -- Caucasian Americans work in the engine

13     department?

14           A.   Yes.

15           Q.   Let me finish my question.

16                     Is it your testimony that only Caucasian

17     Americans work in the engine department?

18           A.   There's -- now there's -- right now there's --

19     it's different now than before.

20           Q.   Right.  We're talking about --

21           A.   Now.

22           Q.   -- October of 2021 when you filed this charge

23     of discrimination.

24           A.   Yes.

25           Q.   Who worked in the engine department?

Page 121

1      A.   Cole Beazley and -- I know it was Cole and

2   another guy.

3      Q.   Cole?

4      A.   Because on second shift there was not that many

5   people, but it was only Cole at that time.

6      Q.   It was only Cole?

7      A.   Yes, at that time it was only Cole.

8      Q.   What's his last name?

9      A.   I don't remember.  I know -- we call him Cole,

10  but his name is William.

11     Q.   His -- his actual name is William.

12     A.   William.  Yes.

13     Q.   And you don't know his last name?

14     A.   Huh-uh.

15     Q.   And what makes Cole racist?

16     A.   He has said racist comments.  He has said

17  racist stuff.

18     Q.   You have heard him say racist stuff?

19     A.   Yes.  When I say him, I heard him.  And he also

20  has -- he has gotten in arguments at work

21  calling somebody the N-word.

22     Q.   What have you heard him say?

23     A.   The N-word.

24     Q.   The N-word.

25          Anything else?

Page 122

1    A.   No.

2    Q.   So what makes you think Cole is racist against

3    Hispanic Mexicans?

4    A.   Because I heard comments from him.

5    Q.   Well, you said you heard him say the N-word.

6    A.   The N-word, yes.

7         But he also had -- he didn't say the

8    wetback word, but he said comments about Hispanics.

9    Q.   Like what?

10   A.   Like -- what do you say?  Cherry pickers, and

11   like we belong in the field.

12   Q.   Who did he say that to?

13   A.   To me when I was in his department.

14   Q.   And who did you report that to?

15   A.   At that time I didn't report it to nobody.

16   Q.   When did Cole make that comment?

17   A.   When I was -- whenever -- whenever I went over

18   there, I was -- I was helping him at one part I think

19   that they needed help.

20   Q.   What year was that?

21   A.   I don't recall the year.  Maybe 2019, 2018.

22   Q.   How do you know that Jackie knew that Cole was

23   racist against people?

24   A.   They were -- well, they would always -- they

25   would always get together.  Jackie would always spend

Page 123

1    most of the time over there with them.

2         Q.  But it's your personal belief that he knew; is

3    that correct?

4         A.  No, not me.  Everybody.  Everybody at work knew

5    that.

6         Q.  But the only reason you believe that Jackie

7    knew that Cole was racist is because they spent a lot of

8    time together?

9         A.  Not because -- they're co-workers that have

10   heard them talk about racist stuff.

11        Q.  Any other reason?

12        A.  No.

13        Q.  Okay.  Why do you believe Jackie told you you

14   couldn't go to the restroom because you're Mexican

15   Hispanic?

16        A.  I don't know.  But all this happened in his

17   office when he started telling me what I -- what I was

18   allowed to do and what I was not allowed to do.

19        Q.  Did he ever tell Fernando he couldn't use that

20   restroom?

21        A.  No.

22        Q.  What about Luis Martinez?

23        A.  No, but --

24        Q.  So then why you?

25        A.  Because -- I don't know, but one time I was

Page 124

```
1    training a Caucasian guy, his first week there he -- he

2    make sure that I heard.

3                  He told him in front of me, "You're allowed

4    to go everywhere in this plant.  You're allowed to go --

5    walk through any aisle.  You're allowed to go to any

6    restrooms and go to the break room every time you need a

7    break."

8                  And in my mind, I'm okay, how come I don't

9    get these privileges?

10        Q.  And when did he say that?

11        A.  I think after -- it was after the incident that

12   he took me to the office.

13        Q.  But was it after you started using that

14   restroom again?

15        A.  No.  It was before I was -- before I was using

16   the restroom.

17        Q.  Did you tell HR that too?

18        A.  No.  I didn't tell HR that.

19        Q.  Who was the --

20        A.  I did mention it in person to -- to Reagan that

21   I -- that's when I felt I've been discriminated,

22   whenever I heard him telling another -- like that person

23   that I was -- that I was working with at the time, that

24   he was able -- he was allowed to do the things I was not

25   allowed to do.
```

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 125

1    Q.  Who was the Caucasian person?

2    A.  It was -- it was a guy that I -- I don't

3  know -- remember his name, but it was an electrician.

4    Q.  So he didn't -- he wasn't an assembler?

5    A.  He was an assembler.  He's -- they called him

6  assembler's electrician because sometimes they do

7  assembler and electrical work.

8    Q.  Did he report directly to Jackie?

9    A.  Yeah.  He reported to Jackie.

10   Q.  How do you know he's Caucasian?

11   A.  Because he introduced himself to me, and he --

12  he told me what -- what he was.

13   Q.  What do you -- what did he say to you?

14   A.  He said he was -- he was born in, I don't know

15  what state, and he said he was American.

16        He asked me what I was, and I told him my

17  nationality.

18   Q.  Is that common that you introduce yourself that

19  way?

20   A.  No.  But he -- he asked me, and I told him, you

21  know.  I didn't --

22   Q.  So you -- you don't remember his name though?

23   A.  I don't remember his name.

24   Q.  Any other reason you believe that Jackie

25  prohibited you from going to that restroom because

Page 126

1    you're Mexican?

2         A.   No.

3         Q.   Okay.  All right.  Then it says you were not

4    hired for job positions.  Tell me about that.  Which job

5    position?

6         A.   It was a tester at that time.

7         Q.   A tester.

8         A.   Position, yes.

9         Q.   What does a tester do?

10        A.   You test the machines, but -- you test the

11   machines.

12        Q.   And how is that different than an assembler?

13        A.   You have to know -- you -- you work inside

14   for -- for a couple -- for a year.  First when I

15   started, for a couple of months, six months or a year.

16   You have to know how to build the machine and get -- get

17   familiar with the parts, and then you -- you can apply

18   for a tester.

19        Q.   Are you sure it wasn't a lead person role that

20   you wanted to apply for?

21        A.   At that time it was the tester position.

22        Q.   Okay.  And who is in charge of the testers?

23        A.   The testers?  I don't -- I think it was our

24   supervisor.

25        Q.   Named?

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

Page 127

1        A.   Mike.

2        Q.   What's Mike's last name?

3        A.   I don't know Mike's last name.

4        Q.   What's Mike's national origin?

5        A.   American.

6        Q.   How do you know?

7        A.   Because I -- I know his son.  His son works

8    there.

9        Q.   What's his son's name?

10       A.   What's his son's name?  Brandon.

11       Q.   What's -- and you don't know Brandon's last

12   name?

13       A.   No.  Because he works in the warehouse, but he

14   would come try to learn the rigs.  He would come help

15   us.  He wanted -- he wanted me to train him how to build

16   the rigs.  And he would come, whenever they were slow in

17   the warehouse, he would come so we can show them how

18   to --

19       Q.   So Mike was the supervisor over the testers?

20       A.   Uh-huh.

21       Q.   Is that a yes?

22       A.   Yes.

23       Q.   And Mike made the decision of who to hire for

24   the tester position?

25       A.   I'm -- I don't know about -- because --

Court Reporting Cost Containment            1-866-318-1233
A Veritext Company                          www.veritext.com

Page 128

1      Q.   Do you know who made the decision to hire the
2   tester?
3      A.   It was both Mike and Jackie.
4      Q.   How do you know that?
5      A.   Because at the end he told me that Jackie
6   didn't told him my knowledge.
7      Q.   I'm sorry.  At the end what is that?
8      A.   After the -- at -- at the end whenever he told
9   me he didn't hire me, it's because Jackie didn't --
10   Jackie didn't let him know what I was capable of.
11      Q.   So you interviewed with Mike?
12      A.   Uh-huh.
13      Q.   And then Mike said you don't get the job; is
14   that right?
15      A.   Before that, I had gone to complain about
16   Jackie.
17      Q.   Well, let me ask you this:  When did you apply
18   for the tester role?
19      A.   It was -- I think it was 2020 or 2019.  I don't
20   remember.
21      Q.   Okay.  So this is still your testimony that you
22   believe that you complained prior to March 2021.
23      A.   Uh-huh.
24      Q.   Is that a yes?
25      A.   Yes.

Page 129

1       Q.   So then you interview with Mike, and you didn't
2    get the position; right?
3       A.   Uh-huh.
4       Q.   Is that a yes?
5       A.   Yes.
6       Q.   And Mike told you why you didn't get the
7    position?
8       A.   Because -- yes.
9       Q.   And what did Mike say?
10      A.   Because I started noticing the people that got
11   the position was the new hires that I was training.
12      Q.   Who was that?
13      A.   It was -- I think it was -- the lady that I
14   don't remember her name and another guy.
15      Q.   Two people got the job?
16      A.   Yes.  The two people that I was training.
17      Q.   So you were training new hires?
18      A.   Yeah, I was training new hires.  They were like
19   six months there.  Yes.
20      Q.   And they received the tester position?
21      A.   Yes.
22      Q.   And one of them was a female?
23      A.   And one of them was a guy, yes.
24      Q.   And the female, you don't remember her name?
25      A.   I don't remember her name.

Page 130

1      Q.  And what about the man?

2      A.  I don't remember his name either.

3      Q.  What was the female's national origin?

4      A.  She's American, I think.  They're both

5   American.

6      Q.  How do you know that?

7      A.  Because they told me they -- they were

8   American.

9      Q.  You don't remember their names, but you

10   remember that they told that they were American --

11      A.  Yeah, I think Dorothy --

12      Q.  Let me finish my question.

13          You don't remember their names but you

14   recall that they told you that they were American?

15      A.  Yes.  Because they didn't know Spanish.  They

16   told me.

17      Q.  So somebody is American because they don't know

18   Spanish?

19      A.  No.  They told me -- I know because they -- I

20   remember now the name Dorothy.

21      Q.  Dorothy was the female?

22      A.  Yes.  Yes.

23      Q.  What about the man?

24      A.  I don't remember -- I don't recall the lady --

25   the man's name.

Page 131

1      Q.   Okay.  Do you -- what was Dorothy's
2  qualifications?
3      A.   She -- I was showing her the tools.  She didn't
4  know how to grab tools.
5      Q.   Do you know her background, her educational
6  history, her certificates?
7      A.   She never told me her background.
8      Q.   What about the man?  Did he ever tell you his
9  background, his experience?
10     A.   He was a welder.
11     Q.   He was a what?
12     A.   Welder.
13     Q.   Okay.  Do you know his educational history, his
14  background?
15     A.   No, I don't -- I don't know but --
16     Q.   His qualifications?
17     A.   No.  Because they didn't even know how to read
18  the print, because I was showing them how to read the
19  print.
20     Q.   Why do you believe you were qualified for the
21  tester position?
22     A.   Because I had -- I had -- I had already asked,
23  and I had done what they told me to, be here, learn the
24  machine, learn -- they had told me to learn the machine
25  and learn the whole rig, which I had already done.

Page 132

1      Q.   Was the tester position a promotion?  Would you
2   have gotten more money?
3      A.   Yes.
4      Q.   How much more?
5      A.   I think it was a dollar something more.
6      Q.   Did you ever apply for a tester position again?
7      A.   I didn't felt like it because that --
8   before I -- before the tester position, before that, I
9   felt comfortable going because my three leadmen were
10  out.
11     Q.   Because your what?
12     A.   My three leadmen were absent at the end of the
13  year.  They both -- Peter Chung --
14     Q.   Oh, your leadmen?  Okay.
15     A.   Yes.  And Mark.  They were out so I had to
16  replace all three of them during the week and the
17  weekends.
18     Q.   So you were acting as leadman at the time?
19     A.   As leadman, yes, at that time.
20     Q.   When was that?
21     A.   2018 or 2019.
22     Q.   Okay.
23     A.   2019.
24     Q.   Did you apply for any other positions that you
25  didn't get that you're referring to in this charge?

Page 133

1        A.   I don't know if this one is related to my
2    leadman position.
3        Q.   Okay.  Well, if it is, when did you apply to be
4    a leadman?
5        A.   In, I think it's 2022 or 2021.
6        Q.   Who -- was it a leadman over the second shift?
7        A.   Second shift, yes.
8        Q.   So who made that hiring decision?
9        A.   Jackie.
10       Q.   And did you apply for the role?
11       A.   Yes.  I applied for the role.
12       Q.   Who else applied?
13       A.   A couple of other people applied for the -- I
14   only -- I was only aware that it was Chris and Jacob.
15       Q.   Chris and Jacob?
16       A.   Chris Hoang and Jacob, yes.
17       Q.   Chris Hoang.
18       A.   And Jacob.
19       Q.   And Chris, he was not an assembler.  What was
20   he?
21       A.   He was an assembler.  Yes, he was assembler.
22       Q.   Oh, he was.  I don't think we mentioned him.
23            What's Chris's national origin?
24       A.   I think he's -- he told me he was from Vietnam.
25       Q.   And what about Jacob?  What's his last name?

Page 134

1        A.   Jacob's -- I don't remember Jacob's --

2        Q.   What was his national origin?

3        A.   He's American.

4        Q.   Who got the leadman position?

5        A.   Chris.

6        Q.   Chris Hoang did, who's from Vietnam?

7        A.   Yes.

8        Q.   And Jackie selected Chris?

9        A.   Yes.

10       Q.   Okay.  And what makes you think that you did

11  not get the tester position because you're Mexican?

12       A.   Well, what makes me think?

13       Q.   Yes.

14            Why do you believe that you didn't get the

15  tester position because you're Mexican?

16       A.   I think he was just getting revenge on me for

17  going -- complaining about him.

18       Q.   Any other reason?

19       A.   Because -- he made sure the day before the

20  interview, he made sure -- he stood in front of me with

21  that supervisor from test pad, and they were both

22  talking and looking at me.

23            So since that day, I kind of, okay, I knew

24  I wasn't going to get it.

25       Q.   Any other reason?

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

Page 135

1      A.   No.

2      Q.   Why do you believe you didn't get the leadman

3   position because you're Mexican?

4      A.   Because my -- this one is a weird one because

5   it took more than it usually takes.  And it has never

6   happened -- the leads never interview Thang Nguyen and

7   Peter Chung interview --

8                THE REPORTER:  Say that again.

9                The leads never interview....

10     A.   Never interview, that -- the supervisor

11  managers, but on this time they -- they had the leadmen,

12  Peter Chung and Ricochet interview all three candidates

13  again.

14               And when doing the interview, Peter Chung

15  and Thang Nguyen, they said they were going to tell

16  Jackie they're going to choose me from all three of

17  them.

18     Q.   (BY MS. ASHTON)  So let me make sure I'm

19  understanding.

20               You, Chris and Jacob all three applied for

21  the leadman position?

22     A.   Yes.

23     Q.   And you had an interview with Peter Chung and

24  Thang Nguyen?

25     A.   First Jackie.

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 136

1          Q.   Oh, first interview with Jackie.

2          A.   First --

3          Q.   You passed that interview; correct?

4          A.   First -- this is what happened first.

5               First I was waiting for -- Jackie

6     approached me one day and said, "You have an interview

7     with -- with Bob Jones."

8               And I said, "With Bob Jones?  What do you

9     mean with Bob Jones?", I said.

10              "Bob Jones, yes, for a lead position."

11              Like for -- I told him, "I didn't apply for

12    that.  I applied with your -- your position."

13              He said, "Don't worry about it.  Just go

14    see Bob Jones on this date."

15              So I got interview with Bob Jones.  And Bob

16    Jones asked me if I signed up for him.

17              I said, "I didn't sign up."

18              It was -- it was after -- it was weird that

19    Jackie told me to come interview for --

20              "What position did you apply?"

21              I said, "For Jackie's on second shift."

22              "Okay.  Have you interviewed for Jackie?"

23              I said, "No."

24              "Okay," he stopped and he says, "you know

25    what?  I don't like what I'm seeing.  Jackie should have

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 137

1    interviewed you first.  I don't want to be involved with
2    whatever Jackie has."
3                    And that was it.
4                    And then Jackie interviewed me a week
5    later.
6        Q.  So then you did interview with Jackie?
7        A.  I did.
8        Q.  And you passed that interview?
9        A.  I passed that interview.
10       Q.  And so then you interviewed with Peter and
11   Thang Nguyen; correct?
12       A.  Yes.  But I never got interviewed with Matt
13   like the other employees did.
14       Q.  I'm going to get there, but I'm just going step
15   by step.
16       A.  Okay.
17       Q.  You interviewed with Jackie.
18       A.  Uh-huh.
19       Q.  You passed that interview; correct?
20       A.  Uh-huh.
21       Q.  Yes?
22       A.  Yes.
23       Q.  Then you interviewed with the leadmen, Peter
24   and Thang Nguyen; correct?
25       A.  Uh-huh.

Page 138

1        Q.  Is that a yes?

2        A.  Yes.

3        Q.  Was that an interview -- was it by yourself, or

4    did you interview with them with also Chris and Jacob?

5        A.  Just by myself.

6        Q.  Okay.  And then you never got the Matt

7    interview; correct?

8        A.  They -- they -- they asked me, "Did you get --

9    who did you get interviewed?"

10              I told them, "I got interviewed with Jackie

11    only."

12              I said, "Did you get interviewed with

13    Matt?"

14              And they're like -- I was, "No."  I said,

15    "No, I've never...."

16              "Oh, okay.  We're sorry.  We're sorry about

17    that, but Matt should have been -- you should have had

18    interview with Matt, too.  Like -- like the other

19    employees, you should get the same privileges like the

20    other people do."

21              But I told them, "I didn't.  I just got

22    interviewed with Jackie."

23              "Okay," they're like, "Okay.  We're sorry.

24    We're sorry you went through that list interview right

25    now."

Page 139

1          So they start interviewing me and they

2     start saying that they knew I had -- I had replaced them

3     when they were out, and I had knowledge in -- in the

4     production floor with all the new stuff that we've got

5     going on, picture factory and all that --

6               THE REPORTER:  What is that last thing you

7     said?

8               The new stuff that we've got going on....

9          A.   Yeah, the -- because we have this -- we don't

10    look at prints no more.  We look at picture factory,

11    which is kind of like a TV version of the machine, but

12    it's through -- it's through TV.

13              And the other sides, they deal with prints.

14    On our side we deal picture factory.

15              THE REPORTER:  Picture factory?

16         A.   Picture factory.  It's kind of like a -- it's a

17    new thing.

18              Because back then -- they want to make it

19    so easy for somebody to get their -- turn on the TV, and

20    the TV will show you every single thing they got to do.

21         Q.   (BY MS. ASHTON)  Let me just stop you here.

22              So if Jackie wanted to discriminate against

23    you because you're Mexican, why would he pass -- why

24    would he say that you passed your first interview?

25         A.   I remind him when I helped him.  I kind of went

Page 140

1    back, and I try to remind him the time that I cover his

2    three leadmen.

3              And that's when he said, "Okay.  I'll get

4    back with you."

5              That's all he said.  I don't know if I

6    passed or I didn't.  But I don't know if I passed or --

7    he never said nothing.

8              And then what -- what I was -- what was

9    weird, it took another while -- and that's when they

10   make the decision to Peter Chung and Peter -- to

11   interview all three of us again.

12       Q.   Who -- who interviewed all three of you again?

13       A.   Peter Chung and Chris -- Peter Chung and --

14       Q.   What makes you think that Jackie made the

15   decision not to hire you for the leadman position

16   because you're Mexican?

17       A.   Because Peter told me.  And I think Peter told

18   me, "Okay.  We choose you."

19             They told -- Peter Chung and Ricochet told

20   me, "We chose you.  We're going to let Jackie know who

21   we chose.  We will interview all three of them.  And

22   Jacob," he said, "he has bad attitude with employees.

23             Chris doesn't know nothing on this line, so

24   we're going to tell Jackie, you've done this job before.

25   You qualify.  And we're going to choose you."

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

Page 141

1          And then Peter comes back and said that

2    Jackie told him to take me off the list and to focus

3    only on Chris and Jacob.

4      Q.  You were not part of the conversation between

5    the leads and Jackie to decide who was hired as a

6    leadman; correct?

7      A.  I was not part of it.

8      Q.  All right.  You injured your finger, we've

9    talked about this a little bit, on January 24th of 2022;

10   correct?

11     A.  January 2022.  Yes.

12     Q.  And generally what happened?

13     A.  What happened?

14     Q.  Yes.

15     A.  We were doing what's called a Russian teardown.

16          THE REPORTER:  A what?

17          THE WITNESS:  Russian.  Russian teardown.

18     Q.  (BY MS. ASHTON)  Like the country Russia?

19     A.  Yes.

20     Q.  Okay.  Russian.

21     A.  Russian teardown, that's what they call it.

22          And in that time it was -- it was -- we

23   were outside in the bay.

24          THE REPORTER:  We were what?

25     A.  Outside in the bay area, outside in the bay, in

Page 142

1    the canopy.

2              And it was -- that day it was -- it was

3    drizzling a lot and foggy.  And in order for us to

4    start, the first thing we do is we have to balance the

5    tracks.  The tracks is the first thing that comes off.

6              So we have to balance one to level the

7    yoke, because if we don't balance it, if we take one off

8    without balancing the yoke, when we take one track off,

9    the other track is just going to fall on the floor.  So

10   we always put a block of wood on it.

11             And when I was putting a block of wood that

12   we always put, it was -- it was still a gap.  It was --

13   it was still a gap in there.  So I grab a two by four,

14   and I decided to push it with the rawhide.  But somehow

15   when I push -- tried to push it with the rawhide, I

16   ended up hitting my --

17             THE REPORTER:  Push it with a what?

18             THE WITNESS:  Rawhide, with a hammer.

19             THE REPORTER:  Rawhide.

20        A.  Because I didn't want to stick my -- my finger

21   in it?

22        Q.  (BY MS. ASHTON)  Is that like a hammer?

23        A.  It's a hammer, yes.

24             So -- and then -- but I was holding the

25   wood at the same time, but somehow I hit my -- I ended

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company              www.veritext.com

Page 143

1    up hitting my index finger.

2        Q.  And when you hit your finger, what did you do

3    immediately after?

4        A.  I stopped because I felt it was -- I felt

5    something.

6                And then Miss Glenda was witnessed -- Miss

7    Glenda was right --

8                THE REPORTER:  Who?  Glenda?

9                THE WITNESS:  Glenda Randall.

10               MS. ASHTON:  G-L-E-N-D-A.

11       A.  Because I was training them how to do a

12   teardown at that time, too.

13               So I noticed -- I felt pain.  So I took

14   off -- when I took off the glove, I panicked.

15               And I told Peter -- I raised my hand.  I

16   told Miss Glenda, and I told Peter, "I need to go find

17   Jackie."

18               So I left and I went to look for Jackie.

19   And that's when I showed Jackie my finger.

20       Q.  (BY MS. ASHTON)  And he took you to the ER?

21       A.  He took me to -- they took me to -- he took me

22   to Occumed but --

23       Q.  Occumed.

24       A.  Occumed, yes.

25               But Occumed was trying to poke me.  They

Page 144

1    were poking it, but it was hurting so much.  They were

2    poking through the bottom to push the nail up.  But it

3    was hurting so much.

4                    And so they, "Why are you in so much pain?"

5                    And like, I don't know.

6                    So when they did the X-ray, they found out

7    they were touching my bone when they were -- when they

8    were trying to push my nail up.  And that's why I was in

9    so much pain.

10                   So they -- they told me to leave it alone.

11   And I ended up going to the ER.  And the ER said I

12   needed to go see a specialist and take time off.  Take

13   time off.  To take time off, two weeks off.  They gave

14   me a paper.

15       Q.   Okay.  Let me stop you here.

16       A.   Okay.

17       Q.   So is Occumed on the premises?

18       A.   No, it's not on the premises.

19       Q.   Where is it?

20       A.   It's -- it's like a couple of miles down from

21   our place.

22       Q.   So did Jackie drive you to Occumed?

23       A.   He drove me to Occumed.

24       Q.   And he drove you to the ER after Occumed?

25       A.   Yes.

Page 145

1        Q.   Okay.  Do you recall who you saw at Occumed,
2    which doctor it was?
3        A.   It wasn't -- it was not doctors.  It was
4    nurses, I think at that time.
5        Q.   Okay.
6        A.   It was late at night.
7                  (Exhibit No. 8 marked.)
8        Q.   (BY MS. ASHTON)  Okay.  I'm going to hand you
9    Exhibit 8.  This is called "First Report of Incident."
10                 Have you seen this before?
11       A.   (No response.)
12       Q.   Is this your signature on the second page of
13   this document?
14       A.   Oh, yes, it is.
15       Q.   It is.  Okay.
16                 MS. ASHTON:  Do we want to stop here for
17   lunch, or do you want to go a little bit more?
18                 THE WITNESS:  It's up to you.
19                 MS. COLE:  I mean, I've been thinking we'd
20   go to 12:30, but I'm fine with whatever.
21                 MS. ASHTON:  Okay.  I think this is a good
22   time if that works.
23                 (Recess taken from 12:11 until 1:10.)
24                 THE VIDEOGRAPHER:  We're off the record at
25   12:11 PM.

Page 146

1          (Recess taken from 12:11 until 1:10.)

2          THE VIDEOGRAPHER:  We are back on the

3    record at 1:10 PM.  Media 3.

4          Q.  (BY MS. ASHTON)  Mr. Reyna, you understand you

5    are still under oath?

6          A.  Yes, ma'am.

7          Q.  Before our lunch break, we were talking about

8    your finger injury, and you went to Occumed and then to

9    the ER; correct?

10         A.  Uh-huh.

11         Q.  Is that a yes?

12         A.  Yes.

13         Q.  And then you returned back to work a couple of

14   days later.  Is that what you recall?

15         A.  No.  The same -- the next day I had to go back

16   to work.

17         Q.  Okay.

18         A.  I was forced to go back to work, because I

19   talked to Gina on the phone.  And I told Gina we ended

20   up in the ER.  But she was upset that we ended up in the

21   ER.

22              And I told them the ER gave me two weeks

23   off, and I needed to see a specialist.

24              And she said I couldn't do that.

25         Q.  Who's Gina?

Page 147

1          A.  Gina Casarez is the safety manager.

2          Q.  What's her last name?

3          A.  Gina Casarez.

4          Q.  Castalez?

5          A.  Casarez.  Casarez.

6          Q.  Casarez.

7          A.  Yes.

8          Q.  And she is the safety manager?

9          A.  Manager.  Uh-huh.

10         Q.  Do you know her national origin?

11         A.  She's -- it's because at work they make us say

12    where we're from, sometimes in groups.  I think she's

13    Hispanic.

14         Q.  Okay.  From where?  Do you know?

15         A.  I don't know.

16              (Exhibit No. 9 marked.)

17         Q.  (BY MS. ASHTON)  I'm going to mark Exhibit 9.

18              So what I am presenting to you as Exhibit 9

19    are all of the Texas workers' comp work status reports

20    relating to your injury.

21              So the top one here -- I'm looking at the

22    very bottom, the bottom.

23              And is that your signature there on the

24    bottom?

25         A.  Yes.

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 148

1     Q.  Okay.  And to the left of your signature it

2   says "date/time of visit."

3           Do you see that?

4     A.  Yes.

5     Q.  All right.  So this top one is 11:45 PM from

6   the time of your visit; correct?

7     A.  Where?

8     Q.  11:45 PM.

9     A.  Okay.  Yes.  Yes.

10    Q.  Okay.  And then the very top right-hand corner

11  right here, it says January 24, 2022; right?

12    A.  Uh-huh.

13    Q.  Can you verbally say yes?

14    A.  Yes.

15    Q.  Okay.

16    A.  I was about to burp.

17    Q.  That's okay.

18          This is the initial workers' comp status

19  report that you received immediately following your

20  injury; correct?

21    A.  That -- on the 24th?

22    Q.  Correct.

23    A.  Yes.

24    Q.  And the 24th was the date of your injury;

25  right?

Page 149

1         A.   Uh-huh.   But I think they got it wrong here.
2    It says 1-21.
3         Q.   Right.   Okay.
4              But you actually injured your finger on
5    1-24?
6         A.   On the 24th, yes.   1-24.
7         Q.   And you received this worker -- worker status
8    report on 1-24; right?
9         A.   This?   I think so, yes.
10        Q.   Okay.   And do you see where it says "doctor's
11   name and degree"?
12        A.   Kerry --
13        Q.   Inzer?
14        A.   Yes.   Kerry Inzer.   Yes.
15             MS. ASHTON:   It's K-E-R-R-Y, I-N-Z-E-R,
16   Inzer.
17        Q.   (BY MS. ASHTON)   And immediately under Kerry
18   Inzer, it says Occumed Plus; right?
19        A.   Yes.
20        Q.   So you went -- this is from when you went to
21   the Occumed facility?
22        A.   Uh-huh.
23        Q.   Is that a yes?
24        A.   Yes.
25        Q.   Okay.   And it says -- Part II is work status

Page 150

1    information.

2            Do you see that?  Part II right here.

3        A.  Yes.

4        Q.  Okay.  And it's -- the box for (b) is checked.

5    "Will allow the employee to return to work as of 1-25-22

6    with the restrictions identified in Part III."  Correct?

7        A.  Uh-huh.

8        Q.  Is that a yes?

9        A.  Yes.

10       Q.  Okay.  And then Part III, the restrictions

11   include for your left hand "may not carry heavy objects

12   with left hand."  Right?

13       A.  Yes.

14       Q.  Okay.  Then the second page of this exhibit, if

15   you can flip the page, at the top right corner it says,

16   this is January 25, 2022.  That's the next day; right?

17       A.  Yes.  The next day.

18       Q.  Okay.  And then this is also Dr. Inzer;

19   correct?

20       A.  Uh-huh.

21       Q.  Is that a yes?

22       A.  Yes.

23       Q.  And then Part II, work status, Part B says

24   "will allow the employee work to return to work as of

25   1-25-22 with the restrictions identified in Part III,

Page 151

1    which are expected to last through February 1, 2022."

2    Correct?

3         A.  Correct.  Yes.

4         Q.  All right.  And then in Part III the

5    restrictions are, "Fit for duty with the following

6    restrictions:  Starting that day 1-25-22.  No use of

7    left hand."  Correct?

8         A.  Correct.

9         Q.  Okay.  And that's your signature at the bottom?

10        A.  Uh-huh.

11        Q.  Is that a yes?

12        A.  Yes.

13        Q.  All right.  And I'm going to --

14             We're going to keep this exhibit -- what is

15   this marked?  This is -- we're going to keep Exhibit 11,

16   because I'm going to refer back to it because I just

17   included all of the status reports together.

18             But I'm also going to show you Exhibit 12,

19   and this is a letter you sent from the Methodist ER to

20   Epiroc; correct?

21        A.  Correct.

22        Q.  Okay.  And it's dated January 25th of 2022;

23   right?

24        A.  Uh-huh.

25        Q.  Is that a yes?

Page 152

1          A.   Yes.

2          Q.   And it says, "Edgar Reyna was seen and treated

3    in our emergency department on 1-25-22.  He may return

4    to work on 1-31-22."  Correct?

5          A.   Uh-huh.

6          Q.   Yes?

7          A.   Yes.

8          Q.   And then it says, "Additional information:  If

9    cleared by hand specialist."  Right?

10         A.   Yes.

11         Q.   Okay.  And so according to both of these

12   doctors' notes, you were cleared to return to work, one

13   said if cleared by hand specialist, and then Dr. Inzer

14   said you couldn't use your left hand.  Right?

15         A.   Uh-huh.

16         Q.   Is that a yes?

17         A.   Yes.

18         Q.   Okay.  So when you said Gina Casarez, you told

19   her that you couldn't work for two weeks.

20              Where were you getting that from?

21         A.   They don't have the other paper from the ER

22   that says -- them saying -- that's what he says right

23   here, "Additional information:  If cleared by the hand

24   specialist."

25              They refer me to a hand specialist the next

Page 153

```
 1   day.
 2        Q.   Okay.  And who was that?
 3        A.   The ER.  The ER.
 4        Q.   The hand specialist?
 5        A.   The ER referred me to a hand specialist.
 6        Q.   My question is:  Who is the hand specialist?
 7        A.   I never got a chance to see a hand specialist.
 8        Q.   Okay.  Hold on.  My question is, the ER, you
 9   said they referred you to a hand specialist.
10        A.   Uh-huh.
11        Q.   Who was the ER -- who was the hand specialist
12   the ER referred you to?
13        A.   I don't remember the -- I sent the paper to --
14   to work.  They have all the papers even including this.
15        Q.   Right.  Because you produced this; right?
16        A.   Yes.
17        Q.   Okay.  And so your -- it's your testimony that
18   you provided to the company the name of the hand
19   specialist you were supposed to see?
20        A.   Whatever they're saying to me at the hospital,
21   I provided to the company.
22        Q.   Did you make an appointment with the hand
23   specialist?
24        A.   I didn't get a chance, because the next day in
25   the morning, that's when I called Gina.  And Gina told
```

Page 154

1    me to avoid that.  I couldn't do that.  I had to go to

2    their doctor, not -- not -- I couldn't see a specialist

3    unless Occumed refers me to.

4         Q.  So it's your testimony that Gina Casarez told

5    you not to go to the hand specialist?

6         A.  Yes.

7         Q.  Why would she do that?

8         A.  Because she said it was against the policy,

9    company policy.  I'm also going to be the one paying

10   everything.

11        Q.  Okay.  And so she wanted you to go to Occumed?

12        A.  Occumed, and let Occumed decide if I need a

13   specialist or I didn't.

14        Q.  Okay.  And did you do that?

15        A.  I went to Occumed.

16        Q.  Is that what we're looking at on this

17   Exhibit 11?

18        A.  On the 26th?  On the 26th, yes.

19        Q.  This is the 25th.

20        A.  On the 25th, yes.  The next day, yes.

21        Q.  Okay.  So then you went here.  And Dr. Inzer

22   said you cannot use your left hand; correct?

23        A.  And I couldn't see a specialist.  I asked if I

24   can see a specialist, and she said no.

25        Q.  I'm going to object as nonresponsive.

Page 155

1           It says on this form "no use of left hand";

2    correct?

3           A.  No use of left hand.  Yes.

4           Q.  Okay.  Nowhere on this form does it say you're

5    not allowed to see a specialist; right?

6           A.  Right.

7           Q.  Okay.  So then when did you return to work?

8           A.  Same day.  He said -- I told him -- he said,

9    just take the -- he just told me to take the medicines

10   they gave me at the hospital.

11           But I told him one of them is just going to

12   make me drowsy.  That's why I wanted to stay home.

13   Because Tylenol codeine 3 will make me drowsy, they told

14   me at the ER.

15           And I went.  He said, "Don't worry about

16   it.  Just go to work and take the meds at work."

17           So I went to work.

18           Q.  And you went to work and you did not use your

19   left hand; correct?

20           A.  I did not use my left hand.

21           Q.  All right.  And did you speak to Epiroc and

22   Jackie about your limitations?

23           A.  I gave it to Jackie, yes.

24           Q.  You gave what to Jackie?

25           A.  The restriction, this form they gave me.

Page 156

1       Q.  You gave the form that we're looking here at
2  Exhibit 11 to Jackie?
3       A.  To Jackie.  Yes.
4       Q.  Did you give it to anybody else?
5       A.  Not that I remember.
6       Q.  At this time who was the HR person?  Do you
7  recall?
8       A.  I think it was Tanya.
9       Q.  Okay.  Tanya Tyler?
10      A.  Tanya Tyler.
11              THE REPORTER:  Excuse me?
12              MS. ASHTON:  Tanya Tyler.
13              THE WITNESS:  Tanya Tyler.  Tyler.
14              MS. ASHTON:  T-A-N-Y-A, T-Y-L-E-R.
15      Q.  (BY MS. ASHTON)  So you mentioned that the ER
16  referred you to a hand specialist.  You don't recall the
17  name of that specialist.
18              At any other time did you make efforts to
19  see a hand specialist?
20      A.  When I was getting scared about my finger, I
21  did go see a hand specialist.  And she was -- she told
22  me that it sounded like I was being tortured because you
23  don't poke nobody's finger without it being numb and
24  injecting -- you have to put antibiotics, especially the
25  way my finger was.

Page 157

```
 1          Q.   Who was this hand specialist?

 2          A.   She's in McKinney, I think.

 3          Q.   What's her name?

 4          A.   I don't know her name.

 5          Q.   What's the clinic's name?

 6          A.   Finger injuries, finger something.

 7          Q.   Have you provided that information to your

 8     attorney?

 9          A.   No.  I think I have -- yes, I think I have.

10          Q.   Okay.  If you have not, will you agree to

11     provide that information?

12          A.   I will agree to provide it, yes.

13          Q.   Other than this hand specialist in McKinney,

14     have you seen any other hand specialists?

15          A.   Yes.  After we did the transfer of

16     the switching doctors.

17          Q.   Transfer of switching doctors?

18          A.   Yes.  Whenever I didn't see the company doctor

19     no more, and I saw a different doctor.

20          Q.   Who is that?

21          A.   The doctor that was giving me therapy on my

22     finger, he referred me to that specialist I mentioned

23     earlier in Dallas, yes.

24          Q.   Okay.  Okay.  Okay.  Are those all of the hand

25     specialists that you've seen?
```

Page 158

1          A.   Yes.

2          Q.   Okay.  The hand specialist that you saw in

3     McKinney, how long did you see them?

4          A.   It was just one day because I was afraid, you

5     know, about my -- the way my finger was looking and I

6     was --

7          Q.   Do you recall when that was?

8          A.   I think it was the week after, I think.  I

9     don't -- I'm not --

10         Q.   The week after the injury?

11         A.   Yes.  The week -- yes, I think so.

12         Q.   Okay.  All right.  And Epiroc allowed you not

13    to use your left hand; correct?

14         A.   Yes.

15         Q.   All right.  And you -- by them allowing you to

16    do that, they placed you on light duty; right?

17         A.   Yes.

18         Q.   And this duty -- light duty was focused on

19    training; is that correct?

20         A.   Yes.

21         Q.   Okay.  And you returned to Occumed several

22    times to follow up; right?

23         A.   Uh-huh.  Follow up.

24         Q.   Okay.  Also I'll refer back to this Exhibit 11.

25              You went basically once a month; is that

Page 159

1    right?

2        A.   Something like that, yes.

3        Q.   Oh, that's 9.  My bad.  I keep calling it 11,

4    but it's Exhibit 9.  Thank you.

5             So if you go back to Exhibit 9, it's the

6    third page.  And it says at the bottom -- it's the one

7    that's dated 2-2-22, February 2nd of '22.

8             Do you see that?  At the bottom right here.

9        A.   Okay.  Yes.  Yes.

10       Q.   Is that your signature to the right of that

11   date?

12       A.   Yes.

13       Q.   Okay.  And, again, this is Dr. Inzer; correct?

14       A.   Uh-huh.

15       Q.   Is that a yes?

16       A.   Yes.

17       Q.   All right.  And then it -- again, it just

18   repeats no use of left hand; right?

19       A.   Yes.

20       Q.   Okay.  So after this Occumed appointment that

21   we're talking about here, you asked Jackie to take the

22   rest of the week off; correct?

23       A.   It was the same day on the 25th.  On the 25th I

24   asked him, I didn't feel right being at work, taking my

25   meds.  I feel -- I'm going to feel dizzy, and I'm afraid

Page 160

1    I'm going to get hurt, fall and get hurt.

2              And if you leave, you get points, so I have

3    to use my vacation so I can leave.

4         Q.  Were you allowed to leave?

5         A.  Yes.

6         Q.  Okay.  But also on February 2 you also asked to

7    take time off; correct?

8         A.  I don't recall if I -- if I --

9         Q.  If you -- if you asked to take time off, did

10   Epiroc give you the time off?

11        A.  To -- yes.  For the injury, yes.  Yes.

12        Q.  Okay.  And Epiroc offered -- while you were on

13   this light duty, Epiroc offered you to participate in

14   several trainings but you declined; correct?

15        A.  Not that I recall.

16        Q.  Do you recall declining any training?

17        A.  I was already mentoring when -- before I got

18   hurt so I continued mentoring.

19        Q.  Okay.  Well, objection; nonresponsive.

20              Do you recall declining training?

21        A.  No.

22        Q.  I'm not talking about mentoring.  Just the

23   training for you to take personally.

24        A.  That they gave me training?

25        Q.  Correct.  They offered you training and you

Page 161

1    declined?

2         A.   On light duty, when I was on light duty?

3         Q.   Correct.

4         A.   I don't recall.

5         Q.   Okay.  What about training on Lean Principles?

6    Did you ever do that training?

7         A.   They gave me some training through Reagan.

8    Reagan was the one for the training.

9         Q.   Through Reagan?

10        A.   Yes.  Ever since I took him my complaints, he

11   was going to be the one in charge of putting my name on

12   the list, the way that Jackie don't made the decision

13   who goes and who doesn't go.

14        Q.   So you were able at that time to take the

15   training that you wanted to take?

16        A.   Through Reagan, yes.

17        Q.   Okay.  But as of that time in 2019, I believe

18   you said you were able to do the trainings you wanted to

19   take; is that correct?

20        A.   I don't recall, ma'am.

21        Q.   Well, you said you went to Reagan before your

22   original complaint in March of 2021, you believed it was

23   in 2019; correct?

24        A.   I think -- I don't remember, recall the exact

25   date because I used to go in person, and in person when

Page 162

1     I talked to Tanya, they said she wasn't aware of it.  So

2     I don't know which one did Reagan before.

3          Q.  But after you spoke to Reagan, you had no

4     issues with training?

5          A.  Yes.  I didn't have no issues with training.

6               (Exhibit No. 10 marked.)

7          Q.  (BY MS. ASHTON)  Okay.  This is Exhibit 10.

8               If this is the right one -- mine it is all

9     missed up.  What does yours say?  No.  That's the right

10    one.

11              Here it is.  Here it is.  Here you go.

12    Exhibit 10.  All right.

13              So the second page of Exhibit 10, if you'll

14    flip the page right here.  You can flip it.  The first

15    email is an email from Jackie Gudgel to Peter Chung.

16              Do you see that?

17         A.  Jackie -- from Jackie to Peter.  Okay.  Yes.

18         Q.  Right.  Do you see that?

19         A.  Uh-huh.

20         Q.  And it's dated April 11th of 2022; correct?

21         A.  Uh-huh.

22         Q.  And this was the time when you were on light

23    duty; right?

24         A.  Yes.

25         Q.  Okay.  And it says, "Peter, would you ask Edgar

Page 163

1    if he might like the Lean Principles Training tomorrow,

2    please."

3              Did I read that correctly?

4        A.  Yes.

5        Q.  Okay.  And the next email chain, Peter -- it's

6    on this page -- Peter responds and says, "Hi, Jackie.

7    He says no."

8              Did I read that correctly?

9        A.  Yes.

10       Q.  Okay.  Do you recall this situation?

11       A.  I don't recall it.  But there was sometimes,

12   yes, maybe -- well, that was when I was on light duty.

13       Q.  Why would you decline a training?

14       A.  Why did I decline a training?

15       Q.  Yes.

16       A.  Because I think I had learned -- to my

17   understanding, I thought I had already taken the Lean

18   Principles training.

19       Q.  So you declined it because you thought you had

20   already taken it?

21       A.  I already had training.

22       Q.  And they didn't tell you no, you didn't.

23   Why --

24       A.  They didn't say no.

25              I asked Peter, "Have I taken it?"

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

Page 164

1          Because in some of the trainings we

2     duplicate them.

3          Q.  Okay.  But if they were asking you to take a

4     training, do you think that they wanted you to take the

5     training?

6          A.  Yes.

7          Q.  So you still declined it anyway?

8          A.  Uh-huh.

9          Q.  Is that a yes?

10         A.  Yes.

11         Q.  Going back to Exhibit 9, this one with the

12    status report, I'm --

13         A.  Which one?

14         Q.  Sorry.  This one right here.

15              Flipping to the April status report,

16    April 5, 2022.

17              So I think you're going to flip two more

18    pages, where at the bottom it says April 5, 2022.  I

19    think it's this one.

20         A.  Okay.  April 5.

21         Q.  Oh, yeah, perfect.

22              So this one -- it's also Kerry Inzer;

23    correct?

24         A.  Uh-huh.

25              THE REPORTER:  It's also....

Page 165

1          MS. ASHTON:  Kerry Inzer, I-N-Z-E-R.

2      Q.  (BY MS. ASHTON)  And under second section,

3  "work status information," the first box is checked.

4          And it says "...will allow the employee to

5  return to work as of April 5, 2022, without

6  restrictions."

7          Did I read that correctly?

8      A.  Uh-huh.  Yes.

9      Q.  So as of this date you were released back to

10  work with no restrictions; right?

11      A.  Yes.

12      Q.  Okay.  And this was the time where you

13  complained that Dr. Inzer was rude to you?

14      A.  Yes.

15      Q.  And what do you -- why do you think Dr. Inzer

16  was rude to you?

17      A.  The day before this, Jackie -- Jackie wanted me

18  to go full duty at work.

19          And Peter told him I was still on light

20  duty.  So the next day I -- I get an appointment to see

21  the doctor, and the doctor releases me.

22          But he checked my -- he just -- he checked

23  whatever I had on my finger.  And he started being

24  aggressive.

25          And he just said I didn't -- I didn't need

Page 166

1     it no more, just to go back to work.

2                   And I let know the people in front about

3     it.  And they said that -- they apologized for his --

4     his behavior.  They were going to let the upper people

5     know.

6                   So I didn't -- I sent an email to Madison

7     about it.

8         Q.  Right.

9                   So you said Jackie, the day before, wanted

10    you to go back to full duty.

11        A.  Yes.

12        Q.  How do you know that?

13        A.  Because he -- Peter told me.

14        Q.  Jackie never told you?

15        A.  No.  He would send Peter.

16        Q.  Okay.  So what exactly did Peter tell you that

17    Jackie said?

18        A.  Peter said that Jackie told him that he wanted

19    me to be working.  He wanted to see me working, see

20    something -- to me work to be doing something.

21                   But Peter said he told him to hold on until

22    they released me from light duty because he doesn't want

23    him -- for me to get hurt again.

24        Q.  Okay.  So you have no knowledge of whether

25    Jackie talked to Dr. Inzer; do you?

Page 167

1       A.   I don't have knowledge.

2       Q.   Okay.  So when Dr. Inzer was rude to you, do

3   you think he was intending to discriminate against you?

4       A.   I was -- I was -- it was unexpected.  I would

5   appreciate if he would said, you know, in a different

6   tone, let me see, instead of just going in there and

7   jerking it.

8       Q.   In the prior visits with Dr. Inzer, how did he

9   behave with you?

10      A.   He would just -- told me to keep taking the

11  medicines.  And I would keep asking for -- for

12  specialist, but he would say it was up to him, not up to

13  me.

14      Q.   Was it -- was he nice towards you?

15      A.   Not nice, but he just -- nothing that I wanted,

16  he -- everything I asked was a no.  A no.

17      Q.   Okay.  But this is the first time you've -- you

18  complained about Dr. Inzer?

19      A.   Yes.  It was the first time I complained.  Yes.

20      Q.   Okay.  And after you complained to Madison

21  about Dr. Inzer, they -- Epiroc offered for you to see a

22  different Occumed doctor; correct?

23      A.   I think they were asking for a different

24  doctor, right.

25      Q.   And you declined; right?

Page 168

1     A.   They were in the process of switching doctors.

2     Q.   Okay.  Objection; nonresponsive.

3     A.   Okay.  Yes.  I told him -- I told him I was

4  during the process -- yes, I did decline it.

5     Q.   You did decline seeing another Occumed doctor;

6  correct?

7          THE REPORTER:  You're going too fast.

8          THE WITNESS:  Yes.

9          THE REPORTER:  Okay.  Could you repeat it,

10  please.

11     Q.   (BY MS. ASHTON)  Epiroc offered for you to see

12  a different Occumed doctor but you declined; correct?

13     A.   Uh-huh.

14     Q.   Is that a yes?

15     A.   Yes.

16     Q.   Why did you decline?

17     A.   Because my other attorney told me that I

18  couldn't see another doctor because my paperwork was in

19  process switching doctors, my -- my attorney that I had

20  with my workers' comp.

21     Q.   Who is that?

22     A.   I forgot -- her name was -- let me see what her

23  name was.  I have to remember her name.

24     Q.   Did you retain her personally?

25     A.   Yes, I did.

Page 169

1       Q.   How -- okay.  So you -- at this time you were
2    represented by an attorney?
3       A.   For the injury, yes.
4       Q.   What do you mean "for the injury"?
5       A.   For my finger injury was a workers -- work comp
6    injury.
7       Q.   Does that attorney still represent you?
8       A.   No.
9       Q.   When did you end that --
10      A.   We went to -- we went to -- we went to --
11      Q.   Mediation?
12      A.   Yes.  I think, with workers' comp.
13           MS. COLE:  I think it was the final thing
14   where the workers' comp system --
15           MS. ASHTON:  The appeal?
16           MS. COLE:  No.  Where they -- where they
17   give you your rating, your disability rating.
18           MS. ASHTON:  Oh, okay.
19           MS. COLE:  I think maybe.
20           THE WITNESS:  Yeah, that was it.  Yeah.
21      Q.   (BY MS. ASHTON)  Okay.  And you were
22   represented by counsel at that time?
23      A.   Yes, I was.
24      Q.   And then after that, she no longer represented
25   you?

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

Page 170

1       A.   Yes.  She no longer represented me.

2       Q.   What was the outcome --

3            THE REPORTER:  Okay.  Repeat it.

4            After that she no longer represented

5    you....

6            THE WITNESS:  No.  She no longer -- she no

7    longer represented me.

8       Q.   (BY MS. ASHTON)  What was the outcome of that

9    hearing or meeting that you -- the workers' comp --

10      A.   They just gave me the -- one rating with

11   permanent disability.

12      Q.   The one percent?

13      A.   One percent with permanent disability.

14      Q.   Okay.  So Epiroc -- okay.  Strike that.

15           Epiroc then offered for you to see a doctor

16   of your own choosing; correct?

17      A.   I don't recall.  Because Madison would stop me

18   on the hallway in front of everybody --

19           THE REPORTER:  Repeat it.

20           THE WITNESS:  I don't recall.

21           THE REPORTER:  But you said more.

22      A.   Madison would stop me in front of everybody

23   sometimes and ask me, and I -- and I was advised by my

24   other attorney not to go because if I go, I was going to

25   mess up the paperwork on switching doctors through

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 171

1    the -- through the state.  They were switching doctors

2    through the state.

3         Q.  (BY MS. ASHTON)  But you declined that, too;

4    correct?

5         A.  I didn't -- I couldn't -- I didn't know what to

6    do.  That's why I called the attorney.

7              She said, "You can't go see no doctors

8    right now.  There's a process you got to follow."

9         Q.  Okay.  You didn't tell that to Epiroc, correct,

10   about what your attorney --

11        A.  They -- yes.

12        Q.  Let me finish.  Let me just finish.

13             You did not tell Epiroc what your attorney

14   advised you to do?

15        A.  I did send an email to Madison.

16        Q.  Objection; nonresponsive.

17             THE REPORTER:  You're going way too fast.

18             MS. ASHTON:  He said he did send an email

19   to Madison.

20             THE REPORTER:  Well, I need to hear it from

21   him.

22             "You did not tell Epiroc what your attorney

23   advised you to say; right?"

24        A.  I did send them an email.

25        Q.  (BY MS. ASHTON)  And I'll object as

Page 172

1    nonresponsive.

2              You did not tell Epiroc that the reason you

3    were declining to see another Occumed doctor and to see

4    a doctor of your own choosing was because your attorney

5    advised you not to; correct?

6         A.  I did let them know.

7         Q.  You let them know that it was your attorney,

8    that's why?

9         A.  Yes.  Yes, that there was -- there was -- there

10   was rules -- there was procedures that needed to be

11   followed.  I sent Madison an email.

12        Q.  Have you provided that email to your attorney?

13        A.  Yes, I have.

14        Q.  After Dr. Inzer released you to return to work

15   at full duty with no restrictions effective April 5,

16   2022, you had a meeting with Tanya Tyler and Matt

17   Buttacavoli; correct?

18        A.  The day after?

19        Q.  Around that time.

20        A.  Around -- yes, around that time.

21        Q.  And during that meeting, you told them that you

22   could return back to work as an assembler; correct?

23        A.  They didn't give me a choice.

24        Q.  Objection; nonresponsive.

25              In the meeting with Tanya and Matt you told

Page 173

1    them that you could work as an assembler; correct?

2         A.  Yes.

3         Q.  They told you during that meeting to come to

4    them if you ever needed an accommodation; right?

5         A.  I don't recall.

6         Q.  They also asked you about details of prior

7    complaints that you made about Jackie; right?

8         A.  The thing is they would take me to HR for my

9    injury, and then they would change it to a different

10   thing.

11        Q.  Objection; nonresponsive.

12             During your conversation with Matt and

13   Tanya -- and Tanya is in HR, by the way; correct?

14        A.  Yes.

15        Q.  Okay.  She -- they would ask you about details

16   of your complaint; right?

17        A.  Uh-huh.

18        Q.  Is that a yes?

19        A.  Yes.

20        Q.  And you would refuse to provide information

21   about your complaint; correct?

22        A.  I would never refuse.  I would tell them they

23   have it in emails.

24             THE REPORTER:  I would never....

25             THE WITNESS:  I never refused.

Page 174

1      Q.   (BY MS. ASHTON)   It's your testimony today

2  under oath that you never refused when they asked you to

3  provide details about your complaint?

4      A.   I remember telling them, you guys have all the

5  emails.  All my -- all my -- all my complaints are in

6  emails.  Everything is in email.  You guys can go over

7  the emails and read them.

8      Q.   You don't recall telling them that you don't

9  want to tell -- talk about names or events -- let me

10  finish -- because you felt scared of retaliation?

11     A.   I did tell them.

12     Q.   You did tell them that?

13     A.   Uh-huh.  I told them that my -- my witnesses

14  were afraid to come in because of what's going on with

15  me.  And I did not -- didn't want them to get retaliated

16  because of me.  And the only thing that I come -- I've

17  been coming to HR for so many years, the only thing that

18  I get is retaliation.  That's why I was afraid.

19     Q.   Okay.  So let me just make sure I'm

20  understanding.

21          During the conversation with Matt and

22  Tanya, when they asked you to provide information

23  relating to your complaint, you refused to provide

24  details regarding the who and the when and the where

25  regarding your complaint; correct?

Page 175

1      A.   I didn't refuse.   I told them everything is on
2   paperwork, and the reason why I was afraid for
3   retaliation.
4      Q.   But you did not provide details about who was
5   involved; right?
6      A.   Yes.   And sometimes -- I've been so many --
7   I've been so many times to HR -- I forgot -- I've been
8   so many times to HR, and the times I said the names, but
9   I can't recall when I did and when I did not say the
10  names.
11     Q.   There were times when you did not?
12     A.   There's times when I did not.
13     Q.   All right.   Epiroc investigated the issue
14  involving Dr. Inzer; is that right?
15     A.   Yes.
16     Q.   All right.   And Jackie told you that you could
17  get the splint back on your finger; correct?
18     A.   Yes.
19     Q.   Okay.   Epiroc provided you with ADA
20  accommodation forms; correct?
21     A.   I don't recall.
22     Q.   At all times Epiroc accommodated your
23  restrictions; correct?
24     A.   Correct.
25              (Exhibit No. 11 marked.)

Page 176

1          Q.   (BY MS. ASHTON)  I hand that to you.

2               I'm going to mark this as Exhibit 11.

3          A.   I have a question.  The time that you said that

4     I -- they -- they come in to HR, right, Madison -- to

5     Tanya and -- was the reason why --

6               (Exhibit No. 13 marked.)

7          Q.   (BY MS. ASHTON)  We're about to talk about that

8     meeting in this exhibit.

9          A.   All right.

10         Q.   Okay.  So this is Exhibit 12, I think.

11              MS. COLE:  This would be 13 because --

12              MS. ASHTON:  I skipped an exhibit?

13              MS. COLE:  No.  Like we did 12 first and

14    then we went back.  So this would be 13.

15              MS. ASHTON:  13?

16              MS. COLE:  Did you already mark it?

17              MS. ASHTON:  Yeah.

18              MS. COLE:  Oh, okay.  Sorry.

19              MS. ASHTON:  I think so.

20         Q.   (BY MS. ASHTON)  Okay.  This -- so this is an

21    email from -- I'm looking at a second email in the

22    chain.

23              Tanya Tyler to you, copying Matt

24    Buttacavoli dated April 18, 2022; right?  Do you see

25    that?

Page 177

1            I'm just talking about here.  I'm just

2      establishing who was involved.

3            A.  Oh, okay.

4            Q.  Do you see that?

5            A.  I see it.

6            Q.  All right.  And the subject line is "discussion

7      on April 15, 2022."  Right?

8            A.  Yes.

9            Q.  All right.  And Tanya writes, "Edgar, thanks

10     for meeting with me and Matt on Friday, April 15.  I

11     wanted to send you a summary of our discussion in case

12     you had any questions.  You informed me that were

13     unhappy with your visit with the Occumed doctor, who

14     released you to work without any restrictions, and you

15     did not feel that the doctor understands your job

16     duties.  We offered for you to see a different Occumed

17     doctor, or to see a doctor of your own choosing, but you

18     declined.

19                 "Instead, you stated that you are able to

20     return to your regular job duties as an assembler

21     effective immediately.

22                 "We agreed to let -- we agreed that you --

23     to let us know how your return goes, and if you require

24     an accommodation in order to perform any of your

25     essential job duties."

Page 178

1              That's what we just talked about; correct?

2         A.  Yes.

3         Q.  Okay.  And then the second paragraph is, "We

4    then discussed your recent complaints regarding your

5    supervisor, Jackie.

6              "We asked for you to provide us with

7    details regarding your complaint so we can fully

8    investigate the situation, but you chose not to.  We

9    explained that it is our intention to fully understand

10   the situation so we can best address it and resolve any

11   problems that may exist.  We encourage you to discuss

12   this complaint with us -- and any others with us.  We

13   cannot act if we do not fully understand what is going

14   on.

15             "Please do let us know if you decide you

16   would like to discuss this, or any other problems that

17   you have, any further."

18             Did I read that correctly?

19        A.  Uh-huh.

20        Q.  Is that a yes?

21        A.  Yes.

22        Q.  Does that refresh your memory as to whether --

23        A.  It refreshed but --

24        Q.  Let me finish my question.

25             Does that refresh your memory about whether

Page 179

1    or not you declined to provide Matt and Tanya with

2    details regarding your complaints?

3         A.   It is missing some stuff.

4         Q.   What is it missing?

5         A.   What we talked about.  It's missing the part

6    when I told them, is it going to affect me if I say --

7    if I -- if I say no, I can't work.  If they say yes,

8    it's going to affect you if you say no.  So I had to say

9    yes, I could work.

10        Q.   You recorded this conversation; right?

11        A.   I don't recall.

12        Q.   Okay.  You -- you recorded a lot of

13   conversations; correct?  Is that a yes?

14        A.   Yes.

15        Q.   Okay.  And the -- when you recorded a

16   conversation, did you let the people you were recording

17   know that you were recording them?

18        A.   No, I didn't.

19        Q.   Okay.  And you provided all the recordings that

20   you had to your attorney; correct?

21        A.   Correct.  Yes.

22        Q.   This conversation with Matt and Tanya, do you

23   recall recording it?

24        A.   I have to -- I have to check.

25        Q.   Okay.  Well, I'll represent to you that you did

Page 180

1   record it.  And so we have a record of it; right?

2         A.  Okay.

3         Q.  What is it that you believe that Tanya did not

4   say in this email that actually happened?

5         A.  Is this the one -- they took me to HR so many

6   times, there -- did the one where they said about --

7   right after the finger, right?  That's the same one we

8   were talking earlier.

9         Q.  Mr. Reyna, I don't know.  This one is dated

10  April 18, 2022.  Your injury happened January 24, 2022.

11        A.  Because you said it was the same one whenever

12  they took me -- that Matt and Tanya took me about --

13  about when they would -- they asked me about my injury.

14        Q.  In this one you were released to work full

15  duty.

16        A.  Yes.

17        Q.  You represented to them, I can work full duty.

18  You declined to see additional doctors.  You declined to

19  see -- you declined to provide information regarding

20  your complaints.

21              What is it that you believe happened in

22  this meeting that is missing --

23        A.  The reason why --

24        Q.  -- from Tanya's email?

25        A.  Okay.

Page 181

1          Q.   Go ahead.

2          A.   When the doctor released me, my finger was

3     still injured.  So I showed Jackie my finger, the way it

4     was -- the way -- the way it looked.  And he didn't care

5     about it.

6               And I told him, you know, "They tell us

7     every day in the safety, that if you see somebody

8     injured, don't allow them to work."

9               So I told him, "I'm still injured.  And I

10    know the doctor put me in full duty."

11              And he said to ignore it, just to -- if the

12    doctor say to work full duty, just to work full duty.

13              And I think that's when they took me to --

14    then Matt -- I guess Matt found out, and that's when

15    they took me there.

16         Q.   Took you where?

17         A.   To HR.  They -- they were going to talk about

18    my injury.  And that's when they put me back on light

19    duty.

20              Matt and Tanya decided to put me back on

21    light duty because of the way that my finger was

22    looking.

23         Q.   Okay.  So at the time Jackie had the

24    conversation with you, you were released to work for

25    full duty; correct?

Page 182

1     A.  Yes.  Uh-huh.

2     Q.  All right.  And you just said you don't recall

3  if the company ever provided you with forms for your

4  position to complete if you needed an accomodation?

5     A.  They did provide me with some forms when I

6  switched doctors.  When the doctor -- when I switched

7  doctors, that's when they provided me forms.

8     Q.  When did you switch doctors?

9     A.  Like in the middle of 2022.

10     Q.  And is that the doctor, the chiropractor?

11     A.  She's not a chiropractor.  There's --

12  there's -- I think there -- the building is called

13  chiropractor.  But she's -- she's -- they have different

14  doctors in there.

15     Q.  What kind of doctor is she?

16     A.  Like they have a different specialists,

17  therapists and doctors that will -- doctor that was in

18  charge of my injury, and another doctor that was --

19  Dr. Pierson.

20     Q.  What kind --

21          THE REPORTER:  Doctor who?

22          THE WITNESS:  Pierson.

23     Q.  (BY MS. ASHTON)  What kind -- the doctor that

24  you had, what kind of doctor was she?

25     A.  I never asked her what kind of doctor she was.

Page 183

1    So just the doctor that I was seeing.  I saw her and

2    Dr. Pierson.  Those two doctors.

3        Q.  Okay.  So you said that the company then put

4    you back on light duty; correct?

5        A.  Uh-huh.

6        Q.  And that's what you requested?

7        A.  That's when -- they saw my finger.  I didn't

8    request it.  I showed them my finger, and I told them to

9    decide, same day.

10       Q.  Okay.  So they -- you didn't ask for it because

11   you were still on full duty.

12       A.  That was -- they had put me on full duty, but I

13   showed them my finger.

14       Q.  And then they made a decision, oh, that looks

15   bad.  We're going to put you back on light duty?

16       A.  Back on light duty.

17            THE REPORTER:  You're still talking a lot

18   on --

19       Q.  (BY MS. ASHTON)  Let me ask this question

20   again.

21            You were on full duty; correct?

22       A.  Uh-huh.

23       Q.  Is that a yes?

24       A.  Yes.

25       Q.  Okay.  Then Madison and Matt saw your finger;

Page 184

1    right?

2         A.   Uh-huh.

3         Q.   Is that a yes?

4         A.   Yes.

5         Q.   And they said, let's put you back on light

6    duty; correct?

7         A.   Yes.

8         Q.   Okay.  So at that time you were put back on

9    light-duty work?

10        A.   Yes.

11        Q.   While you were back on light-duty work, they

12   checked in with you to see how you were doing again;

13   correct?

14        A.   I don't recall, to be honest.

15        Q.   All right.  Do you recall saying -- or for

16   Tanya offering for you to start going directly to

17   Madison, instead of Tanya, since you kept refusing to

18   provide details about your complaints to Tanya?

19        A.   At first -- I don't know what's going on, but

20   at first she said not to -- not to send my emails to

21   Madison because it was too much for her to handle.

22        Q.   I'm going to object as nonresponsive.

23             Do you recall that Tanya said to you, "We

24   want to know details of your complaint.  If you feel

25   uncomfortable coming to me, Tanya, you can go to

Page 185

1    Madison"?

2         A.   She did.

3         Q.   Okay.   Did you start going to Madison?

4         A.   I went to Madison one time, but at that time my

5    mind was confused because at first she had told me not

6    to go to Madison.   And that's when she told me to go to

7    Madison, that's why I was confused.

8         Q.   She told you to go to Madison because she

9    wanted you to feel comfortable about who you were able

10   to tell your complaints to; correct?

11        A.   Yes.   Yes.

12        Q.   And then did you eventually go to Madison about

13   your complaints?

14        A.   I went to Madison, and she started asking me

15   questions.

16        Q.   She was investigating your complaints; wasn't

17   she?

18        A.   She was not, but she was asking me questions.

19   I told her all my info was in emails.

20        Q.   Hold on.   Madison is in HR; correct?

21        A.   Yes.

22        Q.   It is her job to investigate complaints; isn't

23   it?

24        A.   Yes.

25        Q.   So when she was asking you about your

Page 186

1    complaints, wasn't she trying to investigate them?

2         A.  I've -- I've been to HR so many times and I was

3    afraid to get retaliated again.  That's why I told them

4    everything is in emails.

5         Q.  So you did not tell Madison information she was

6    asking you; correct?

7         A.  I told her some info.  I told her.  And she

8    started saying, you feel comfortable emailing, but you

9    don't feel comfortable talking.

10             And I told her I'm afraid to come talk to

11   you guys.

12        Q.  Okay.  We'll talk about that in a second.

13             The company also offered for you to work

14   for a new supervisor; didn't they?

15        A.  Yes, they did.

16        Q.  And you declined that?

17        A.  I declined it.  I told them why -- why -- how

18   come always all minorities we have to move to please

19   Jackie, instead of you guys fixing Jackie?"

20        Q.  I'm going to object as nonresponsive.

21             The company, after they offered for you to

22   get off of Jackie -- under Jackie and then go to a new

23   supervisor, you said no; correct?

24        A.  I said no to investigate my actions and --

25             THE REPORTER:  Just a minute.  Just a

Page 187

1    minute.  You're just going to have to wait until she

2    gets her question out.  I don't mean to be rude.

3                    THE WITNESS:  Because I'm --

4                    MS. COLE:  She's trying to protect the

5    record.

6                    THE WITNESS:  She's being aggressive --

7                    THE REPORTER:  I'm just trying to protect

8    the record.

9                    MS. COLE:  Let's take a break.

10                   THE REPORTER:  Okay.  Do you want to take a

11   break?

12                   MS. ASHTON:  I have a question pending.

13        Q.  (BY MS. ASHTON)  The company offered for you to

14   work under a new supervisor and you declined; correct?

15        A.  Yes.

16                   MS. COLE:  Objection; asked and answered.

17                   MS. ASHTON:  Okay.  We can take a break.

18                   THE VIDEOGRAPHER:  Off the record at

19   1:49 PM.

20                   (Recess taken from 1:49 until 2:00.)

21                   THE VIDEOGRAPHER:  We are back on the

22   record at 2 o'clock PM, media four.

23        Q.  (BY MS. ASHTON)  Mr. Reyna, you understand

24   you're still under oath?

25        A.  Yes, ma'am.

Page 188

1      Q.   Before the break we were talking about the

2    offer to switch to a new supervisor, Earl Lange.

3               Do you recall that testimony?

4      A.   Yes.

5      Q.   Why did you decline to switch to Earl Lange?

6      A.   I told Matt and Tanya why -- I wanted to

7    resolve the issue because I'm not the first one that's

8    complained about discrimination against Jackie.

9               Why -- why do we always get to -- as

10   minorities get to move to satisfy Jackie, instead of you

11   guys resolving the issue with Jackie.  And that's what I

12   said.

13              I want you guys to resolve the issue, not

14   to move me, like you move everybody else to so you

15   can -- we can please Jackie.

16     Q.   The pay and your schedule would have been

17   exactly the same; right?

18     A.   Exactly the same.

19     Q.   Who else do you believe Tanya and Matt moved

20   off of Jackie's team because of racial claims?

21     A.   The ones that I know that moved was Joey.

22     Q.   What's Joey's last name?

23     A.   Joey has a long last name.  I don't recall.  It

24   has H in the last name.

25     Q.   Okay.

Page 189

1        A.   Joey Khammanee, Khammanee something.

2             And then Miss Glenda, Glenda Randall, and

3    Curtis.  And Patrick Alec Bouton, he quit because he

4    couldn't take Jackie's racism no more, so he -- he

5    had -- he used to get panic attacks at work so he

6    quit on his own.

7        Q.   Who -- who is that?

8        A.   Patrick Bouton.  Alec Bouton.

9        Q.   What is Patrick's nationality?

10       A.   Alec, he told me was Italian and American.

11   Yes.

12       Q.   What about Curtis?

13       A.   Curtis is African-American.

14       Q.   What about Glenda?

15       A.   African-American.

16       Q.   And you said Joey is Asian?

17       A.   Yes.

18            And Lonnie Robison.

19       Q.   We talked about Lonnie.  You said Lonnie was an

20   electrician.

21       A.   Electrician.  Yes.

22       Q.   Okay.  Joey, Glenda, Curtis, Patrick, none of

23   them are assemblers; correct?

24       A.   Joey is an assembler.  Miss Glenda is an

25   assembler.  Curtis is an assembler, and Alec was an

Page 190

1    assembler.

2          Q.   We've never talked about them before.

3               So when did Joey switch off of Jackie's

4    team and where did he go?

5          A.   He went to Mr. Earl's.

6          Q.   When was that?

7          A.   I'm thinking 2021, 2022.  I'm -- I don't recall

8    at this time.

9          Q.   And how do you know why he switched to Earl's

10   team?

11         A.   Because Joey told me.

12         Q.   What did he tell you?

13         A.   He told me that he was in a test pad.  And he

14   went to the restroom on -- when he was coming out of the

15   restroom, Jackie and Peter were waiting for him, and

16   they shut the doors and cornered him in the test pad.

17              And Jackie asked them -- he kept walking

18   towards him, he said, and he feel threatened.

19              And he said that Jackie kept asking him,

20   you know, it's -- it's -- it's against the policy to

21   make false accusation about his department being

22   hostile.

23              And he said no.  He said his department was

24   hostile.  That's why he was trying to move to Mr. Earl's

25   department.

Page 191

1              And a lot of stuff went down.  He went to

2      HR, and I think they talked about it.  But Peter said it

3      was Jackie's idea to shut the doors.

4          Q.  What about Glenda?  When did she move to --

5      whose team did she move to?

6          A.  Glenda.  To Mr. Earl.

7          Q.  And when was that?

8          A.  Around the same -- around the same time, I

9      think.

10         Q.  Why did she move?

11         A.  Because of her issues, too, complaints and the

12     way they were treating her.

13         Q.  With Jackie?

14         A.  Yes.  Jackie was under -- we were -- we were

15     all working under Jackie.

16         Q.  Okay.  Do you believe Jackie discriminates

17     against other people in addition to Hispanic Mexicans?

18         A.  Just because we're minorities.

19         Q.  So all minorities Jackie discriminates --

20         A.  Not every -- every single one.

21         Q.  Let me finish my question please.

22         A.  Go ahead.

23         Q.  Do you believe Jackie discriminates against all

24     minorities?

25         A.  Not all minorities.

Page 192

1      Q.  Do you believe Jackie discriminates against
2   Black workers?
3      A.  He does, yes.
4      Q.  Do you believe Jackie discriminates against
5   Asian workers?
6      A.  Well, Joey, yes, he's Asian.
7      Q.  And you obviously believe he discriminates
8   against Hispanic workers?
9      A.  Yes.
10      Q.  Who else -- what other minority group do you
11   think Jackie discriminates against?
12      A.  So far just those.
13      Q.  And I guess one guy we talked about is Italian;
14   correct?
15      A.  He's mixed, American and Italian.  But he looks
16   Hispanic.  He thought he was Hispanic, he say.  Because
17   they used to call him Patricio.  Patrick.
18      Q.  Who used to call him that?
19      A.  At work.  He used to say his name was Patricio.
20   Patrick.
21      Q.  Patrick.
22      A.  He looks -- if you look at him, he looks like
23   me, Hispanic.
24      Q.  Patrick would refer to himself as Patricio?
25      A.  Yes.

Court Reporting Cost Containment        1-866-318-1233
A Veritext Company                 www.veritext.com

Page 193

1      Q.   Is that like an Italian name?

2      A.   I don't know.  He would just say Patricio.

3   Patrick.

4      Q.   Okay.  Did you like Earl?

5      A.   Mr. Earl helped me out.  He shared his stories

6   with me.  He also went through a lot of racism at work

7   when he became supervisor.

8      Q.   What is Earl's race?

9      A.   Earl Long.

10      Q.   What's his race?

11      A.   It's African-American.

12      Q.   What is his national origin?

13      A.   American.

14      Q.   How do you know that?

15      A.   He told me.

16      Q.   He told you he's American?

17      A.   He told me his stories and everything, yes.

18   He's the one that gave me like -- he used to give me

19   motivations, you know, to keep working.

20      Q.   Okay.  Did Jackie discriminate against Earl?

21      A.   Not against Earl but some of his employees.

22      Q.   But Earl is Black?

23      A.   Yes.

24      Q.   Why wouldn't Jackie discriminate against Earl?

25      A.   I don't know.

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 194

1      Q.   I'm going to mark Exhibit 13.  This is the next
2   charge that you filed.  Take a look at it let me know if
3   it looks familiar and confirm that's your signature at
4   the bottom of the page.
5      A.   Yes.
6      Q.   That's your signature at the bottom of the
7   page?
8      A.   Yes.
9      Q.   And this charge is dated May 13th of 2022;
10  correct?
11     A.   5-15, yes.
12     Q.   Here you check the boxes for race, color,
13  national origin, discrimination and retaliation; right?
14     A.   Uh-huh.
15     Q.   Is that a yes?
16     A.   Yes.
17     Q.   So in the middle of the second paragraph you
18  say that from November 2021 through May 11, 2022, I have
19  been watched on the job, filmed on the job; correct?
20     A.   Right.
21     Q.   What makes you believe that's true?
22     A.   Because I saw -- I -- I would -- every -- I
23  work -- I'd be working on a work station, and then I see
24  a light outside, you know, a light or something on.  And
25  I look, and I would see Jackie or Tim.  And when I --

Page 195

1    they noticed I'd see them, they would take off.

2         Q.   Jackie or who?

3         A.   Tim Choate.

4         Q.   Tim?

5         A.   Tim Choate.

6         Q.   Tim, C-H-O-A-T-E.  His last name.

7         A.   Jackie Gudgel and Tim Choate.  Yes.

8         Q.   Okay.  So you would see -- you would look out

9    and see Jackie and Tim doing what?

10        A.   When I was -- we work at nightshift.  Right.

11   And you can tell when the light is on, on something.

12   When I look outside the bay door, I can see a light or

13   something.  When I -- when I keep looking, that's when I

14   see them take off walking.

15        Q.   So you believe that when you spotted them, they

16   were filming you?

17        A.   Yes.  Because I saw the light of the phone.

18        Q.   You saw a phone light on?

19        A.   I saw a light.  A light.  Yes.  Yes.

20        Q.   And it's your belief that it was a phone light?

21        A.   I have asked a couple of people, and they say

22   that Jackie and Tim, they like to record people doing

23   wrong stuff.

24        Q.   Were you doing anything wrong?

25        A.   Not that I'm aware.

Page 196

1      Q.  Okay.  What other -- what other time do you

2   believe you've been watched or filmed on the job?

3      A.  It's been a couple -- all the time that when I

4   was working, it was me, three of us working, and during

5   a video, she caught -- he caught one of us doing

6   something wrong.

7      Q.  Let me go back to this first time.

8          Did you approach Jackie or Tim and ask them

9   if they were filming you?

10     A.  I didn't -- I'm so afraid to approach them.

11     Q.  So is that a no?

12     A.  No, I didn't.  I'm afraid to approach them.

13     Q.  So the second time, describe to me the second

14  time that this happened.

15     A.  It's been more than once when I saw the phone

16  on a couple of times in the bay, but I never -- every

17  time I seen them, they would just take off.

18     Q.  Okay.  And what's another time where you

19  believe you've been watched or filmed on the job?

20     A.  When he said that -- but he didn't -- when he

21  said he caught one of us breaking the policy.

22     Q.  Who is "he"?

23     A.  Tim.

24     Q.  Tim told --

25     A.  Jackie, and Jackie told us.

Page 197

1      Q.   Okay.  Hold on.  I'm getting confused.

2           Tim told Jackie that what?

3      A.   That one of us was breaking the policy and he

4  had her on the phone.

5      Q.   Tim told Jackie that he has on his -- on Tim's

6  phone evidence of somebody breaking a policy?

7      A.   Yes.  The people that I was training, yes, in

8  the group.

9      Q.   Who were you training?

10      A.   I was training Aileen and Glenda.

11      Q.   Aileen.

12      A.   And Glenda.

13      Q.   And Glenda.

14      A.   Yes.

15      Q.   And you -- Tim said to Jackie, that Tim has

16  evidence of either you, Aileen or Glenda breaking a

17  policy?

18      A.   Uh-huh.

19      Q.   What was the policy?

20      A.   We were putting diesel -- we were putting

21  diesel in the truck.  And diesel is really strong.  And

22  I think she got dizzy, but nobody noticed but somehow

23  Tim said he noticed that she closed her eyes.

24      Q.   Who's "she"?

25      A.   Aileen.  Aileen closed her eyes.

Page 198

1     Q.   Aileen.

2     A.   Yes.

3     Q.   Oh, so she caught Aileen sleeping?

4     A.   Supposedly that she closed her eyes.  But I --

5  we were not aware of what happened until she got taken

6  to the office.

7     Q.   Did you get in trouble for this?

8     A.   No.  But he -- he told somebody -- we didn't

9  know who it was until he -- he came and said who he was.

10    Q.   I'll object after no.  Everything to no.

11    A.   I -- no, I didn't get in trouble.

12    Q.   Okay.  What is another time where you believe

13 you'd been watched or filmed on the job?

14    A.   I can't remember.

15    Q.   Will you agree that at some point during this

16 deposition, if you remember, you'll tell me?

17    A.   There's been so many times that I saw them, but

18 I don't remember the dates.  I would see them outside of

19 bays.

20    Q.   Who -- did they swatch anybody else or was it

21 just you?

22    A.   At that time they were just watching me.

23    Q.   How do you know that?

24    A.   Because I was -- I was the one making -- I was

25 the one -- I was the one saying the complaints.

Page 199

1        Q.  But you didn't see them all the time; right?

2        A.  All the time -- I'll see their bodies, and I

3    see it was them.  I knew it was Jackie because I saw

4    Jackie.  I could tell from -- let me see.  I could tell

5    who it was when I saw them walking away.

6        Q.  But it's possible they were filming other

7    people and you just didn't know about it; right?

8        A.  My rig was the only one showing right there on

9    that bay.

10       Q.  Objection; nonresponsive.

11            It's possible that they were filming other

12   people, and you just didn't know about it; right?

13       A.  Maybe I didn't know about it.

14       Q.  And you were never disciplined for something

15   discovered on a camera; correct?

16       A.  No.

17       Q.  All right.  You then say that your workplace

18   restrictions have been ignored.

19            At this time, May 13, 2022, you're on light

20   duty; is that correct?

21       A.  Uh-huh.

22       Q.  Is that a yes?

23       A.  Yes.

24       Q.  What workplace restrictions were ignored?

25       A.  Jackie was trying to send me to a test pad.

Page 200

1      Q.  Jackie was trying to send you to a test pad?

2      A.  To a test pad.

3      Q.  When was that?

4      A.  I think it was in 2022.  I don't recall the

5   exact date.

6      Q.  And when you say Jackie was trying to send you

7   to a test pad, describe to me what happened.

8      A.  I got there that day, and he said he needed me

9   in the test pad, but I told him I was on light duty.

10          He said, "I need you in the test pad."

11          And I was -- I got nervous.  I got scared

12   because on the test pad you have to be in full capacity

13   because we're testing the machines at full capacity.

14   And people have like really -- really hurt outside.  So

15   you have to be like alert in full capacity to go to a

16   test pad.

17          But -- and then Peter -- Peter heard the

18   conversation.  He -- he told Jackie that how was he

19   going to put me in a test pad if I was on light duty.

20          And then he was still trying to send me.

21   But then that day I thank God that I forgot my safety

22   shoes.  I have -- that day I had forgot my safety shoes,

23   and I was wearing the company slip-on shoes that you

24   wear over your shoes.

25          And then that's when Peter told me, okay,

Page 201

1    look, he's not just on light duty.  He also forgot his

2    safety shoes.  If he goes outside, he's going to --

3    because they wiggle too much.  He's going to trip --

4    he's going to be more a trip hazard.  He's going to be

5    more worse.  And that's -- that's what stopped Jackie.

6    And he said okay.  He -- he didn't send me.

7         Q.  So you did not go to the test pad?

8         A.  I didn't end up going, but I felt intimidated.

9    I was scared.

10        Q.  Objection; nonresponsive.

11             I'm just going to ask a question.  Let

12   me -- wait until I'm done talking.

13             You claim Jackie tried to send you to the

14   test pad, but you did not go to the test pad; correct?

15        A.  Yes.

16        Q.  Is that correct?

17        A.  I did not go.

18        Q.  Okay.  Is there any other time that you believe

19   your workplace restrictions had been ignored?

20        A.  When Tim -- Tim -- Tim Choate, kind of the same

21   thing, I was on the machine, but he was a little bit far

22   away.  And he yelled out my name to get off the machine

23   and to go do kind of like a teardown in the test pad.

24             And I told him I was on restrictions.  He

25   ignored me.  He said, just to -- yelling really loud.  I

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

Page 202

1    have a witness, Miss Glenda.

2              And I got scared, so I got out.

3              And I said okay.  So I went, took my bag

4    and I was going to go over there, but on the way --

5              And then he -- he said he ran into Peter,

6    and Peter told him I was still in restrictions, that he

7    wasn't aware of it.  But I had already told him I was on

8    restrictions.

9         Q.  Tim told Peter, Tim was unaware that you were

10   on restrictions?

11        A.  Peter told -- because Peter -- Tim, after --

12   after he came and told me, he looked for Peter.  And

13   then Peter told him that I couldn't do that job because

14   I was still on restrictions.  And then Tim said he had

15   forgot I was on restrictions, that he didn't know I was

16   on restrictions.

17        Q.  So you didn't do the job?

18        A.  I did not do the job.

19        Q.  You remained on light duty?

20        A.  I remained on light duty.

21        Q.  All right.  Any other time where you believe

22   your workplace restrictions had been ignored?

23        A.  I don't recall.

24        Q.  Okay.  Then you claim that there was an

25   April 28 incident with Tim Choate (however you pronounce

Page 203

1    it) harassed you.  What -- what was that?

2         A.   That's what I just --

3         Q.   That was the incident.  Okay.

4              All right.  The times where -- when Jackie

5    asked you to go to the test pad and when Tim asked you

6    to go to the test pad, do you believe that they asked

7    you to do that because you are Hispanic Mexican?

8         A.   Yes.  I think they were trying to intimidate

9    me.

10        Q.   Why?  What makes you believe that they asked

11   you to do that because of your national origin?

12        A.   Because they've been discriminating me all this

13   time.

14        Q.   Based on the things we've already talked about?

15        A.   Yes.

16        Q.   All right.  Then you mentioned a comment by

17   Scott O'leske, and he approached you and told you to

18   keep your, quote, freaking woman from stopping work

19   early or else he's going to tell Jackie.  Is that

20   correct?

21        A.   Yes.

22        Q.   Who was Scott referring to?

23        A.   Miss Glenda Randall and Aileen.

24        Q.   And what was he trying to -- what does this

25   mean, this comment?

Page 204

1      A.  He said that I need to tell -- because he's
2   been watching them -- I don't recall exactly.  But he
3   said he's been watching them, and they're just lazy.  He
4   said a bad word.  They don't want to work.  They're
5   just --  he said cuss words.  He said keep your --
6      Q.  You can say it.  What did -- tell me.  I want
7   to know exactly.
8      A.  Keep your -- that they're lazy as fuck.  They
9   don't do nothing.
10     Q.  Referring to Glenda and Aileen?
11     A.  Glenda and Aileen.  All they want to do is just
12  walk around and not do nothing.  To make -- make sure to
13  put them to work because he's watching us, or else he's
14  going to tell Jackie.
15     Q.  He told that to you?
16     A.  To me, yeah.
17     Q.  He told you, "I'm watching Glenda and Aileen.
18  They're lazy.  Make sure that they work."
19     A.  Yes.  And making -- make sure that they work
20  because I'm watching and -- because he was Jackie's
21  buddy.
22     Q.  Scott was?
23     A.  Yes.  Yes.
24     Q.  What is Aileen's national origin?
25     A.  Hispanic.

Page 205

1       Q.  And so -- and Glenda too?

2       A.  Glenda is African-American.

3       Q.  Glenda is African-American.  Okay.

4            All right.  On June 7, we're going to go

5   back to this one right here, the --

6       A.  Which one?

7       Q.  The -- the workers' comp status report.

8            So you -- you went back on June 7.  It's

9   the next page.  So you're going to go to the June one.

10  There's one a month, so we'll just flip to June.

11      A.  June 7?

12      Q.  Yes.

13           Do you see that?

14      A.  Okay.

15      Q.  Okay.  And this is a new doctor, right, because

16  it says --

17      A.  Oh, yes, Dr. Mehreen Nadeem.

18      Q.  -- Dr. Mehreen Nadeem?

19      A.  Yes.  That's the name I couldn't remember.

20  That's the clinic, Peak Integrated Healthcare.

21      Q.  This is the chiropractor; right?

22      A.  Yeah.  The clinic.  Yes.  Peak Integrated.

23      Q.  Because before you said she wasn't a

24  chiropractor, but here it says D. C.

25      A.  There's -- that's the doctor.  There's so many

Page 206

1     doctors in there.

2          Q.   D. C. means what, do you know?

3          A.   I don't know what it means.

4          Q.   Doctor of -- doctor of chiropractic, something

5     like that.  Are you aware of that?

6          A.   No.  I was not aware of that.

7          Q.   Did Dr. Nadeem ever work on your back?

8          A.   No.  She never worked on my back.

9          Q.   Okay.  So for you she only worked on your

10    hands?

11         A.   Just on my hand, yes.

12         Q.   So according to Dr. Nadeem, it says for work

13    status information, "will allow the employee to return

14    to work as of June 7, 2022, with the restrictions

15    identified in Part III, which are expected to last

16    through 6-21-22."

17              And then under Part III where it says

18    restriction, it says no bending or twisting; correct?

19         A.   Uh-huh.

20         Q.   Is that a yes?

21         A.   Yes.

22         Q.   And that's your signature at the bottom of the

23    page?

24         A.   Yes.

25         Q.   Okay.  And at this time you had not seen a hand

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 207

1    specialist; correct?

2        A.  I don't recall -- I don't think I haven't.

3        Q.  You had not provided any information to Epiroc

4    that you had seen a hand specialist; right?

5        A.  I hadn't.  Yes.

6        Q.  Okay.  And you had still not completed -- you

7    had not completed the ADA questionnaire form; correct?

8        A.  All those -- I think all those papers, whatever

9    she was -- I was -- I was taking this to Epiroc.  But

10   all the other papers from them they were giving them to

11   Occumed -- to -- no, to workers' comp.  They were

12   talking to a lady from workers' comp.

13       Q.  Not Dr. Mehreen Nadeem?

14       A.  Dr. Mehreen Nadeem was in contact with my

15   workers' comp lawyer, and they were -- give her all the

16   info about the other doctors.  And then I would -- I

17   would just take this to Epiroc, my restrictions form.

18       Q.  So the form we're looking at right now you

19   provided this to Epiroc?

20       A.  Yes, I did.

21       Q.  Okay.  Epiroc provided you with additional

22   forms, a medical questionnaire; correct?

23       A.  Yes.  The one I took to them when I first

24   started going with them.  Yes.

25       Q.  So my question is:  As of June 7, 2022, you had

Page 208

1    not given Epiroc that completed form yet; right?

2         A.  I don't remember when I gave it to her, but I

3    did give it to her.

4         Q.  Okay.  The restrictions here on 6-7-22, Epiroc

5    accommodated these restrictions; correct?

6         A.  Yes.

7         Q.  Okay.  So Epiroc made you another Occumed

8    appointment after this one because you still needed to

9    see a hand specialist.

10             Do you recall that?

11        A.  I don't recall, but I --

12        Q.  Do you recall missing an Occumed appointment,

13   skipping it?

14        A.  I don't -- I don't recall skipping it.

15             After the incident, I told them I didn't

16   feel comfortable going to the same doctor.

17        Q.  You didn't feel comfortable going to Dr. Inzer?

18        A.  Yes.

19        Q.  But that's why you went to Dr. Mehreen Nadeem;

20   right?

21        A.  That's when I got my own doctor.  Then I wasn't

22   able to see a specialist.

23        Q.  Okay.  But you don't recall skipping an

24   appointment that was made for you?

25        A.  I don't recall.  Just -- I just -- I just told

Page 209

1    my workers' comp lawyer that they -- she said they can't

2    force you to go to a doctor when you're switching

3    doctors.  That's -- and that's what I --

4        Q.  Okay.  There was something that happened where

5    at the end of the day you went to the hospital; right?

6              You had a meeting with Jackie, and then you

7    were taken by ambulance to the hospital.  Do you know

8    what I'm talking about?

9        A.  Yes.  I know what you're talking about.

10       Q.  Tell me about this incident.

11       A.  That day I get to work, and right there by

12   the -- where we stretch, Jackie was -- he's with

13   Mr. Earl.

14             And he approaches me and said, by -- by HR

15   rules, I'm -- I'm no longer welcome in the production

16   floor no more, to go wait in the lobby for further

17   instructions.

18             So that got me really nervous, you know.  I

19   was scared, because the only thing I have done is just

20   raise up my complaints.  And I thought I was getting

21   fired that day since he -- he told me I was no longer

22   welcome on the production floor.

23             And I started -- and then I started -- that

24   same day I started feeling sick.  I had a headache.  My

25   chest was hurting.  I was -- I had shortness of breath

Page 210

1    and my -- my -- one of my arms was hurting.

2            And then I told -- I was afraid to tell

3    Jackie, so I told Mr. Earl.  I told Mr. Earl that the

4    way I was feeling.

5            He said, okay, let me call first responder.

6    He called first responder, Adrian.  Adrian checked me,

7    and he said if I have high blood pressure.  I told him

8    no, because he said it was high.

9            I said, "No, I don't have high blood

10   pressure.  I'm just, you know, stressed out what

11   happened today."

12           And he was telling me to calm down.  Then

13   Mr. Earl called the ambulance, and then that's when they

14   took me in the ambulance.

15           And then Adrian -- I didn't know that

16   Adrian followed me to the ambulance until my wife told

17   me.

18           And over there they said I was having a

19   panic attack, and they gave me a medicine to calm down

20   and knocked me out.  And then my wife took me home.

21      Q.  So make sure I'm understanding.  What caused

22   you to go to the ambulance was that Jackie asked you to

23   wait in the lobby?

24      A.  He said I was no longer welcome on the

25   production floor, to go wait in the lobby for

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

Page 211

1    instructions.

2         Q.   Did he say anything else?

3         A.   He just said that for -- you no longer work in

4    the production floor.  That I took it like, I'm getting

5    fired.

6         Q.   Well, you were on light duty at the time;

7    correct?

8         A.   I don't remember if I was on light duty.

9         Q.   There was a -- there was a confusion about your

10   restrictions at the time.

11              Do you remember that?

12        A.   I don't recall nothing.  I just recall that

13   time like he told me that, and that's what got me really

14   stressed out.

15        Q.   Is it possible that Jackie was trying to

16   understand your restrictions and asked you to go wait in

17   the lobby so that you could talk to HR about your

18   restrictions --

19        A.   He said that --

20        Q.   Let me finish.  Let me finish.

21              MS. COLE:  Hold on.  Hold on.  I need to

22   object, so go ahead and finish.

23        Q.   (BY MS. ASHTON)  Oh, yeah.  Is it possible --

24              Can you read it back to me?  I'm sorry.

25              THE REPORTER:  "Is it possible that Jackie

Page 212

1    was trying to understand your restrictions and asked you

2    to go wait in the lobby so that you could talk to HR --"

3                MS. ASHTON:  I'll just put a question mark

4    there.

5                MS. COLE:  Objection; form.

6         Q.  (BY MS. ASHTON)  Go ahead.

7         A.  No.  Because he said it was coming from HR, not

8    from him.

9         Q.  Okay.  Right.  That's my point.

10               So it's possible that HR told Jackie to ask

11   you to wait in the lobby so that they could figure out

12   your restrictions; correct?

13               MS. COLE:  Objection; form.

14   You may answer.

15        A.  The way he approached me, the way he told me,

16   it didn't sound like that.  If it would have been that,

17   he would have gave me the -- he could have just told me,

18   no, if we have problems with your -- you know, this and

19   that.  Instead of what he told me that I was no longer

20   welcome in the production floor no more.

21        Q.  (BY MS. ASHTON)  And he said HR said that?

22        A.  Coming from HR, he said.

23        Q.  Okay.  Coming from HR, not coming from Jackie?

24        A.  That's what he said.

25        Q.  All right.  So after you went to the hospital,

Court Reporting Cost Containment        1-866-318-1233
A Veritext Company                       www.veritext.com

Page 213

1    you -- you provided a doctor's note to return to work;

2    correct?

3         A.  I didn't provide it.  They forced me to provide

4    it.

5         Q.  All right.  Well, let's -- objection;

6    nonresponsive.

7              Let's talk about that for a second.  So you

8    went to the hospital.  Was that on June 9?

9         A.  I don't remember the date, but it was the same

10   day -- the date that I went, the next day I was -- I was

11   going to go back.

12        Q.  So you went to the hospital one day, and the

13   next day you were going to return to work?

14        A.  Yes.

15        Q.  You approached the entrance; correct?

16        A.  I -- I was at the -- before I got there, the

17   vice-president and Matt, they were already waiting for

18   me.

19        Q.  That's Brett Border?

20        A.  Brett Border and Matt Buttacavoli, yes.

21        Q.  They were waiting for you?

22        A.  They were waiting for me.

23        Q.  And then what -- what was the conversation?

24        A.  They said that I broke the policy for leaving

25   in an ambulance.

Page 214

1           And I told, "I've seen a lot of people

2    leaving in an ambulance, and I never see them treated

3    like this."

4        Q.  You recorded this conversation, too; correct?

5        A.  Yes.  Yeah, I know.

6        Q.  So is it your testimony that if -- on the

7    recording they're telling you that you broke a policy?

8        A.  Yes.  I think it's on the recording.

9        Q.  Did they write you up?

10       A.  They didn't write me up.  They just -- I told

11   them, are --

12           I told them, "Are you sure it's because of

13   this?  Because this is -- this is what happens when

14   you," I told them, "This is what happens when you -- I

15   see people complain.  Sometimes this is -- this is the

16   same thing they tell them, like you're telling me that I

17   broke the policy.

18           This is the same thing I heard from other

19   people that have had complaints saying that, oh, they

20   broke the policy.  That's why they got fired.

21       Q.  Brett and Matt talked to you about the fact

22   that they needed a clearance from a doctor for you to

23   return to work; correct?

24       A.  They said that what was going on with me that

25   I -- and I told them, and they asked -- they didn't --

Page 215

1    they didn't want -- me that I went to the ER because of
2    the news that Jackie gave me.
3        Q.  I'm going to object as nonresponsive.
4            Brett and Matt told you that in order for
5    you to return to work, you needed to provide a doctor's
6    note; right?
7            MS. COLE:  Objection; form.
8        A.  Yes.
9            MS. COLE:  You got to give me a chance to
10   object, and then you can answer.
11           THE WITNESS:  Okay.
12       Q.  (BY MS. ASHTON)  You can go ahead.
13       A.  Yes.  But before that it was some other stuff.
14   And I told them that it was not fair because I never
15   seen nobody leave in an ambulance, and then -- then they
16   wait for them like that, and then they deactivate the
17   badge like that, the same way I was getting treated.
18       Q.  Right.
19           So then y'all talked about why your badge
20   was deactivated; correct?
21       A.  Uh-huh.  And he said he gave the --
22       Q.  Is that yes?
23       A.  Yes.
24       Q.  Okay.  And Brett said that Brett deactivated
25   your badge?

Page 216

1        A.  He said he gave the order, yes.

2        Q.  What is Brett's national origin?

3        A.  He's American.

4        Q.  How do you know?

5        A.  Whenever he introduced himself to the company,

6    he said it, I think.  I remember he --

7        Q.  He said I'm Brett Border and I'm American?

8        A.  He said he worked -- he worked at GMC.  I

9    remember.

10       Q.  But do you recall if he represented that he's

11   American?

12       A.  I don't know.

13       Q.  What's his race?

14       A.  I'm not -- he -- he never told me his race.  I

15   never had a talk with Brett.

16       Q.  Do you think Brett is an honest person?

17       A.  Not after that day.

18       Q.  Okay.  So Brett told you, "Per company policy,

19   I deactivated your badge"; correct?

20       A.  Uh-huh.

21       Q.  Is that a yes?

22       A.  Yes, that's what he said.

23       Q.  And then they asked for you to provide a

24   doctor's note to release you back to work, and then they

25   would reactivate your badge; right?

Page 217

1      A.   Yes.

2      Q.   So then you did go back and get a doctor's

3   note; correct?

4      A.   I had to go to the HR.  And they said they had

5   never had this type of situation like they're having

6   right now with me.

7      Q.   Who told you that?

8      A.   The lady in HR that gave me the paper.

9      Q.   What's her name?

10     A.   I don't remember her name, but she's the one

11   that signed the paper that she gave me.

12     Q.   She's the one who signed what paper?

13     A.   The paper that I took to Matt, and then Matt

14   had to cover to verify the paper that it was -- if it

15   was -- if it was the real paper.

16          (Exhibit No. 14 marked.)

17     Q.  (BY MS. ASHTON)  Okay.  I'm going to hand you

18   Exhibit 14.

19          This is from Richardson Methodist Medical

20   Center; is that right?

21     A.   Uh-huh.

22     Q.   Is that a yes?

23     A.   Yes.

24     Q.   Is this the hospital you went to on June 9?

25     A.   Yes.  It says -- yes, that's where I went.

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

Page 218

1          Q.   Okay.   And it says patient, Edgar Reyna.   You
2    were treated in the emergency room on June 9, 2022, by
3    Dr. Andrew Rutherford.
4                Do you see that?
5          A.   Yes.
6          Q.   Okay.   And it says you have zero restriction
7    for days?
8          A.   May return to work, yes.
9          Q.   Okay.   Other instructions, you may return to
10   work on 6-10-22 with no restrictions; correct?
11         A.   Yes.
12         Q.   So you provided this to Matt and Brett;
13   correct?
14         A.   Yes.
15         Q.   And then your badge was reactivated?
16         A.   Yes.
17         Q.   And you were allowed to return to work?
18         A.   But I was -- had to wait for him to verify.
19         Q.   Okay.   After he verified it, you were allowed
20   to return to work; correct?
21         A.   Yes.   Correct.
22         Q.   Okay.   And you went back to work on light duty;
23   correct?
24         A.   Yes.   Correct.
25         Q.   Okay.   What makes you think that Brett

Page 219

1    deactivated your badge because of your national origin?

2          A.   Because I had never seen this happen to nobody.

3          Q.   Well, who have you seen it happen to?

4          A.   I seen a lot -- I talked to a lot of people

5    that leave in ambulance.  I had talked to a lot of first

6    responders, especially the first responder that treated

7    me.

8               He said -- he said he had never seen this

9    happen to nobody.  He has called the ambulance on a lot

10   of people, and he has never seen their badge -- even

11   Brett wait outside for them.

12         Q.   Do you have any names?

13         A.   Lonnie, first responder.

14         Q.   Lonnie?

15         A.   Robison.  He's the first responder.  He told

16   me.

17              And Adrian, the first responder.  I don't

18   know Adrian's last name, but he's the first responder

19   that treated me.

20         Q.   Sorry.  I meant do you have any names of people

21   who left in an ambulance whose badges were not turned

22   off?

23         A.   Audrey.  I think Audrey left in -- Audrey and

24   Lonnie.  Lonnie, too.  Lonnie has left in an ambulance.

25         Q.   Okay.  I think you mentioned one of them in one

Page 220

1     of the charges that we're going to talk about that.

2                  (Exhibit No. 15 marked.)

3          Q.   (BY MS. ASHTON)  This is Exhibit 15.  This is

4     the next charge of discrimination filed.

5                  So take a look at this, and I'm going to

6     just ask you to verify your signature at the bottom.

7                  Does this look familiar to you?

8          A.   Yes.

9          Q.   This charge of discrimination is dated June 15,

10    2022; correct?

11         A.   Uh-huh.

12         Q.   Is that a yes?

13         A.   Yes.

14         Q.   And you checked the boxes here for national

15    origin and race discrimination and retaliation?

16         A.   Uh-huh.

17         Q.   Yes?

18         A.   Yes.

19         Q.   I'm looking at the second paragraph.

20                  It says:  On May 20 -- on May 20, 2022, you

21    were approached by leadman Peter Chung, immediately

22    after he spoke with Jackie Gudgel, where he told me that

23    I am restricted from accompanying Ms. Glenda Randall

24    (Black) or Mrs. Aileen (Hispanic) to show them what

25    tools to get from the tool crib, as well as hardware and

Court Reporting Cost Containment
A Veritext Company

1-866-318-1233
www.veritext.com

Page 221

1    ice pops.  I responded to Peter that I'm still their

2    mentor and they're still in the learning process.  His

3    response was "By now they should already know.  If they

4    don't know, then I don't know what to say."

5                Did I read that correctly?

6        A.  Yes.

7        Q.  And then he said, Peter said, he said that the

8    only one that is allowed to do it right now is Jamie

9    Tamez (white).  Right?

10       A.  Yes.

11       Q.  What are you trying to allege here?

12       A.  That they took -- they took it from me and gave

13   it to Jamie.  Jamie was the one in charge of that

14   training.  Jamie took over that training.

15       Q.  Oh, that's Jamie Tamez?

16       A.  Yes.

17       Q.  Okay.  So Jamie took over Glenda and Aileen's

18   training?

19       A.  Yes.

20       Q.  For how long?

21       A.  I don't remember, but after -- after me, I

22   don't remember for how long, but he kept -- he's the one

23   that kept training them --

24       Q.  How long did you train Glenda and Aileen?

25       A.  For -- I think for a couple of months.  Like

Page 222

1    one or two, like two or three months, I think.  Or one,

2    two months.  I don't recall the exact amount.

3        Q.  Is it possible that they were just switching

4    trainers because the company wanted them to switch

5    trainers?

6             MS. COLE:  Objection; form.

7             You may answer.

8        A.  No.  Because he said Jackie told him.

9             THE REPORTER:  He said what?

10       A.  Peter said that Jackie -- it was Jackie

11   talking when -- Jackie told him he didn't want to see us

12   walking no more.

13       Q.  (BY MS. ASHTON)  He didn't want to see you

14   walking anymore?

15       A.  He didn't -- not to -- he didn't -- he didn't

16   want to see me walking with them.

17             They're in the learning process.  I have to

18   tell them what tools to get from the tool crib because

19   they're not going to know exactly the right tools to

20   get.  So I -- you know, I need to walk with them so I

21   can show them and tell them which -- the right tools to

22   get.

23       Q.  What -- what type of training did Jamie do with

24   Glenda and Aileen after he took over mentoring for them?

25       A.  The same training I was given.

Page 223

1    Q.  Which was what?

2    A.  Show them the rig.

3    Q.  Show them what on the rig?

4    A.  How to assemble the rig.

5    Q.  And you don't know how long Jamie was the

6  trainer?

7    A.  I don't know.

8    Q.  I mean, at what point in time do Glenda and

9  Aileen not need training anymore?

10   A.  They had -- they get -- they get interviewed

11 for that.  They get an interview.

12           And I don't know if they -- I don't know if

13 at that time they were doing the cross training

14 diversity thing.  I don't know -- I don't remember --

15 recall at that time.

16   Q.  So they could have been doing cross training

17 with Jamie?

18   A.  No.  No.  They go different departments.  So

19 from us, they have to go to a different department.

20   Q.  And Jamie is in your department?

21   A.  He's in my department, yes.

22   Q.  And he's an assembler?

23   A.  He's an assembler.

24   Q.  Why do you believe that had to do with your

25 national origin?

Page 224

1        A.   Because I believe Jackie is racist and he's

2    done --

3                 THE REPORTER:  He is what?

4                 THE WITNESS:  He's racist.

5        Q.   (BY MS. ASHTON)  Any other reason?

6        A.   Billy, one of my witnesses, Billy Poe, he -- he

7    told him, and he -- he's -- he's also -- has

8    conversations with management and how they going to --

9    how they practice, how they're going to treat us

10   minorities.

11                 So he told me that he talked -- he had

12   talked to Jackie and told Jackie to leave me alone.

13       Q.   Billy Poe said that he talked to Jackie about

14   how Jackie treats minorities --

15       A.   He didn't say -- he didn't tell me no --

16       Q.   Let me finish.

17       A.   Okay.

18       Q.   Is it -- is what I'm understanding you're

19   saying is that Billy Poe talked to Jackie about Jackie

20   treats minorities; is that correct?

21       A.   Yes.  And he told him to leave me alone.

22       Q.   In that conversation Billy Poe told Jackie to

23   leave you alone; correct?

24       A.   Yes.

25       Q.   When was that?

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

Page 225

1          A.   That's in 2018.

2          Q.   Did it happen after that?

3          A.   It kept happening.  He never left me alone.

4          Q.   Sorry.  The conversation with Billy Poe, was it

5     just that one time in 2018?

6          A.   I don't know how many times he told him, but he

7     told me he told him -- he had told him to leave me

8     alone.

9          Q.   And you were not part of the conversation?

10         A.   I was not part of the conversation.

11              (Exhibit No. 16 marked.)

12         Q.   (BY MS. ASHTON)  All right.  So your --

13    Dr. Nadeem completed interactive process questionnaire

14    paperwork in late June of 2022; correct?  And you

15    provided that to the company?

16         A.   Oh, yes, yes, yes.

17         Q.   Okay.

18         A.   I remember.  This is the one you're talking

19    about?

20         Q.   Yes.

21         A.   Yes.  I think that's --

22         Q.   This document looks familiar to you?

23         A.   I remember taking it -- I think she did it

24    wrong.  I don't -- but some -- I took it back.  I don't

25    know how many -- because she had to fix one thing the

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company          www.veritext.com

Page 226

1    first time.

2         Q.   So that's what I was going to ask you.

3         A.   Okay.

4         Q.   Because in this exhibit, the -- if you go to --

5    you see at the bottom it says Epiroc, and then there's

6    some numbers afterwards?  Right, right here.  Epiroc.

7         A.   I can't see numbers.

8         Q.   So Epiroc 67 -- oh, sorry.  I think it's before

9    that.  For some reason it's cut off.

10              At the -- yeah.  So this one is -- Epiroc

11   67 is dated June 22nd of 2022; right?

12        A.   Uh-huh.

13        Q.   And the next -- there's one right before it and

14   it's dated June 21, 2022.  And I was curious why there

15   were two forms a day apart.

16        A.   One of them she had to fix.  And Madison told

17   me I needed to take -- I remember she had to redo one

18   again.

19        Q.   The doctor did?

20        A.   Because they didn't -- they were not

21   understanding her handwriting or something.

22        Q.   Okay.

23        A.   So Madison told me to take it again to her.

24        Q.   Okay.  So I'm looking at Epiroc 65.  Yeah.

25   That one.

Page 227

1      A.   Okay.

2      Q.   So for No. 2 it says, "From the job description

3  lists, he will be limited to the top three.  He can

4  fully function for the first three responsibilities

5  "desig," something "in the sheet but only with his right

6  hand.  He cannot use left hand for performing these

7  duties.  So first three are limited."  Is that right?

8      A.   Yes.

9      Q.   All right.  On the next page she identifies

10  some more restrictions.

11           And then the very last question and line

12  she writes, "Needs to see orthopedic (hand specialist)";

13  correct?

14      A.   Yes.

15      Q.   Okay.  And then the last page, before her

16  signature, she says, "After he sees ortho (hand

17  specialist) right now he is returned to work but with

18  restrictions.  Will remove the restrictions once ortho

19  clears him."  Is that right?

20      A.   Yes.

21      Q.   Okay.  So this document is saying you still

22  need light duty; correct?

23      A.   Uh-huh.

24      Q.   Is that a yes?

25      A.   Yes.

Page 228

1      Q.   And Epiroc provided you with the light duty?

2      A.   Yes.

3                 (Exhibit No. 17 marked.)

4      Q.   (BY MS. ASHTON)  I'm going to hand you the next

5  charge.  This is Exhibit 17.  This is the charge dated

6  June 29 of 2022.  Take a look at that and let me know if

7  it looks true and correct.

8            MS. COLE:  What number is this?

9            MS. ASHTON:  17.

10           MS. COLE:  Thank you.

11     Q.   (BY MS. ASHTON)  This charge is dated June 29,

12  2022; right?

13     A.   Uh-huh.

14     Q.   Is that a yes?

15     A.   Yes.

16     Q.   And that's your signature?

17     A.   Yes.

18     Q.   And in this charge you check the boxes for

19  national origin, race, color, discrimination.  And then

20  this is your first charge where you also marked

21  disability discrimination; correct?

22     A.   Correct.

23     Q.   And you also marked retaliation?

24     A.   Correct.

25     Q.   Okay.  In this charge you're complaining that

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 229

1    Jackie asked you to clean because of the workplace

2    restrictions that you were on; correct?

3         A.   Where?

4         Q.   It says, "Peter told me that Jackie asked him

5    what I was doing.  Peter told him he put me to mentor to

6    which Jackie Gudgel said 'no, put him back to

7    cleaning.'"

8         A.   Not because of my restrictions.

9         Q.   "I asked why and Peter said, 'I don't know

10   why.'  Scott O'leske told me he heard I'm being

11   punished.  That is the reason why Jackie has me cleaning

12   the beams, doors, shelves and tables."

13             Do you see that?

14        A.   Yes.

15        Q.   Okay.  "These cleaning assignments are not easy

16   because I can only use my right hand due to my workplace

17   injury, of which the company is aware.  As a result, I

18   get tired."

19             Do you see that?

20        A.   Yes.

21        Q.   Okay.  So you were complaining that Jackie was

22   asking you to clean; is that right?

23        A.   Uh-huh.

24        Q.   Correct?

25        A.   Correct.

Page 230

1      Q.   Okay.  What were you cleaning?

2      A.   The beams and -- the big old walking beams,

3  some big old beams, metal beams, that we have, like the

4  stuff that holds the building, like the -- it's like

5  metal, kind of like warehouse beams.  And the doors --

6  doors that go up and down.

7      Q.   Were you cleaning anything else?

8      A.   Pretty much I had to clean.  I was cleaning the

9  whole beams because it was the whole department.  I had

10  to go around cleaning the whole beams.

11      Q.   Was anyone else doing cleaning like that?

12      A.   On light duty, the Caucasian that I knew he was

13  doing paperwork.  He asked me, why was I cleaning

14  instead of doing paperwork like him.

15      Q.   Okay.  Objection; nonresponsive.

16           Was anybody else cleaning?

17      A.   Not -- not -- at that time it was just me.

18      Q.   At that time it was just you cleaning?

19      A.   Cleaning, yes.

20      Q.   Who was this other person on light duty?

21      A.   Eric Griffin.

22      Q.   Eric Griffin?

23      A.   Uh-huh.

24      Q.   G-R-I-F-F-I-N?

25      A.   I think so.  I don't know.

Page 231

1      Q.   What was his job title?

2      A.   He's a welder.

3      Q.   And he reported to who?

4      A.   To the -- I don't know his -- I don't know what

5   supervisor he reported.

6      Q.   He was not in your department?

7      A.   No.  He was first shift.  First shift.  Yes.

8      Q.   Okay.  And you said that he was on light duty?

9      A.   Yes.

10     Q.   How do you know that?

11     A.   Because he -- he told me.

12     Q.   And as his --

13     A.   Because he told me, walking he saw me cleaning

14   the beams.

15     Q.   Okay.  When he said that he was also on light

16   duty, what did he say was his light-duty work?

17     A.   Office work.

18     Q.   What kind of office work?

19     A.   Doing -- putting -- he just said doing paper

20   and stuff.

21     Q.   For how long was Eric Griffin on light duty?

22     A.   I didn't -- I didn't ask.

23     Q.   For -- do you know if Eric Griffin did anything

24   else other than office work on light duty?

25     A.   No.

Page 232

1      Q.   Okay.  If you're not cleaning the beams, who

2   usually cleans the beams?

3      A.   Nobody cleans the beams.  Maintenance.  There's

4   people that come clean.

5      Q.   There's just the general cleaner?

6      A.   Cleaner, yes.

7      Q.   What did you want to be doing on light duty?

8      A.   Just what I was doing, mentoring.

9      Q.   Were there people available to mentor?

10      A.   Yes.  There were people to mentor.

11      Q.   Who?

12      A.   Still Miss Glenda and Aileen.

13      Q.   Glenda and Aileen were still in need of

14   mentoring?

15      A.   Yes.

16      Q.   Anybody else?

17      A.   No, not that I know.

18      Q.   Okay.

19      A.   But I was doing projects -- at the time I was

20   doing projects for Simon Vargas.

21                THE REPORTER:  For Simon....

22                THE WITNESS:  Simon Vargas.

23                MS. ASHTON:  Vargas.

24                THE WITNESS:  He's a supervisor engineer.

25      Q.   (BY MS. ASHTON)  Well, we're going to talk

Page 233

1      about that because that's when you were doing the

2      documentation project.

3           A.   No.   That was before.

4           Q.   So this was before?

5           A.   That's before the documents.

6           Q.   So Simon Vargas, what's his title?

7           A.   He's ME supervisor.

8           Q.   Sorry.

9           A.   Mechanical engineer supervisor.

10          Q.   Oh, ME supervisor.

11               And you were doing some work for him, too?

12          A.   Yes.   Yes.

13               He saw me cleaning the shelves.

14               He said, "Okay.   I've got something better

15     for you to do and help me."

16               And he gave me a stack of papers for me to

17     make sure the -- the hardware was on the shelves.

18          Q.   To make hardware was on the shelves?

19          A.   Yes.   All I had to do is just put a check mark.

20          Q.   Okay.   So how long were you cleaning for?

21          A.   Cleaning for a couple of months, yes.   For a

22     couple months.

23          Q.   A few months straight you were cleaning?

24          A.   I don't really recall the time, but I was

25     cleaning for -- yes, I was cleaning for a couple of

Page 234

1    months.

2         Q.   Well, because you weren't on this type of light

3    duty for -- you -- you just got back on this type of

4    light duty; right?

5         A.   Uh-huh.  I don't recall how long but I was --

6    the time that they put me, I was -- I was cleaning, yes.

7    The time this happened it was -- I was cleaning.

8         Q.   So when did Vargas ask for your help?

9         A.   When I was cleaning the shelves, when he saw me

10   cleaning, during the same time, he asked me one time for

11   help and -- and to help him.

12        Q.   Okay.

13        A.   When was this?  In June, right?

14        Q.   Your charge is dated June 29, 2022.

15        A.   Yeah.  It was around June.  Yes, it was in

16   June.

17        Q.   Okay.  Yeah.  It says on June 13, 2022, is when

18   all of this happened.

19        A.   It was in June, because I think June was the

20   same thing that I got walked out the first time.

21        Q.   June was the same time you went -- so that's

22   when you went to the hospital?

23        A.   Uh-huh.  And also got walked out, I think in

24   June.

25        Q.   We're going to talk about that, too, in a

Page 235

1    second.

2          A.   Okay.   Okay.

3          Q.   I think that's your next charge.

4               You're talking about when they told you

5    that there's no more light duty available?

6          A.   Yes.   At the time when I was working with

7    Simon.

8          Q.   Right.   Okay.   We're going to talking about

9    that in a second.

10              But for this period of time, so this was

11   when you went to the hospital, and then you returned

12   with a clearance note, and they put you back to light

13   duty.   Right?

14              So before you went to the hospital, were

15   you cleaning beams at that time, or were you mentoring?

16         A.   I was cleaning.

17         Q.   The whole time?

18         A.   I think I was cleaning, yes.   I don't remember

19   if I was cleaning.   I -- they had me switching for --

20   and then -- and then Peter would switch me back to

21   cleaning.

22         Q.   Okay.   What does cleaning have to do with your

23   national origin or disability?

24         A.   Because this is what Jackie used to put me to

25   do back then.

Page 236

1      Q.  But this isn't Jackie telling you to clean.

2   This is Peter telling you to clean.

3      A.  But he -- he would tell Peter.  He uses Peter

4   as a messenger to tell me.  He didn't -- you know, I

5   said, Peter -- Peter would tell me, it's from Jackie.

6   Jackie is the supervisor.  So Jackie would tell Peter

7   to put me to --

8            Because Peter will put me to mentor, and

9   then Jackie will see me mentoring.  He was not happy.

10            So he said, "No, put him back to cleaning."

11      Q.  Did you ever hear Jackie himself tell you to

12   clean, or did it always come from Peter?

13      A.  It always came from Peter.

14      Q.  Okay.  So in early July 2022 Matt and Madison,

15   Matt Buttacavoli and Madison Farnsworth, the HR person,

16   informed you that your light-duty project was over, and

17   there was no more light-duty work for you to perform;

18   correct?

19      A.  Is this on this one?

20      Q.  No.  This is after this.  So I'm done with this

21   exhibit.  I'm asking in July.

22      A.  In July.

23            That the project was over?

24      Q.  Right.  The light-duty project.  And there was

25   no more light-duty work for you to perform.

Page 237

1      A.   Oh, yes.  Yes.  Yes.  Yes.  Correct.

2      Q.   Okay.  And so you met with Matt and Madison to

3  discuss this?

4      A.   Yes.  I did meet with Matt and Madison.

5      Q.   Okay.  And Matt said that he spoke to the

6  manager of the department, and the manager said there is

7  no more light-duty work?

8      A.   He didn't -- that was -- when he talked to the

9  manager in the front, that was in November.

10     Q.   So you recorded this meeting also; right?

11     A.   Yes.  But you said in July.  That was not in

12  July.

13     Q.   Okay.  Hold on one second.

14          I'm talking about a meeting that occurred

15  in July 2022 with Matt and Madison.  Okay.  You recorded

16  that meeting; correct?

17     A.   I don't remember.  I don't recall that -- that

18  one.

19     Q.   Okay.  Do you recall speaking to Matt, and he

20  said that he spoke to the manager of the department you

21  were currently doing the light duty for and that there

22  was no more light-duty work for you to perform?

23     A.   Not in July.  That was -- I know that was

24  during the time I did the project with Simon, when he

25  told me -- whenever he told me he spoke to Simon Vargas,

Page 238

1      the manager in charge of that department.

2                  That happened in November, I think it

3      happened -- that was when I was doing the -- when they

4      called me back in August and I was doing the project

5      with the -- with the engineers.  And he told me he spoke

6      to the manager in charge of that project, that was the

7      second time they walked me out.

8           Q.   Do you recall a documentation project?

9           A.   Yes.  The documentation.  I do recall.  That

10     was back in August.

11          Q.   That was -- you said that was in August?

12          A.   Yes.

13          Q.   That was not the one in July?

14          A.   It was not the first time they walked me out.

15          Q.   We're going to look at it.

16                  (Exhibit No. 18 marked.)

17          Q.   (BY MS. ASHTON)  I'm handing you Exhibit 18.

18     This is an email to you from Madison Farnsworth dated

19     July 8, 2022.

20                  Do you see that?

21          A.   Yes.  The --

22          Q.   Okay.  And this was after they informed you

23     that your light-duty work was over and that you were

24     being placed on leave because there was no work for you

25     to perform; correct?

Court Reporting Cost Containment        1-866-318-1233
A Veritext Company                      www.veritext.com

Page 239

1        A.   Uh-huh.

2        Q.   Is that a yes?

3        A.   Yes.

4        Q.   Okay.  So she says:  Thanks for emailing.  Glad

5    you're asking these questions so we can clarify the

6    meeting Matt and I had with you yesterday.

7              And so the yesterday would have been

8    July 7, 2022; right?

9        A.   Uh-huh.

10       Q.   Yes?

11       A.   Yes.

12       Q.   All right.  She said, "First and foremost, you

13   are absolutely not terminated.  We want you to continue

14   working at Epiroc, and we are doing all we can to ensure

15   that your employment continues with us."  Right?

16       A.   Right.

17       Q.   And then about midway down the paragraph, she

18   said, "For this reason, and again, because we want you

19   to continue working at Epiroc, we offered you a

20   temporary light-duty position focusing on training and

21   mentoring.  As we discussed with you yesterday, we are

22   scaling back our operations due to reduced production

23   needs.  In other words, we are slow on parts and in a

24   lull.  For this reason, your light-duty position is no

25   longer available."  Correct?

Page 240

1        A.   Correct.

2        Q.   You are not privy to business needs and

3   operational needs; correct?

4        A.   Huh-uh.

5        Q.   Is that a no?

6        A.   No.

7        Q.   So you don't know if the company was scaling

8   back operations doing -- due to reduced production?

9        A.   It was more -- when that happens, there's no

10   rigs coming in.  The line was full.

11        Q.   Okay.  But you're not familiar with the

12   business and the production needs yourself; correct?

13        A.   No.  Correct.

14        Q.   Okay.  Then the last paragraph she says, "I

15   want to address the badge issue.  As discussed in our

16   meeting yesterday, it is Epiroc policy to deactivate

17   badges for employees on leave.  This is not punishment;

18   this is mere procedure.

19             "Once you are able to return to work,

20   whether it's light-duty work once it becomes available

21   or your assembler role, your badge will be reactivated.

22             "Edgar, we want you to heal and we want you

23   to continue working at Epiroc.  We value your skills and

24   your support."  Correct?

25        A.   Correct.

Court Reporting Cost Containment       1-866-318-1233
A Veritext Company                     www.veritext.com

Page 241

1       Q.   Okay.  At this time you had retained

2   Ms. Ventress; is that right?

3       A.   Yes.

4       Q.   Okay.  Do you recall when you first retained

5   her?

6       A.   I don't recall, but I think it was -- I don't

7   really recall the date but --

8       Q.   And Epiroc placed you on FMLA leave that began

9   July 8th of 2022; correct?

10      A.   They -- I requested FMLA.  I asked their --

11  but, yes, they did.

12      Q.   And it started July 8.

13      A.   It gave me -- she gave me the paperwork for me

14  to fill out and send it to her.

15               (Exhibit No. 19 marked.)

16      Q.   (BY MS. ASHTON)  Okay.  All right.  This is

17  your next charge dated July 28, 2022.

18               Take a look at that, and let me know when

19  you have reviewed it.

20      A.   Yes.

21      Q.   This charge you marked the boxes for national

22  origin, race, color and disability discrimination and

23  retaliation; right?

24      A.   Uh-huh.

25      Q.   Yes?

Page 242

1      A.   Yes.

2      Q.   You complain that the company said that they

3  can no longer accommodate your restrictions, but the

4  company was accommodating another employee's

5  restrictions; is that right?

6      A.   Yes.

7      Q.   And you say that's Aileen; right?

8      A.   Uh-huh.

9      Q.   Is that the person we were talking before who

10  you were training, or is that a different Aileen?

11      A.   I think it's the same -- yeah, it's the same

12  one, I think.

13      Q.   Do you know her last name?

14      A.   I don't know who -- I don't know.

15      Q.   Do you know what job she performed?

16      A.   I don't know.  But I know she got in a car

17  accident.

18      Q.   Is that why she needed restrictions?

19      A.   Yes.  She got in a car accident.

20      Q.   But you don't know what job she does or did?

21      A.   She -- she was working in another department

22  already when that happened, I think.

23      Q.   Okay.  So she --

24      A.   I think.  I don't -- I don't remember.

25      Q.   -- she didn't report to Jackie?

Page 243

1      A.   At that time -- I don't remember if she was

2   still working with Jackie.  But then during -- no, I

3   think she was.  I think, yes, she was reporting to

4   Jackie.  That's when Jackie put her in the tool crib, I

5   think, yes.

6                THE REPORTER:  Jackie put her in....

7                THE WITNESS:  Tool crib.

8      Q.   (BY MS. ASHTON)  Tool crib?

9      A.   Yes.

10     Q.   What does that mean?

11     A.   That's where the people that hands out the

12   tools.

13     Q.   Okay.

14     A.   So they're just scanning tools.  Like they're

15   just scanning, sitting down and scanning stuff.  And

16   your badge, they scan your badge.

17     Q.   Okay.

18     A.   You ask, I need this.  They give it to you.

19     Q.   Okay.  And was she on restrictions the same

20   time that you were on FMLA leave?

21     A.   I think so, yes.

22     Q.   Do you know for sure?

23     A.   I think, yes.  I think so, yes.

24     Q.   So do you know what her job type was?  Was she

25   an assembler?

Page 244

1      A.   She was an assembler, yes.

2      Q.   And she reported to Jackie?

3      A.   To Jackie, yes.

4      Q.   Do you know what her specific restrictions

5  were?

6      A.   I did not know.  I don't think she told me.

7  She had gotten in a car accident.

8      Q.   Okay.  And you were not part of the

9  conversations between Aileen --

10     A.   No, I wasn't.

11     Q.   Let me just finish.

12          You were not part of the conversations

13  between Aileen and the company regarding her

14  restriction; correct?

15     A.   No, I wasn't.

16     Q.   Was there anybody else at the time that you

17  were aware of who were also on light-duty restrictions?

18     A.   At that time, those times, yes.  Eric Griffin.

19     Q.   Eric we already talked about.

20     A.   Yes.  Him and -- he also mentioned somebody

21  else, but I forgot the name.

22     Q.   And do you know how long Eric's restrictions

23  were for?

24     A.   For a couple of months because he did -- I

25  think he injured his muscle in his shoulder.

Page 245

1      Q.   You don't know what his specific restrictions

2   were?

3      A.   No, I do not know.

4      Q.   Or his limitations?

5      A.   Huh-uh.

6      Q.   Is that a no?

7      A.   I do not know.

8      Q.   Okay.  All right.  So on August 4, 2022, Epiroc

9   emailed you about a new position that could accommodate

10  your restriction; is that right?

11     A.   Yes, I think.  Yes.

12     Q.   And you didn't respond to this email right

13  away; correct?

14     A.   Yes.  I did.

15     Q.   I'm sorry?

16     A.   I think -- I don't remember seeing the email,

17  but I -- I don't remember responding either.

18     Q.   Sorry.  I did not hear you.

19     A.   I didn't see the email on time.  I didn't --

20  yes.

21     Q.   You didn't see the email on time?

22     A.   All this -- all this happened whenever Madison

23  found out that she never sent my paperwork to FMLA.  And

24  I called her to -- I called her to -- I called her

25  because I didn't get paid for a whole month and asked

Page 246

1    her -- and she said she -- and I -- and I called UNUM,

2    and she never send the paperwork that I give her for

3    FMLA to turn, she never turned it in.

4         Q.   Okay.  Objection; nonresponsive.

5              You -- you received an email from Epiroc on

6    August 4th, 2022, informing you that there was a new

7    position available that could accommodate your

8    restrictions; right?

9         A.   Yes.

10        Q.   And you did not respond to that email right --

11        A.   I did not respond.

12        Q.   Let me just finish my sentence.

13             You did not -- you did not respond to the

14   email right away; correct?

15        A.   Correct.

16        Q.   Why?

17        A.   I was -- I didn't see it, or I didn't -- I

18   don't remember.

19        Q.   Okay.  And you did not show up for work on

20   August 8, 2022; correct?

21        A.   I don't -- I -- I didn't because in order

22   for me to -- I could not show up to work like I had to

23   cancel my FMLA first before I do all that, so I

24   wasn't --

25        Q.   The first time you communicated to Epiroc about

Page 247

1    all of this was August 15th of 2022; correct?

2         A.   Correct.

3         Q.   Okay.  Why did it take you so long?

4         A.   I was in the process of doing my own -- my

5    own -- my own stuff with Unum, because the stuff that

6    management didn't do for me.

7         Q.   But what does that have anything to do with you

8    returning to work?

9         A.   I can't return to work because I was -- I

10   was -- I was -- the impression I was on FMLA for more

11   than -- because they wanted me to go back until I get

12   well.  I was --

13                   THE REPORTER:  They wanted me to go

14   back....

15        A.   Until I finished my restrictions.  I was under

16   the impression that I needed to be full duty in order

17   for me to go back.

18        Q.  (BY MS. ASHTON)  Who told you that?

19        A.   In that meeting that -- I think that's what I

20   understood.  They didn't have no more work for me.  So

21   then that's when I got FMLA, and I -- because I had

22   to -- I had to send my FMLA paper and I had to --

23   because before I did FM -- I have to get -- before I go

24   to work, I have to go see the doctor, and I have to

25   go -- and I have to call FMLA, so they can put it on

Page 248

1    hold.  It's not just for one day to another for me to --

2                    (Exhibit No. 20 marked.)

3         Q.  (BY MS. ASHTON)  I handed you Exhibit 20.

4    All right.  And I'm going to -- I'm referring to the

5    first -- the email on the first page.  This is an email

6    from Madison Farnsworth to you dated August 16, 2022.

7                    Do you see that?

8         A.  Where is the date?

9         Q.  It's the first page.

10        A.  Oh, the first page.  Oh, okay.

11        Q.  It's right at the bottom there.

12        A.  Oh, okay.

13        Q.  Do you see that?

14        A.  Tuesday, August 16.  Yes.  Okay.

15        Q.  And it says, "Edgar, thank you for responding.

16   We need to clarify a few things.  I informed you of the

17   availability of this position on August 4.  This is the

18   first response I have received from you (twelve days

19   later)."

20                    Do you agree with that?

21        A.  Yes.

22        Q.  And the next page, the paragraph starts, "We

23   still have this light-duty position available for you.

24   I do, however, need to understand the status of your

25   current restrictions.  Can you please provide me with

Page 249

1    the current status of your medical restrictions?"

2              Do you see that?

3         A.  Yes.

4         Q.  And then in the next paragraph it says, "As to

5    your comment below about a hostile work environment, we

6    have investigated every allegation you have made

7    regarding Jackie Gudgel and we have not substantiated

8    those allegations.  In any event, with respect to this

9    project you will be reporting to Simon Vargas."  Right?

10        A.  Uh-huh.

11        Q.  Is that correct?

12        A.  Correct.

13        Q.  So I think before you said that you were doing

14   some work for Simon prior to this?

15        A.  Uh-huh.

16        Q.  Light duty?

17        A.  Yes.

18        Q.  Is that correct?

19        A.  Correct.

20        Q.  Okay.  So when you did go back to work and you

21   were reporting to Simon Vargas, what kind of work were

22   you doing?

23        A.  Before this or after?

24        Q.  No.  No.  When you went back in August.

25        A.  Oh, I was doing the project with them for the

Page 250

1    230s.

2                   THE REPORTER:  Doing the project with

3    them....

4                   THE WITNESS:  To document.  I was

5    documenting PB 230s.  PB 230s.

6        Q.  (BY MS. ASHTON)  What is that?  What did that

7    require you to do?

8        A.  It's -- since that was one of the ones with

9    more knowledge from that machine because I was the

10   one -- the only that had knowledge in my department,

11   building the rig.  I was -- I was going to help the MEs

12   document more better.

13                   THE REPORTER:  Help the what?

14                   THE WITNESS:  Mechanical engineers.

15       Q.  (BY MS. ASHTON)  So it was like -- it was

16   paperwork, a lot of it?

17       A.  Yes.  Paperwork and pictures.

18       Q.  And pictures.

19       A.  Pictures and the right tools and the right

20   steps to do the job.

21       Q.  And you started this new light-duty job

22   August 17 of 2022?

23       A.  I think so, yes.

24       Q.  Did you enjoy it?

25       A.  I was -- I was -- lot of stress still for

Page 251

1    everything that I went through.

2        Q.  When you were reporting to Simon Vargas, did

3    you have any interaction with Jackie Gudgel?

4        A.  Yes, because I have to go to the stretches.

5        Q.  You had to go to the what?

6        A.  To the meeting with them, do exercises every

7    day.

8        Q.  Oh, okay.

9        A.  Yes.

10       Q.  Was that your only interaction with Jackie?

11       A.  Yes.  Every day.  Every day I have to -- yes.

12   Every day I have to go to my -- to that department, and

13   then from there, I go to Simon.

14       Q.  What is Simon's nationality?

15       A.  He told me he was from Columbia.

16       Q.  And what's his race?

17       A.  Hispanic.

18           (Exhibit No. 21 marked.)

19       Q.  (BY MS. ASHTON)  I'm handing you Exhibit 21.

20   Take a look at this, and let me know if this is true and

21   correct.

22           Did you have a chance to review it?

23       A.  Yes.  Right.

24       Q.  So this charge is dated October 12, 2022.  And

25   is that your signature next to the date?

Page 252

1        A.   Uh-huh.

2        Q.   Is that a yes?

3        A.   Yes.

4        Q.   Okay.  Here in this charge you say that a

5   co-worker named Audrey Lee went to the ER.  No one told

6   her -- and no one told her that her badge was

7   deactivated; is that right?

8        A.   Yes.  That one I mentioned earlier.

9        Q.   Oh, that's who you mentioned earlier?

10        A.   Yeah, I did, yes.

11        Q.   Okay.

12        A.   When you asked me if I knew anybody that I had

13   contact.

14        Q.   Got it.

15             And sorry.  Can you remind me?  What is

16   Audrey's position?

17        A.   Assembler.

18        Q.   Reporting to....

19        A.   I don't know who she reports to.  She used

20   to -- I don't know who she reports to.

21        Q.   But not to Jackie?

22        A.   Not to Jackie.  At first she did to Jackie.

23   Then she moved.

24        Q.   At the time she went to the ER, she did not

25   report to Jackie?

Page 253

1      A.  She never -- not that I remember.

2      Q.  Okay.  And Audrey's national origin?

3      A.  Do you know, I don't remember if she did.  I

4  didn't remember if that was her that went into the ER

5  one time in the flowline.  I think it was her but I

6  don't recall.

7      Q.  Well, it says July 25, 2022.

8      A.  I don't -- I don't recall.

9      Q.  Okay.  Do you know Audrey's national origin?

10     A.  African-American.

11     Q.  And her race?  Or her national origin?  Her

12  race is African-American.  Her race is -- her national

13  origin -- I'm losing my mind.  I'm sorry.  Strike that.

14  Strike that I'm losing my mind.

15          MS. COLE:  Let the record reflect....

16     Q.  (BY MS. ASHTON)  Okay.  So here it says,

17  "Audrey Lee was transported from Epiroc to the ER, and

18  Epiroc never told her that -- never told her her badge

19  was restricted or deactivated like I was."

20          You have no knowledge if her badge actually

21  was deactivated; correct?

22     A.  I asked her.  I don't know, but I asked her.

23     Q.  And she said what?

24     A.  She said no.

25     Q.  Did she -- how would she know, though?

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 254

1       A.   Because she was able to go in.

2       Q.   If she was able to go in, it's possible she was

3   cleared to go back to work; right?

4       A.   If she was deactivated, she couldn't because

5   according to what they told me, whoever leaves in an

6   ambulance cannot go inside the building.  It's not -- it

7   wouldn't work.

8                    THE REPORTER:  Can't go --

9                    THE WITNESS:  It will not work to go in.

10      Q.   (BY MS. ASHTON)  But your badge was deactivated

11  once you -- once you provided a note that you were

12  cleared to work; right?

13      A.   Yes.

14      Q.   So if Audrey was allowed to go back in the

15  building, it's possible she also provided a note saying

16  she was released to return to work; correct?

17      A.   She said she didn't -- she said they didn't ask

18  her nothing.  She didn't -- she said they didn't ask her

19  for nothing.  Later on she got the paper, I think she

20  said.

21      Q.   But you have no knowledge of when Audrey

22  actually provided paperwork to Epiroc?

23      A.   But not -- the next day she said she was able

24  to go in with no problem.

25      Q.   Okay.  Let me just be clear.  You have no

Page 255

1    knowledge of when Audrey actually provided paperwork to
2    Epiroc; correct?
3         A.   Yes, I don't.
4         Q.   Okay.  Do you know why she went to the ER?
5         A.   I don't know why she went to the --
6         Q.   Did she have any workplace restrictions that
7    you're aware of?
8         A.   No.  I don't know.
9         Q.   When did she return to work that you know of?
10        A.   The next day I think.
11        Q.   You also claim Madison failed to timely submit
12   your FMLA paperwork; is that right?
13        A.   Who?
14        Q.   Madison timely --
15        A.   Oh, yes.  Yes.
16        Q.   -- failed to submit your FMLA paperwork?
17        A.   Yes.  We talked about it earlier, I think, when
18   you were asking me.
19        Q.   And I think you mentioned that it goes through
20   Unum, which is a third-party?
21        A.   Yes.  Through Unum.
22        Q.   So when you completed your FMLA paperwork,
23   did -- who did you submit it to?
24        A.   To Unum.  When I did it on my own, I had to
25   call Unum and to do it through Unum, yes.

Page 256

1      Q.   Okay.  So Madison gave you FMLA paperwork --

2      A.   For me to give to her.

3      Q.   Okay.  Let me -- just one second.

4      A.   Okay.

5      Q.   Madison gave you FMLA paperwork and then when

6  you completed the paperwork, you submitted it to Unum

7  directly?

8      A.   After I found out that Madison didn't do it, I

9  had to do my own claim.  Madison was going to do my

10 claim through Unum.

11     Q.   Okay.  So then you yourself went online and

12 completed the paperwork?

13     A.   I -- I called.  I called them.

14     Q.   And do you believe Madison delayed your

15 paperwork because of your national origin or disability?

16     A.   I think it was -- I don't know why she did it.

17 I guess -- I guess retaliation from my complaints.

18     Q.   What makes you believe that?

19     A.   Because she didn't do anything to the -- I

20 remember when I called Unum in August when I went back

21 to work, when I called Unum August -- when I called Unum

22 that I was going back to work, that -- they had found me

23 work.  That's when they told me they had received the

24 paper from my company.  That same day that I was going

25 back to work, that's the same day that they had sent

Page 257

1    that paper.

2        Q.  But what makes you believe Madison would want

3    to retaliate against you and why would she do it by

4    delaying your FMLA paperwork?

5        A.  Probably from my complaints.

6        Q.  But what makes you think that she wants to

7    retaliate?  Why?  What's her motive?

8        A.  She -- I don't know because they have been

9    having so many complaints in the company.  I told them

10   the only thing I get is retaliation.

11       Q.  But isn't it her job as an HR person to hear

12   complaints?

13       A.  Yes, it is.

14       Q.  So why would she retaliate against you for

15   doing something that is her job to listen to?

16       A.  Why?  Because I know there's a lot of things

17   the company -- I know it's racism.  I know they do it to

18   do racist stuff.

19       Q.  My question is:  How do you know that?

20       A.  Billy Poe told me that -- Billy Poe told me

21   that he had talked to management and how they shared --

22   how they shared the races against minorities.

23       Q.  And that's the conversation you mentioned Billy

24   had in 2018?

25       A.  No.  That's recently.  A couple months ago.

Page 258

```
1        Q.  Tell me about that conversation.

2        A.  He -- he said that he communicated with

3   managers -- management and how they were going -- how

4   they planned to treat us minorities.

5        Q.  When was that conversation that Billy had?

6        A.  With me?

7        Q.  No.  No.  No.  That he had with management.

8        A.  I don't -- I didn't ask him what day, when it

9   was.

10        Q.  Who was it with?

11        A.  He said a lot of -- he said a lot of big people

12   they brought.

13        Q.  But you weren't there?

14        A.  I was not there.  Only him.

15        Q.  Why were you not there?

16        A.  I don't -- he -- he knew them people really

17   close.

18            THE REPORTER:  He knew the....

19            THE WITNESS:  The management.  He knows

20   the -- a lot of people at work.

21        Q.  (BY MS. ASHTON)  If Epiroc wanted to

22   discriminate against you, why would they offer you a new

23   light-duty position?

24        A.  Why they offer me?  I don't know.  I think they

25   were just doing so they can see that, you know, that
```

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 259

1    they're trying to help me.

2         Q.  And you're a current employee; right?

3         A.  Uh-huh.

4         Q.  Is that a yes?

5         A.  Yes.  I'm a current employee.

6         Q.  And you've never received any formal discipline

7    before; correct?

8         A.  From Jackie, the harassment discrimination I've

9    been getting from Jackie.

10        Q.  Objection; nonresponsive.

11             My question is:  Throughout your entire

12   employment since you've been hired in November of 2017,

13   Epiroc has never delivered to you any sort of formal

14   discipline?

15        A.  For me to sign?  No.  I have never signed

16   nothing.

17        Q.  Okay.  You state also that you learned that a

18   new hire named Niko replaced you.

19        A.  That's what the -- that's what the people -- my

20   co-workers were telling me when I went back.

21        Q.  Your co-worker -- who was your co-worker told

22   you --

23        A.  Scott -- who else?  It was Scott and Noe.

24        Q.  Who?

25        A.  Noe Bedoy.

Court Reporting Cost Containment
A Veritext Company

1-866-318-1233
www.veritext.com

Page 260

1    Q.  Sorry.  Can you -- who is that?

2    A.  Noe Bedoy.

3    Q.  Noe?

4    A.  Yes.

5    Q.  N-O-E?

6    A.  N-O-E, B-E-D-O-Y.  Noe Bedoy.

7    Q.  Is Noe an assembler?

8    A.  He's an electrician.

9    Q.  Okay.  So Scott and Noe told you --

10   A.  And Curtis.  Curtis Williams.

11   Q.  Okay.  Said that they hired Niko?

12   A.  Supposedly that's what they were saying, that

13   they hired Niko as my replacement.

14   Q.  And Niko was hired as what?  An assembler?

15   A.  Assembler, yes.

16   Q.  Do you know Niko's national origin?

17   A.  I don't know.

18   Q.  Do you know his race?

19   A.  Huh-uh.

20   Q.  Have you ever met Niko?

21   A.  I met Niko but I haven't really got close to

22   talk to him.

23   Q.  Okay.  And you were not part of any discussions

24   regarding Niko's employment; right?

25   A.  No.

Page 261

1      Q.   Okay.  Do you -- does Niko have a disability

2   that you're aware of?

3      A.   No, that I don't.

4      Q.   All right.  The second light-duty assignment

5   ended in early November of 2022.  Is that what you

6   remember?

7      A.   What -- what day?

8      Q.   November --

9      A.   Yes.  Yes.  Yes.  Yes.

10     Q.   And as a result, Epiroc placed you back on an

11  FMLA leave beginning November 14th of 2022; correct?

12     A.   That's correct.

13     Q.   Then you submitted a note from your doctor

14  releasing you back to work with no restrictions; is that

15  right?

16     A.   Yes.  A week later, I think.

17     Q.   A week.

18     A.   I was off for the week.  Thursday and Friday I

19  got sick.  I had the flu, so I didn't go to work

20  Thursday and Friday.  I went -- when I went back Monday,

21  that's when they -- they walked me out.

22     Q.   Because there was no more work available?

23     A.   That's what they said, but according to Simon,

24  Simon had told me we have work all the way to December.

25     Q.   And Simon is who you reported to; correct?

Page 262

1      A.   He was the one that would tell me how long --

2   how much time that we had left to finish -- to document,

3   to upload all the information.

4      Q.   But Simon was not the manager of the

5   department; right?

6      A.   He was not the manager, but he was in charge of

7   me.

8      Q.   But you have no personal knowledge about the

9   business decision with respect to your light duty;

10   correct?

11      A.   What do you mean?

12      Q.   You don't know what the company was deciding or

13   what it wanted to do with respect to your light-duty

14   position or what work was available.

15      A.   I think they were retaliating.  That's what

16   I --

17      Q.   I know what you believe.  But I'm asking if you

18   have any personal knowledge of company discussions and

19   decisions with respect to production work and workloads.

20      A.   No.

21      Q.   Okay.  And so about a week after you were

22   placed back on FMLA leave, you -- you were released to

23   return to work --

24      A.   Yes.

25      Q.   -- as an assembler?

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                         www.veritext.com

Page 263

1      A.   Yes.

2      Q.   Okay.  And that's what you currently do now?

3      A.   Yes, that's what I currently do.

4      Q.   Since about November 21st of 2022 through the

5    present, you've been in your position as an assembler?

6      A.   Yes.  I've been --

7               (Exhibit No. 22 marked.)

8      Q.   (BY MS. ASHTON)  I'm going to mark your next

9    charge as Exhibit 22.

10              I have a couple of questions about this

11   charge, and we'll take a quick break.

12              This is dated November 23, 2022.  And is

13   that your signature right there?

14     A.   Yes, ma'am.

15     Q.   Okay.  The one -- the allegation here that I

16   want to talk about is the second-to-last paragraph where

17   you complained that Jackie yelled at you about taking

18   off your safety glasses on November 22, 2022.

19     A.   Yes.

20     Q.   And you didn't receive any discipline for this;

21   correct?

22     A.   No, I didn't.

23     Q.   You claim Caucasian workers also took off their

24   glasses, but Jackie did not discipline them.  Who

25   specifically do you know took off their glasses that

Page 264

1    Jackie did not discipline?

2         A.   That guy William from power pack.

3         Q.   William from --

4         A.   Power pack.

5              And other Caucasian workers who -- when I

6    go over there to get parts, Jackie used to be there

7    talking to them, and I can -- I would see them.  I have

8    to face them when I go get my parts, I would see them

9    without the safety glasses and on the phone.  And Jackie

10   was just having a conversation with them.

11        Q.   Are they in the same area that you are in when

12   Jackie --

13        A.   No.

14        Q.   Let me finish my question.

15             Were these people in the same area that you

16   were in when Jackie yelled at you about your glasses?

17        A.   No.   They were not in the same area.

18        Q.   What area were they in?

19        A.   Power pack.

20        Q.   Can you say that again?

21        A.   Power pack department.

22        Q.   Power pack?

23        A.   Yes.  Engine department.

24        Q.   Engine department.

25        A.   Yes.

Page 265

1    Q.  And what area were you in when he yelled at you

2    about the glasses?

3    A.  I was in the flowline.

4    Q.  Flowline.

5        And are there different safety requirements

6    in the engine department and the flowline?

7    A.  No.  It's the same department everywhere.  But

8    I was just cleaning my safety glasses.

9    Q.  All right.  My question is:  Is it possible

10   that they weren't required to have their safety glasses

11   on in the engine department, but you were required to

12   have your safety glasses on in the flowline?

13   A.  No.  You have to -- as soon as you step on the

14   floor, you walk in, you're required to have your safety

15   glasses.

16   Q.  Do you know if Jackie has ever disciplined

17   Black workers for this?

18   A.  For -- yes, for that and a lot of stuff.

19   Q.  Do -- what about Asian workers?  Do you know if

20   Jackie has ever disciplined Asian workers for their

21   glasses?

22   A.  The only one that I know is Joey.

23   Q.  You know he disciplined Joey for taking off

24   his --

25   A.  I don't know --

Page 266

1          Q.  Let me finish my question really quick.

2              You know that Jackie disciplined Joey for

3      taking off his safety glasses?

4          A.  No, not about the safety glasses.

5          Q.  Not about the safety glasses?

6          A.  Yes.

7              MR. ASHTON:  We can take a quick break.

8              THE VIDEOGRAPHER:  We're off the record at

9      3:30 PM.

10             (Recess taken from 3:30 until 3:39.)

11             THE VIDEOGRAPHER:  We are back on the

12     record at 3:39 PM, media five.

13         Q.  (BY MS. ASHTON)  Mr. Reyna, you understand

14     you're still under oath?

15         A.  Yes, ma'am.

16             (Exhibit No. 23 marked.)

17         Q.  (BY MS. ASHTON) I'm going to hand you

18     Exhibit 23.  This is your next charge of discrimination.

19             Take a moment to look at this and let me

20     know when you are ready to talk about it.

21             I think I said this before.  This is dated

22     March 6, 2023; is that right?

23         A.  Yes.

24         Q.  Okay.  So the first thing I want to talk about

25     in this charge is you claim you were falsely accused of

Page 267

1    taking tools.  Who accused you?

2         A.   I think Razi.

3         Q.   I'm sorry?

4         A.   Somebody named Razi.

5         Q.   Razi?

6         A.   Uh-huh.

7         Q.   What's Razi's position?

8         A.   Position is electrician.

9         Q.   When did she accuse you of taking tools?

10        A.   I don't remember the time, but she yelled out

11   my name.

12        Q.   She yelled your name?

13        A.   Uh-huh.

14        Q.   What makes you believe she believed you were

15   taking tools?

16        A.   I had already gone to work.  I don't know what

17   made her believe.

18        Q.   What is Razi's race?

19        A.   She told me she was from, I think, Iran I

20   remember.  She told everybody when she -- at first.

21   Because she was an engineer, at first she worked with

22   the engineers, and then they moved her with us.

23        Q.   Okay.  Anyone else accuse you of taking tools,

24   or just Razi?

25        A.   That I know before was -- her was William, the

Page 268

1    guy from the engine department.

2         Q.   William also accused you of taking tools?

3         A.   That's -- that's why whenever I got restricted

4    from Jackie not to -- not to go through the engine

5    department.

6         Q.   And remind me, when was that?

7         A.   That was a while back.  The engine department

8    was a while back.

9         Q.   Anyone else other than Razi and William?

10        A.   No.

11        Q.   Okay.  You said you were repeatedly denied

12   overtime.  So first when you were on light duty, you're

13   not eligible for overtime; correct?

14        A.   Correct.

15        Q.   So you only had overtime when you were on full

16   duty?

17        A.   Uh-huh.

18        Q.   Is that right?

19        A.   Yes.

20        Q.   Okay.  When were you denied overtime?

21        A.   The overtime was a while, when I started

22   working like around -- a long -- for a long while, like

23   from 2018, 2019 all the way through.  Sometimes, yes;

24   sometimes, no.  I had to beg for it.

25        Q.   Let me back up a second.

Page 269

1      A.  Okay.

2      Q.  So 2018 and 2019.

3      A.  2018, 2019.

4      Q.  What about more recent?

5      A.  2021, 2022.  And 2022 I couldn't because I was

6   on light duty.  So 2020 -- when I went back to full duty

7   was in November 20 something.  Right?  So 2023.  Yes.

8      Q.  So 2023 you were denied overtime?

9      A.  Yes.  Originally, yes.

10     Q.  When?

11     A.  I think -- I remember asking -- I work, and

12  then I asked Ricochet, Thang Nguyen.

13              THE REPORTER:  I asked....

14              THE WITNESS:  Thang Nguyen.

15              MS. COLE:  Excuse me.  He's using his

16  nickname, Ricochet.

17              THE WITNESS:  Yeah.  They call him

18  Ricochet.

19     Q.  (BY MS. ASHTON)  Is Ricochet the same person

20  as --

21     A.  Thang Nguyen.

22     Q.  -- T-H-A-N-G.

23     A.  Thang.  Yes.  Yes.

24     Q.  N-G-U-Y-E-N?

25     A.  Right.

Page 270

1      Q.  Oh, okay.  So that's Ricochet's -- that's his

2  middle -- his nickname?

3      A.  He tells everybody that, that they cannot

4  pronounce his name, so he tells them to call him -- they

5  call him Ricochet.

6      Q.  So Ricochet denied you overtime in 2023?

7      A.  Yes.

8      Q.  What -- when?

9      A.  I don't remember.  I remember -- I can't

10  remember the exact time but it was overtime --

11      Q.  How -- how many times did they deny you

12  overtime in 2023?

13      A.  A couple of times, I think.

14      Q.  Who's in charge of selecting overtime workers?

15      A.  This is what one of the leadmen told me.

16  Chris, Chris Hoang, the leadman, he told me that they

17  take the list, but the supervisors at the end, they're

18  the ones that make the decision.

19      Q.  Because overtime is voluntary; right?

20      A.  It's -- it's supposed to be voluntary, but they

21  don't take -- some -- some management abuse the power,

22  but they just pick whoever they want to pick.

23      Q.  Let me -- let me start from the beginning.

24          Overtime for Epiroc is voluntary?

25      A.  Supposed to be voluntary, yes.

Page 271

1       Q.   Okay.  And so in order to express that you want
2   overtime, you have to sign up for the weekend; right?
3       A.   They go around asking you.
4       Q.   Okay.  So the leadmen go around?
5       A.   They go around asking.
6       Q.   And then if you want overtime, you ask to be
7   put on the sheet; correct?
8       A.   Yes.
9       Q.   Okay.  And then if you're put on the sheet,
10  your -- it's your testimony that that doesn't guarantee
11  overtime?
12      A.   It doesn't guarantee until your supervisor sees
13  it.
14      Q.   So then the sheet is given to the supervisor,
15  and the supervisor decides who gets overtime?
16      A.   According to Chris Hoang, that's what he told
17  me, yes.
18      Q.   So you don't actually know --
19      A.   I don't know.
20      Q.   Let me get the question out.
21           You don't know personally how overtime is
22  given; correct?
23      A.   I just know that it's the supervisor that makes
24  the decision.
25      Q.   How do you know that?

Page 272

1      A.   It's been more people that tell me that.

2      Q.   And is that the only way that you know that?

3      A.   Yes.

4      Q.   When was the last time you had overtime?

5      A.   I was on light duty.  The last time -- I've

6   been -- the last time like --

7      Q.   Yeah.

8           When did you do overtime most recently?

9      A.   I just -- last weekend.

10     Q.   So you had overtime last weekend?

11     A.   With my new supervisor, yes.

12     Q.   Okay.  When Jackie was a supervisor, did you

13  have overtime before he was -- he retired?

14     A.   I was on light duty when he retired.

15     Q.   So didn't Jackie retire summer of 2023?

16     A.   2023.  That's when I was --

17     Q.   Hold on.  Hold on.  Hold on.

18           Jackie retired last summer; correct, 2023?

19     A.   I think it was -- I don't remember what time,

20  but I was on light -- in 2022, I was on light duty.

21     Q.   Right.

22           2022 you were on light duty.  And so you

23  were not eligible for overtime anyway; correct?

24     A.   Yes.

25     Q.   So then you went back to being full time

Page 273

1    November 21st of 2022; right?

2         A.   Uh-huh.  Yes.  Yes.

3         Q.   And then Jackie retired summer of 2023?

4         A.   2023.  Yes.  You're right.  You're right.  Yes.

5         Q.   Okay.  So from the time you were released to

6    full duty in November of 2022 through December of 2023,

7    did you have any overtime?

8         A.   Some.  I did a -- I did one or two times, but

9    I -- at one time I didn't because supposedly, according

10   to Ricochet, he said if I needed overtime, I had to go

11   ask Mr. Earl.

12        Q.   Did you go ask Mr. Earl?

13        A.   I didn't because I told him there was --

14   because I got ahold of the -- I got ahold of the list,

15   and there was overtime.  It was the people that came

16   with me, they came the next week.

17             And he told me if I needed to go ask -- if

18   I needed it so bad, to ask Mr. Earl.

19             And I told him, there's no point for us

20   minorities to always go ask Mr. Earl for overtime when

21   there's overtime in our department.

22        Q.   Okay.  Let me just make sure I'm understanding.

23             You did not ask Earl for overtime?

24        A.   I did not.  Huh-uh.

25        Q.   Okay.  And can you recall any specific time

Page 274

1    where you put your name on the sheet that you wanted to

2    voluntarily sign up for overtime but then you did not

3    receive the overtime?

4        A.  You can't put your name, because they -- they

5    check you.  They go around with the name -- your name

6    already there.  They just check you.

7        Q.  Okay.  So can you recall a specific time when

8    they checked your name as indicating you wanted

9    overtime, but then you did not receive the overtime?

10       A.  No.  I know they skipped me.  They didn't stop

11   at my rig when they were asking.

12       Q.  So they didn't -- they didn't stop to even ask

13   you, is your testimony?

14       A.  They didn't stop.  Yes.

15       Q.  Did you ever go to them and say, hey, I want

16   over --

17       A.  Yes.  When I --

18       Q.  Hold on.  Let me finish my question.

19            So it's your testimony that they skipped to

20   even ask you if you wanted overtime; correct?

21       A.  Uh-huh.

22       Q.  Is that a yes?

23       A.  Yes.

24       Q.  When they did that, did you then go to them and

25   say, hey, I actually did want overtime?

Page 275

1      A.   Yes.

2      Q.   When was that?

3      A.   When -- I don't remember the time.  That was

4   the time I asked Thang Nguyen about it.

5      Q.   And did you get the overtime?

6      A.   I didn't get it.

7      Q.   When was this?

8      A.   I don't recall the time, but I didn't get it.

9   I did not get the overtime.

10          And he said if I wanted it, to go ask

11   Mr. Earl.

12          And I told him, why is it always --

13   Mr. Earl has known to give overtime to all the

14   minorities on second shift from different departments.

15     Q.   So Ricochet said, if you want overtime, go ask

16   Earl for overtime?

17     A.   Yes.

18     Q.   But you did not ask Earl?

19     A.   I did not ask Earl.

20     Q.   Okay.  Is there any time that you can recall

21   where you indicated you wanted overtime but did not get

22   overtime?

23     A.   There is, but I don't remember the times.

24     Q.   You don't remember the what?

25     A.   The dates and the time.

Page 276

1      Q.   Okay.  Is it your contention that you were

2   denied overtime because of your national origin or race?

3      A.   Yes.

4      Q.   And what makes you believe that?

5      A.   Because it was Jackie's decision.  I know

6   Jackie doesn't -- has issues with me.

7      Q.   But you already testified that you sometimes

8   got overtime under Jackie --

9      A.   Yes.

10     Q.   -- right?

11     A.   Yes.

12     Q.   So why would -- if he wanted to discriminate

13  you because of your national origin or race, why would

14  he give you overtime sometimes but not other times?

15     A.   I don't know.  He does that to certain people.

16     Q.   Who's the other people he does that to?

17     A.   Noe.  Noe Bedoy.

18     Q.   What is -- and you said Noe's national origin

19  is what?

20     A.   Hispanic.

21     Q.   Who else does he do it to?

22     A.   To usually we -- mostly to -- like Curtis and

23  Miss Glenda.  We have complained.  So they do it to the

24  ones that complain.  They take the overtime away when

25  you complain.  They've done it to Gustavo Sanchez too.

Page 277

1    He's from --

2         Q.  Gustavo Sanchez?

3         A.  Sanchez.  Yes.

4         Q.  Gustavo, what is his position?

5         A.  He was an assembler.

6         Q.  Under Jackie?

7         A.  Under Jackie.  Under Peter.  That's -- under

8    Peter.

9         Q.  Not under Jackie?

10        A.  Not under Jackie.

11        Q.  Okay.  Have -- are you aware of any Caucasian

12   employee being denied overtime?

13        A.  No.

14        Q.  But you don't know for sure if that's ever

15   happened; correct?

16        A.  I don't know for sure.  I just know that being

17   denied to something, minorities that have complained.

18        Q.  Okay.  You then say that you were asked to set

19   up the 270 frame on a rig mover, and that it was just

20   you and two trainees; right?

21        A.  Yes.

22        Q.  And describe to me why you need six employees

23   to do that.

24        A.  Because the 270 is one of the biggest rigs that

25   we're building on the flowline, and you need to -- you

Page 278

1    need to have your -- you need to have the rig mover set

2    up for the 270 because the -- the rig mover comes in

3    assembled.  You have to disassemble some parts in order

4    for you to put the 270 in.  And you have to do it before

5    you pick up the frame.

6                    But I was so nervous because the week

7    before six -- six knowledgeable people --

8                    THE REPORTER:  Six what?

9        A.  Six knowledgeable employees got -- got wrote up

10   for making an error on that machine, setting it on the

11   rig mover.

12       Q.  (BY MS. ASHTON)  But you did not make an error;

13   correct?

14       A.  I did not make an error.  I was praying to God.

15   I feared for my life.  I did.  I was so scared because I

16   had two new employees with no knowledge.

17                    And I was -- I told Peter I was scared.

18   And he said he didn't have nothing else for me.  But the

19   week before I had gone to complain to HR.

20       Q.  So Peter told you to do this.

21       A.  Yes.

22       Q.  It was not Jackie?

23       A.  It was not Jackie.  It was Peter.

24       Q.  And at this time -- because at one time you

25   believe Peter was trying to help you, but at this time

Page 279

1    you think Peter was trying to discriminate against you?

2        A.  At first in the beginning he told me, "This is

3    not going to stop, Edgar.  HR is going to be on Jackie's

4    side.  I'm going to be honest.  HR is going to be on

5    supervisor's side, not your side.  So your best thing to

6    do is get a punching bag and punch the stress out at

7    home."

8        Q.  Okay.  But -- so you think he was trying to

9    retaliate against you by assigning you and two of your

10   trainees to set up this 270 frame on a rig mover?

11       A.  Yes.  Because he knew there was an accident the

12   week before.

13       Q.  Have you ever seen other -- fewer than six

14   employees do that?

15       A.  No.  I haven't seen that, just -- I heard about

16   the write-up that happened the week before with four,

17   five or six employees.  I couldn't tell, but it was more

18   than four, and they got a warning.

19       Q.  But you -- again, you did not get written up

20   for anything?

21       A.  I did not get written up.  But I was afraid

22   since -- six of the knowledgeable people, or four or

23   five, got -- made a mistake.  I was afraid to make one.

24       Q.  You then claim that Thang Nguyen separated you

25   from your trainee on a rig; right?

Page 280

1        A.   Yes.

2        Q.   So you -- so your trainee went on one rig, and

3    you went on another rig; right?

4        A.   Yes.

5        Q.   But he was still your trainee; is that right?

6        A.   No more.  He wasn't my trainee no more.  He

7    took it away.

8        Q.   Who was the trainee?

9        A.   It was Cesar.

10       Q.   Who?

11       A.   Cesar.

12       Q.   Scissor?

13       A.   Cesar.

14       Q.   Cesar.

15       A.   Yes.

16       Q.   All right.  What's Cesar's last name?

17       A.   I don't know his last name.

18       Q.   And when was this?

19       A.   I don't recall at the time.  I don't recall.

20       Q.   I think you said this was February 2 of last

21    year.

22       A.   Okay.

23       Q.   And how long did you train Cesar for?

24       A.   I trained him for a couple months.  I trained

25    him on the 230s, him and Kelton.

Page 281

```
 1                THE REPORTER:  Him and who?

 2                THE WITNESS:  Kelton.

 3                THE REPORTER:  Kelton.

 4      Q.  (BY MS. ASHTON)  Is that a name?

 5      A.  Yes.  Kelton.

 6      Q.  After you trained Cesar, who started training

 7   Cesar?

 8      A.  Nam Lee.

 9      Q.  Who?

10      A.  Nam Lee.

11      Q.  N-A-M L-E-E?

12      A.  Yes.

13      Q.  Nam Lee, what is his national origin?

14      A.  He's from Vietnam.

15      Q.  Vietnam.

16          How long did Nam Lee train Cesar?

17      A.  He took him -- he took -- he took over him.

18      Q.  Well, Nam Lee is not an assembler; right?

19      A.  He's an assembler, yes.

20      Q.  Under Jackie?

21      A.  We were all under Jackie at that time I think,

22   yes.

23      Q.  So Nam Lee was one of the assemblers I guess we

24   did mention before?

25      A.  Yes.
```

Page 282

1      Q.  And do you know why Cesar was moved and not

2  Nam Lee?

3      A.  That just came out of nowhere because that --

4  what Ricochet said is too many of you on the machine.

5          I said, okay.  That's -- I -- you know, I

6  just follow orders.  Okay.  That's fine.

7          And I went to the machine he told me.  When

8  I come back, there's three more people added to that

9  machine that I was taken off.  That's why I'm alive.  I

10  was like, okay.

11     Q.  Did you ask him, Hey, I thought there were too

12  many people?

13     A.  Yes, I did.  He said not to worry about it.

14     Q.  Okay.  Because he was the supervisor?

15     A.  He's the leadman.

16     Q.  Or the leadman?

17     A.  Yes.

18     Q.  Okay.  And so it was up to him to make those

19  decisions?

20     A.  I don't know who it was up to but --

21     Q.  Do you believe that Thang Nguyen wanted to

22  discriminate against you by separating you from your

23  trainee?

24     A.  I know they all do things -- in the past they

25  just do what Jackie tells them to do.

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 283

1    Q.  So you believe that they're all Jackie's

2   puppets?

3    A.  Yes.

4    Q.  What makes you -- I mean, what evidence do you

5   have of that?

6    A.  I look -- work with other employees have told

7   me that.

8    Q.  All right.

9    A.  Curtis Williams, Glenda Randall, Noe Bedoy and

10  Thomas Simmons.

11   Q.  You also claim that Peter Chung refused to sign

12  off on paperwork to give you a day off.

13   A.  Yes.

14   Q.  Did you actually take that day off though?

15   A.  I don't remember if I did.  But he just -- I

16  didn't -- because I remember Scott telling me that he --

17  his paper got signed.

18        So I said -- I remember Scott O'leske

19  saying that his paper -- his vacation form did get

20  signed.  But when I asked Peter for mine, he said he

21  didn't want to sign mine because he didn't want his

22  signature to end up on the streets.

23   Q.  He said that directly to you?

24   A.  Yes, directly to me.

25   Q.  Did you ask him what he meant by that?

Page 284

1      A.   And I asked him, yes.

2                And I said, "What do you mean by that?"

3                And he said, "Yes, I don't want my

4      signature out on the streets."

5                And that -- that was it.

6      Q.   But you don't recall if you actually got the

7      day off?

8      A.   I don't recall, yes.

9      Q.   Do you know what day you were asking for?

10     A.   I don't -- I don't know.

11     Q.   Okay.  You then claim management began to

12     document how long, quote, we used the restroom, how long

13     we talk to others, et cetera.

14                Who is this in management that started

15     documenting this?

16     A.   The paper they told us, he came from -- they

17     showed it to us.  We pulled the stretches --

18     Q.   Who's "they"?

19     A.   Our leadmen.  Our leadmen.

20                THE REPORTER:  Say it again.

21                MS. ASHTON:  Who?

22                THE WITNESS:  Thang Nguyen.  Thang Nguyen.

23                MS. ASHTON:  Leadman.

24     Q.   (BY MS. ASHTON)  Leadman.

25                So the leadmen showed you a paperwork and

Page 285

1    said we have to start documenting these things?

2         A.   Yes.   Because every time there's like a new

3    thing they got going on, they show you the paper, like

4    the project they got going on.

5         Q.   Who's "we," when you said "we"?

6         A.   Our employees.

7         Q.   So they were documenting everybody?

8         A.   Yes.   Right.

9         Q.   How long everyone used the restroom.

10        A.   Yes.

11        Q.   How long everyone talked to other people.

12        A.   Yes.

13        Q.   It wasn't just you?

14        A.   It wasn't actually --

15        Q.   It was the Caucasian employees, too?

16        A.   Everybody.   I guess everybody, yes.

17        Q.   Okay.   So when Jackie resigned in summer of

18    2023, you started reporting directly to Peter?

19        A.   Yes.

20        Q.   Peter became the new supervisor?

21        A.   Yes.

22        Q.   And you -- at that time you believe Peter

23    wanted to discriminate against you?

24        A.   He was coming at me already before -- with --

25    with -- because Jackie was training him.   Jackie was

Page 286

1    training him.

2        Q.   So you again believed that Peter was influenced

3    by Jackie?

4        A.   Yes.

5              (Exhibit No. 24 marked.)

6        Q.   (BY MS. ASHTON)  Okay.  I'm going to hand

7    you -- I think this is your last charge.  This is

8    Exhibit 24.

9              Let me know when you're ready to talk about

10   it.

11             This charge is dated June 26th of 2023;

12   right?

13       A.   Yes.

14       Q.   And this is the last charge that you filed with

15   the EEOC; correct?

16       A.   Correct.

17       Q.   Many of the allegations included in this charge

18   were repeated from prior complaints; right?

19       A.   Uh-huh.

20       Q.   Is that a yes?

21       A.   Yes.

22             You asked me some of these questions that I

23   was reading already.

24       Q.   Right.  We've already talked about some of the

25   things that were in here.

Page 287

1      A.   Some of these things.

2      Q.   Okay.  So I'm going to talk about some of the

3   things that we haven't discussed yet.

4           I'm going to begin in the part -- in the

5   middle of the narrative box where it says on March 9,

6   2023.

7           Do you see that?

8      A.   Yes.

9      Q.   Okay.  It says -- the second sentence starts,

10  "Peter offered me a tester position instead of the

11  leadman position I was trying to apply for."

12          Did I read that correctly?

13     A.   Yes.

14     Q.   At the very beginning of the deposition we were

15  talking about that you applied for a tester and then you

16  applied for a leadman; right?

17     A.   Uh-huh.

18     Q.   Is that a yes?

19     A.   Yes.

20     Q.   But that -- I was under the impression that was

21  years ago.

22     A.   Yes.  It was.  Yes.

23     Q.   Okay.  So when did you apply for the leadman

24  position that you recall?

25     A.   I was -- I was -- I hadn't applied.  I was

Page 288

1    about to.  I was asking Peter, because that was

2    Peter's -- that was Peter's replacement.  Peter became

3    supervisor right now so his position is open.

4         Q.  Why would Peter offer you the tester position

5    if he wanted to discriminate against you?

6         A.  He -- he didn't ask me.  He was asking people

7    what they want to do because to him it seems like -- to

8    him, he said -- he say, I don't have future in -- he

9    looks out -- he looks at us.  He looks at me and the

10   other co-workers, he doesn't see a future.  That's why

11   he was asking me if I want to be a tester.

12        Q.  I'm going to object as nonresponsive.

13             My question is:  It says, "Peter offered me

14   a tester position."

15             Why would Peter offer you that position if

16   he wanted to discriminate against you?

17        A.  I don't know.

18        Q.  And then it says, "Instead of the leadman

19   position I was trying to apply for," what do you mean

20   "trying to apply for"?

21        A.  I was -- I was feeling comfortable to apply for

22   his position that was going to be open.  But he said --

23   he said he already had people lined up, I think.

24        Q.  Who did he ultimately hire as leadman?

25        A.  For -- for his position?

Page 289

1      Q.  Because Peter was promoted to supervisor to

2   replace Jackie.

3      A.  Yes.

4      Q.  So then Epiroc had to replace Peter; right?

5      A.  Yeah.

6      Q.  So who was hired to replace Peter?

7      A.  Oh, they hired a guy that came from California.

8   Jamie.  Jamie.

9      Q.  Jamie or Jamie?

10     A.  Oh, Jamie.  Jamie.  Jamie.

11     Q.  Is that the Jamie --

12     A.  No.  No.  It's a different Jamie.  His name is

13  Jamie, yes.  I'm sorry.

14     Q.  Jamie.  What's Jamie's last name?

15     A.  I don't know his last name.  I don't know.

16     Q.  What's Jamie's national origin?

17     A.  He's -- I don't know.  I haven't really talked

18  to him that much.  But he says he's Chicano, I think.

19     Q.  Chicano?

20     A.  He don't know Spanish.  Yes.

21     Q.  But he's Mexican but he doesn't know Spanish?

22     A.  He doesn't know Spanish.

23     Q.  But he -- but y'all share the same national

24  origin?

25     A.  I haven't talked to him that much, but

Page 290

 1    he said he -- because the only thing he said he came --
 2    they brought him from California.
 3         Q.   Okay.   What makes you believe he's Chicano?
 4         A.   He told us he doesn't know Spanish.
 5         Q.   Okay.   Were you -- did you actually submit an
 6    application --
 7         A.   I didn't do nothing.
 8         Q.   Let me just finish my question.
 9              Did you actually submit an application for
10    the leadman position?
11         A.   I didn't.
12         Q.   Okay.   In the next one, March 24, 2023, "Chris
13    Hoang, my leadman, tried to sign me up for overtime work
14    at the rigs because I have knowledge working on it, but
15    Thang Nguyen refused claiming I don't have the
16    knowledge, which is false."
17         A.   Uh-huh.
18         Q.   Okay.   So let me make sure I'm understanding.
19              So Chris Hoang --
20         A.   Chris Hoang, yes.
21         Q.   -- Hoang wanted you to work overtime on the
22    rigs.   Did you want to work overtime?
23         A.   Yes.
24         Q.   But Thang Nguyen said you cannot work the
25    overtime?

Page 291

1       A.   Yes.

2       Q.   And this was on March 24, 2023?

3       A.   Uh-huh.

4       Q.   Why would he say that you couldn't work

5  overtime?  Why would he not want you to work overtime?

6       A.   I don't know.

7       Q.   Do you believe it's because of your national

8  origin or race?

9       A.   It is.  They're retaliating because it was on

10  the rig -- it was on the DMs, the ones we used to build

11  in the lowland light.  It's the ones that have

12  knowledge --

13       Q.   But why would Thang Nguyen, also known as

14  Ricochet, want to discriminate against you?

15       A.   Because he's seen Jackie's done it so he feels

16  comfortable doing it.

17       Q.   Any other reason?

18       A.   No.

19       Q.   Okay.  So you also submitted a complaint

20  through SpeakUp; right?

21       A.   That one was really scary.  Yes, I did.

22       Q.   Sorry.  What was that?

23       A.   I was scared about that one because it's

24  corporate.  But I did, yes.  I did send -- nothing is

25  getting fixed.  I did send it.  I decided, you know

Page 292

1    what?  I'm going to send an email to corporate.

2         Q.  Was that the first time you submitted --

3         A.  Yes, the first time.

4         Q.  Let me ask -- let me just finish the question.

5              Was that the first time you submitted a

6    complaint through SpeakUp?

7         A.  Yes.

8              (Exhibit No. 25 marked.)

9         Q.  (BY MS. ASHTON)  Okay.  I'm going to give you

10   this Exhibit 25, and I just want to confirm that this is

11   the response you received to your SpeakUp complaint.

12             This is dated August 31, 2023; correct?

13        A.  Yes.  Correct.

14        Q.  Okay.  And it says "company response" at the

15   top; right?

16        A.  Yes.

17        Q.  And it says, "Dear Edgar, Thank you for your

18   recent inquiry.  After review of your file and the prior

19   investigation following your previous and similar

20   complaint, we would need to confirm whether there has

21   been some new event that you feel has occurred in the

22   workplace or if this call relates to your prior

23   complaint which was investigated and of which you were

24   informed of the result and closure on May 2, 2023."

25             Did I read that correctly?

Page 293

1        A.   Uh-huh.

2        Q.   Yes?

3        A.   Yes.

4        Q.   Did you provide more information and details

5   about a new event to SpeakUp?

6        A.   Did I -- did I email them again?  I think I

7   did.  I don't remember -- I don't recall if I sent them

8   another email.

9        Q.   Did you provide them with more details and

10  information like they're saying here for them to

11  investigate?

12       A.   Is there a [reading to himself].

13                I don't -- I don't recall.

14       Q.   You don't recall if you provided more

15  information?

16       A.   No.

17       Q.   Okay.  And then it says, "As you know, Epiroc

18  did investigate your past complaint submitted through

19  this line and none of your concerns were substantiated."

20  Right?

21       A.   Yes.

22       Q.   Do you have reason to believe why the Epiroc

23  group compliance people would want to discriminate or

24  retaliate against you?

25       A.   Because they have done it before.

Page 294

1       Q.   Who is it?

2       A.   They just did it again to -- they fire people

3   in --

4       Q.   I'm going to object as nonresponsive.

5            My question is:  Who is part of the Epiroc

6   group compliance?

7       A.   Who is part of it?  I don't know.

8       Q.   You don't know their names?

9       A.   I don't know their names.  But that's supposed

10  to be the hotline that you reach out for help when

11  they're not solving issues at work.

12      Q.   And what makes you think that these

13  unidentified individuals wanted to discriminate or

14  retaliate against you?

15      A.   Because they've done it in the past.

16      Q.   To you directly?

17      A.   Not -- to other people.  Not to me.

18      Q.   Have you applied for any jobs within Epiroc

19  other than the one we talked about at the beginning of

20  the deposition?

21      A.   What do you mean?

22      Q.   Have you applied for any jobs within Epiroc?

23      A.   No.  No.  Only the tester and leadman.  That's

24  it.

25      Q.   The what?  The two that -- the tester and the

Page 295

1    leadman, the two that we've talked about?

2         A.   Yeah.   That's it.   Yes.

3         Q.   Have you applied for any transfers?

4         A.   No, I haven't.   Oh, I did one time.

5         Q.   When?

6         A.   Oh, one time whenever I gave up, and I said

7    this is not going to get fixed.

8              I tried to transfer to first shift, but it

9    was -- I don't know the year.   But it was Tommy --

10   Tommy -- it was Tumi, last name was Tumi, supervisor

11   named Tumi, first shift supervisor when I was on second.

12             But I went there, and in the interview he

13   said that he didn't want me to bring my problems from

14   second shift to first shift.   He don't -- he don't

15   like -- he don't like problems, so not to bring my

16   problems I was giving to Jackie to first shift.

17        Q.   You don't recall when that was?

18        A.   I don't recall when it was.   But I never got

19   called back no more.

20        Q.   Was it your -- was it before or after your

21   injury?

22        A.   It was way before my injury, way before.

23        Q.   Way before your injury?

24        A.   Yeah, because that guy retired a while back.

25        Q.   Okay.

Page 296

1        A.   Yes.

2        Q.   So other than this initial transfer request,

3   did you ever try to transfer again?

4        A.   No, I gave up.  I didn't.  I didn't.  I gave up

5   on a lot of stuff.

6        Q.   And we talked about that you've never applied

7   for any jobs outside of Epiroc either; right?

8        A.   No, ma'am.

9             (Exhibit No. 26 marked.)

10        Q.   (BY MS. ASHTON)  I'm going to mark your

11   complaint as the next exhibit.  This is Exhibit 26.

12             I assume this document looks familiar to

13   you.

14             Is this a copy of the amended complaint you

15   filed on June 21, 2023?

16        A.   See the date.  Yes.

17        Q.   Did you draft this complaint?

18        A.   What do you mean "draft it"?

19        Q.   Did you assist in drafting the words and

20   allegations --

21        A.   Yes.

22        Q.   -- and facts that were incorporated?

23        A.   Reading and everything?

24        Q.   Correct.

25        A.   Yes.  Yes.

Page 297

1    Q.   Did you review it before it was filed?

2    A.   Yes, I did.

3    Q.   Is everything in here true and correct?

4    A.   Yes.

5    Q.   I'm going to go to Page 7.

6    A.   Page 7.

7    Q.   Where it starts "Causes of Action."

8         Let me know when you're there.

9         So the first cause of action here says,

10   "National origin discrimination in violation of

11   Title VII, the TCHRA and 42 USC 1981," correct?

12   A.   Uh-huh.

13   Q.   Okay.  Is that a yes?

14   A.   Yes.

15   Q.   And so you're claiming here that Epiroc

16   discriminated against you based on your national origin;

17   right?

18   A.   Yes.

19   Q.   And who do you believe discriminated against

20   you because of your national origin?

21   A.   The whole -- everybody at Epiroc.

22   Q.   All of Epiroc?

23   A.   Yeah.  Everybody.  Yes.

24   Q.   Have we discussed all the ways you believe you

25   have been discriminated against because of your national

Court Reporting Cost Containment
A Veritext Company
1-866-318-1233
www.veritext.com

Page 298

1    origin?

2         A.   Huh?

3         Q.   Have we discussed all the ways you believe you

4    have been discriminated against because of your

5    national origin?

6         A.   You mean right now?

7         Q.   In the deposition today.  Correct.

8         A.   I don't -- I think we have.

9         Q.   Can we go to Page 8, the next page.

10              Paragraph 46, do you see that?  You include

11   some bullet points here.  And so can you please review

12   the bullet points, and if there is anything that we

13   haven't discussed, let me know so we can talk about

14   that.

15        A.   Yes.

16        Q.   It continues on the next page, too.

17        A.   Yes.

18        Q.   Is there anything that you believe we have not

19   discussed?

20        A.   That one, "Confronting plaintiff for reporting

21   to HR."

22        Q.   Okay.  "Confronting plaintiff for reporting to

23   HR."

24              Okay.  So when were you confronted for

25   reporting to HR?

Page 299

1          A.   I think in March.

2          Q.   Of what year?

3          A.   2023.  I think 2023.

4          Q.   Who confronted you?

5          A.   Alphonso Tyson, HR manager.

6          Q.   And what did Alphonso say?

7          A.   He said he had enough of my complaints.

8          Q.   Was this conversation recorded?

9          A.   I don't recall.  I don't recall.  But he told

10   me -- he was trying to -- he was -- he was asking me

11   about a complaint, but I was embarrassed because my

12   co-workers were hearing everything.

13              And he was ask -- he was bringing up some

14   of the complaints, but I couldn't figure out which one

15   he was referring to.

16              That's when he started getting aggressive.

17   And he told me, "You know what?  I've ha enough of your

18   complaints.  I'm over it."

19              He said he was going to talk to Matt.

20        Q.   He said, "I've had enough of your complaints.

21   I'm over it.  I'm going to go talk to Matt"?

22        A.   Yes.  Yes.  Yes.

23        Q.   And then what happened?

24        A.   I talked to Matt.  And I told Matt what

25   happened.

Page 300

1          He said, "He was wrong.  I'm going to have

2    to -- I'm going to tell him to come apologize."

3          So he came to apologize.

4     Q.  And what did he say specifically?

5     A.  He said sorry for coming at me like that.  He

6    shouldn't have done it.  And the reason why he did it is

7    because his mom passed away.

8          And I told him, "Well, you guys tell us

9    every day not to bring our personal problems to work.

10   Every day we get told at work not to bring us -- don't

11   bring your personal problems to work and take them out

12   on other people."

13          And he say, "Yeah.  I know we say that

14   but," he -- he said he was -- he just said he was sorry.

15    Q.  And Alphonso, what's his national origin?

16    A.  He's -- he's African-American.

17    Q.  What's his race -- or what's his national

18   origin?

19    A.  I don't know.

20    Q.  Okay.  Do you believe Alphonso was intending to

21   discriminate against you?

22    A.  He was -- he told me he had enough.  And that

23   said it all when he said, "I have enough."

24          And that meant he was over it.

25    Q.  And is that the entirety of your evidence that

Page 301

1    Alphonso was trying to discriminate against you, that he

2    said he had enough of your complaints?

3         A.   Enough of my complaints and -- and he went --

4    he started -- he was really, really loud.

5              And one of -- some of my co-workers wanted

6    to step in, but they didn't step in, and to stop it,

7    he -- he got so aggressive the way he was coming -- he

8    was facing me.

9              And I think it was Thomas Simmons and

10   Kelton, but they just -- they said it was wrong for the

11   HR manager to confront somebody about their personal

12   problems in front of everybody.

13        Q.   Is there anything else in this Paragraph 46

14   that you believe we haven't discussed to support your

15   claim of national origin discrimination?

16        A.   I think we talked about most of that right

17   here.

18        Q.   So have we discussed all the ways you believe

19   you've been discriminated against because of your

20   national origin today?

21        A.   Let me see which one -- oh, the way -- when --

22   before Matt walked me out, he didn't -- he didn't --

23   after the meeting I had with Matt, he embarrassed me in

24   front -- everybody.

25              He came to the floor and took the computer

Court Reporting Cost Containment                    1-866-318-1233
A Veritext Company                                www.veritext.com

Page 302

1    out of -- my laptop in a very hostile voice in front of

2    Isabel even.  Isabel was the engineer I was working

3    with.  She -- she got nervous, because she told me she

4    saw the hostility in Matt, the way he was telling me to

5    take my stuff out the -- plus, the whole production

6    floor was watching.

7        Q.  When was this?

8        A.  The second time I got walked out in -- in

9    November.

10       Q.  And this conversation you recorded; right?

11       A.  I don't know if I did.  I don't recall.

12       Q.  Isn't it true that you offered -- it was you

13   who said, hey, I have to give you my laptop because I'm

14   leaving?

15       A.  He asked me what I have.  And I said I have the

16   laptop.  I have my personal backpack, and I have your

17   laptop.  I have the company's laptop.

18           And what do you have from the company?  I

19   told him what I had, what was mine and what was theirs.

20       Q.  And he said, okay, I'm going to need to take

21   that before you leave?

22       A.  Yes.  Yes.  So we walked all the way where I

23   was at with Isabel.

24       Q.  Why do you think Matt wanted to discriminate

25   against you because of your national origin?

Page 303

1       A.   Because of my complaints that I have.

2       Q.   Well, that's retaliation, right?

3       A.   Yeah.

4       Q.   So why do you believe he wanted to discriminate

5   against you because of your national origin?

6       A.   I guess -- why?

7       Q.   Yes.

8       A.   Because I never seen him treat anther employee

9   like this, like he was treating me.

10      Q.   What evidence do you have that he wanted to

11  discriminate against you because of your national

12  origin?

13      A.   What evidence do I have?

14      Q.   Uh-huh.  Yes.

15      A.   Everybody saw it.  Everybody saw it.  All the

16  people that saw me say they used as their scare tactic,

17  the way -- they know what happens.  Everybody know --

18  everybody know they had complaints.  So they told me

19  they used me as a scare tactic to intimidate them and to

20  show them what happens to employees who -- who come and

21  complain.

22      Q.   So now have we discussed all the ways you

23  believe you've been discriminated against because of

24  your national origin?

25      A.   I think we have, yes.

Page 304

1     Q.  And have we discussed all of your evidence in

2     support of this claim?

3     A.  Yes.

4     Q.  The next claim on Page 9 is Count 2,

5     "Disability discrimination in violation of the Americans

6     with Disabilities Act and the TCHRA."

7     A.  The same page we were at, right?

8     Q.  Page 9, correct.

9          Do you see that for -- it's Part B.

10    A.  Part B.  Okay.

11    Q.  Which disability do you contend you were

12    discriminated because of?

13    A.  When they walked me out and they still have

14    work for me.

15    Q.  But what is the disability?

16    A.  My injury to my finger.

17    Q.  Your finger.

18    A.  Uh-huh.

19    Q.  And who is it that you believe discriminated

20    against you because of your disability?

21    A.  Whoever walked me out, Matt and whoever took me

22    to the HR office those two times.

23    Q.  Is it just the walkout?  Is that how you

24    believe you were --

25          Let me finish my sentence.

Page 305

1        A.   Yes.   Go ahead.

2        Q.   Is it when you were walked out of the facility,

3    is that how you believe you were discriminated against

4    because of your disability?

5        A.   No.   Whenever they had me cleaning and whenever

6    they -- they didn't let me mentor.

7        Q.   Have we discussed all the ways in which you

8    believe you've have been discriminated against because

9    of your disability?

10        A.   Yes.   We talked about it.

11        Q.   So there's a -- there's a list on -- in

12    Paragraph 50 of that page, it starts on Page 9 and goes

13    to Page 10.

14             Can you take a look through that list and

15    let me know if there's anything else we need to discuss

16    in support of your claim of disability discrimination?

17        A.   Yes.

18        Q.   Is there anything else you think we need to

19    discuss?

20        A.   No.

21        Q.   So have we discussed all the ways in which you

22    believe you've been discriminated against because of

23    your disability today?

24        A.   Yes.

25        Q.   Have we discussed all of the evidence you have

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company          www.veritext.com

Page 306

1      in support of this claim?

2           A.  Yes.

3           Q.  Do you have any personal knowledge of others at

4      Epiroc who may have a disability?

5           A.  No, I don't.

6           Q.  The next claim is Page 10, "Americans with

7      Disabilities Act failure to accommodate."

8                Do you see that?

9           A.  Same page; right?

10          Q.  Correct.  Yes.  Same page.

11               Are you claiming Epiroc failed to

12     accommodate you for your disabilities?

13          A.  Yes.

14          Q.  How did they do that?

15          A.  They had me cleaning the beams, walking me out

16     and assigned -- put me full duty and but trying put me

17     to full duty and from -- I think we talked about this.

18          Q.  So we've talked about all the ways you believe

19     Epiroc failed to accommodate you?

20          A.  Yes.

21          Q.  Have we discussed all the evidence you have in

22     support of this contention?

23          A.  Yes.

24          Q.  Other than the people we've already discussed,

25     are you aware of anyone else at Epiroc with an

Page 307

1    accommodation?

2         A.   No.

3         Q.   Your last claim on Page 11 --

4         A.   At the same time I was?

5         Q.   At all.

6         A.   The ones were on light duty, just the ones that

7    I found out were on light duty was Eric Griffin.

8         Q.   We talked about Eric; right?

9         A.   Yeah.  We talked -- we talked about, yes.

10        Q.   Is there anyone else that you are aware of with

11   an accommodation?

12        A.   No, I wasn't aware.

13        Q.   Okay.  Your last claim is retaliation, and that

14   begins on Page 11 of your complaint.

15        A.   Page 11?

16        Q.   Right.  Do you see where it says Count 4,

17   "Retaliation under Title VII, the ADA, the TCHRA and

18   42 USC Section 1981."

19        A.   Uh-huh.

20        Q.   Who do you believe retaliated against you?

21        A.   At this time?  Everybody at Epiroc.

22        Q.   Have we discussed all the ways you believe

23   Epiroc retaliated again you?

24        A.   Yes.

25        Q.   Paragraph 61 has a list of bullet points,

Page 308

1    specific examples of your allegations.

2                 Can you please go through all of this list,

3    and let me know if there's anything else that we need to

4    talk about.

5         A.   Yeah.  We talked about it.

6         Q.   Okay.  So we've discussed all the ways you

7    believe Epiroc retaliated against you?

8         A.   Uh-huh.

9         Q.   Yes?

10        A.   Yes.

11        Q.   Have we discussed all your evidence in support

12   of the claim?

13        A.   Yes.

14        Q.   Okay.  Have we discussed all the facts related

15   to your lawsuit?

16        A.   I don't understand the question.

17        Q.   Have we discussed all the relevant facts --

18        A.   Oh, yes.  Yes.

19        Q.   -- related to your lawsuit?

20        A.   Yes.

21        Q.   Okay.  And what damages are you seeking in this

22   lawsuit?

23        A.   Punitive and emotions and all the promotions

24   that I -- that I miss.

25        Q.   Is there a number?

Page 309

1      A.  I'm going to leave that up to the jury.

2      Q.  And you're claiming Epiroc caused you mental

3   anguish and emotional distress; right?

4      A.  Yes.

5      Q.  And what specifically did it do to cause you

6   mental anguish?

7      A.  The abusive behavior they were giving me, the

8   way they were treating me.

9      Q.  And we talked about that as of three days ago,

10   you're not taking any of your medication; correct?

11      A.  Yes.  Yes.  I'm going to therapy, yes.

12      Q.  Okay.  Just wait for me to finish my question.

13      A.  Okay.  Sorry.

14      Q.  Okay.  Do you have any plans right now to go

15   back on any of your medications?

16      A.  Doing therapy.  I'm going to try to do therapy

17   as the most.  I told the nurse, the therapist, that

18   I'm -- I'm -- I'm going to see how it works.

19      Q.  Okay.  Since your employment with Epiroc began,

20   have you had any personal tragedies or other issues

21   occur in your life?

22      A.  No.

23      Q.  Who do you anticipate will testify on your

24   behalf at trial?

25      A.  All -- all my witnesses want to go to court.

Page 310

1          Q.   All your witnesses want to go to court.

2          A.   They want the -- they want the stories to be

3     heard.

4          Q.   And who are -- who's that?

5          A.   Lonnie Robison, Curtis Williams, Noe Bedoy,

6     Thomas -- it's a lot.  Thomas Simmons and LeDaria and --

7          Q.   Are any of these individuals current employees?

8          A.   Some of them just got fired for reaching out to

9     corporate about discrimination and retaliation against

10    management.

11         Q.   How do you know that that's how they got fired?

12         A.   They -- they told me.

13         Q.   How do they know that's how they were fired?

14         A.   They told them.

15         Q.   They said, "I'm firing you because you made a

16    complaint?"

17         A.   That's the only thing --

18         Q.   Let me just finish my question.

19              They said that they fired -- I'm firing you

20    because you made a complaint?

21              MS. COLE:  Can you, when you say "they,"

22    can you mean -- say Epiroc?

23         Q.   (BY MS. ASHTON)  Epiroc fired you -- fired me

24    because --

25              MS. COLE:  Sorry.  I'm so sorry.

Page 311

1              MS. ASHTON:  That's okay.

2         Q.  (BY MS. ASHTON)  They told you that Epiroc told

3    them they were being fired for making a complaint?

4         A.  Yes.  After they reached the corporate, they

5    got fired, they say.

6         Q.  Okay.  So after they complained to corporate,

7    they were fired?

8         A.  They were fired.

9         Q.  And that's why they believe they were fired for

10   making a complaint?

11        A.  Yes.

12              (Exhibit No. 27 marked.)

13        Q.  (BY MS. ASHTON)  This is Exhibit 27.  It should

14   be our last exhibit.

15              These are the initial disclosures that you

16   submitted in this lawsuit.  So a lot of these

17   individuals who you list we've already spoken about.

18              My question is:  Is there any other

19   information -- and I'm talking about -- sorry.  Page 6.

20        A.  Page 6?

21        Q.  Yeah.

22        A.  Okay.

23        Q.  Is there anyone on the list who has information

24   relevant to this case who we have not talked about yet?

25        A.  What do you mean "this case"?  My case?

Page 312

1      Q.   Yes.   That's why we're here.   Yes.

2      A.   Okay.   They're all -- who -- who doesn't have

3   information, you say, right?

4      Q.   Who does have information.

5      A.   They all do.

6      Q.   They all do.

7           So -- and do you expect all of these

8   individuals to testify on your behalf at trial?

9      A.   The ones that have been through what I've been

10  through, I'd say yes.   They told me yes.

11     Q.   So my -- so I think my question is a little

12  different.

13          So even starting at the beginning of your

14  disclosures, I want to understand the individuals who

15  you believe have support of your specific claims and who

16  you believe will testify on your behalf at trial.

17     A.   Who I believe?

18     Q.   Yes.

19          Who do you think will testify at your

20  behalf at trial?

21     A.   Been through what I've been -- Okay.   Yes.

22          Jonathan Simms.

23     Q.   Hold on one second.

24     A.   Okay.

25     Q.   What page are you on?

Page 313

1    A.  Oh, I forgot.  I didn't -- I didn't see the

2    other people.  Aileen.

3    Q.  Okay.  What do you think Aileen is going to

4    testify to?

5    A.  Oh, she's -- she witnessed, and she also went

6    through what I -- some of the stuff that I went --

7    discrimination with Jackie.

8    Q.  What did she witness?

9    A.  She was also a victim.

10   Q.  What did she witness that you say you went

11   through?

12   A.  Oh, whenever Jackie used to -- when he used to

13   come get us -- because I was mentoring him at the time.

14   Whatever we talked about earlier, when I was mentoring,

15   and we got approached, when they told us to stop going

16   around looking for hardware, and the time we were

17   filmed.

18   Q.  Okay.  Have we talked about all the facts

19   relating to Aileen's knowledge?

20   A.  What do you mean "other facts," like --

21   Q.  Have we talked about all the things that Aileen

22   is aware of today?

23   A.  She's been through a lot, but she also has her

24   side of the story, like whatever she's --

25   Q.  I'm asking about your specific complaints.

Page 314

1    Have we talked about all the facts --

2         A.   Yes.  Yes.  Yes.  We talked about all the

3    facts.

4         Q.   What about Fatima Rahimi?

5         A.   Fatima, the time that she complained for sexual

6    harassment and was touched by somebody, they put her to

7    clean with me.  And she was really upset, crying because

8    she complained about sexual harassment, and they

9    retaliate against her to put her to clean with me.

10             And she got really upset.  And the last

11   thing I know, she lost -- she had a miscarriage, and

12   nobody heard from her.  She was --

13        Q.   Does Fatima have any personal knowledge

14   regarding your specific claims?

15        A.   She just witnessed that I was -- she was

16   cleaning with me for -- for speaking up.

17        Q.   Okay.  Audrey Lee, we talked about Audrey;

18   correct?

19        A.   Yes.

20        Q.   She was the one who went in the ambulance?

21        A.   Yes.

22        Q.   Anything else about Audrey I need to know?

23        A.   She's been through a couple of incidents at

24   work.

25        Q.   I'm talking about with respect to your claim.

Page 315

1          A.   With me?   Oh, no.   No.   Just the part in the
2     ambulance.
3          Q.   What about Isabel Buenrostro?
4          A.   Isabel Buenrostro is the ME that her -- the way
5     Matt approached me, was right there present that she
6     felt the hostile from Matt.
7          Q.   She was the mechanical engineer?
8          A.   Yes.   She got nervous.   She got scared.
9          Q.   You're talking about when he --
10         A.   Told me to give him the laptop.
11         Q.   -- retrieved your laptop?
12         A.   Yes.   Yes.
13         Q.   What about -- Eric Gracy was the one on --
14         A.   The welder.
15              THE REPORTER:   Excuse me.   You're doing it
16    again.
17         Q.   (BY MS. ASHTON)   Eric Gracy was the person we
18    spoke about, the welder on accommodations?
19         A.   Yes.
20         Q.   Curtis Williams, I believe that name sounds
21    familiar.
22         A.   Yes.   He's the one that told me all the names
23    from supervisors that were racist.   And he has also been
24    through a lot of stuff, that he said it's never going to
25    change.   The only thing they do is they keep on

Page 316

1    sabotaging you.

2         Q.  Gustavo Sanchez, what does Gustavo know

3    relating to your claims?

4         A.  Gustavo Sanchez, I was training -- he wanted me

5    to train him, but they didn't let me train him.

6         Q.  You wanted to train Sanchez.  And who wouldn't

7    let you train him?

8         A.  He told him that Peter told him that it was

9    against the policy to put two Hispanics together to

10   work, so --

11        Q.  Peter -- okay.  Hold on.  Let me make sure I'm

12   understanding this.

13        A.  Okay.

14        Q.  Gustavo told you that Peter told Gustavo that

15   it's against Epiroc policy for two Hispanics to be --

16        A.  To work together.

17        Q.  -- to work together?

18        A.  Yes.

19        Q.  When was that?

20        A.  I think it was in 2023.

21        Q.  Have you ever trained a Hispanic worker?

22        A.  Yes.  I have trained Hispanic workers.

23        Q.  What about Aubrey Brown?  What does Aubrey

24   know?

25        A.  He quit -- he -- he quit because he --  you

Page 317

```
 1    know how you --
 2         Q.  Who's "he"?
 3         A.  Gustavo.
 4              You know how you were telling me about the
 5    policy?
 6         Q.  What policy?
 7         A.  Epiroc's policy.  You know, you were bringing
 8    up -- you're aware of the Epiroc policy?
 9         Q.  Uh-huh.
10         A.  One day on the Epiroc training, we always --
11    not every year but once a year we get Epiroc training.
12              And Matt was covering the policy, and he
13    told Matt that he would -- he was retaliated for
14    complaining.  And then Matt -- in front of everybody
15    Matt made a joke about it.
16         Q.  Made a joke about what?
17         A.  About his complaint, about his complaint that
18    he brought up right there, that he -- when he
19    complained, he got retaliated, and Matt made a joke off
20    of it and everybody --
21         Q.  What did Matt say?
22         A.  He -- he told Matt that when he complained, he
23    didn't get overtime and that he didn't get over -- and
24    then Matt say, oh, he said that William had work at his
25    house, doing -- he needed help with girls, if he wanted
```

Page 318

1    to go, he can go, something like that.  And everybody

2    started laughing.

3         Q.  Okay.

4         A.  And I think he took it to HR.  And somehow

5    he -- he -- he said some -- something happened.

6    Supposedly he approached Peter in a different way, and

7    then Peter complained about him.

8              And I was a witness there.  But he never

9    got close to Peter but --

10        Q.  Does this have anything to do with your

11   specific complaints?

12        A.  No, not specific, no.  Okay.

13        Q.  What about Aubrey Brown?

14        A.  Aubrey.

15        Q.  What does she know about your specific

16   complaint?

17        A.  Okay.  Okay.  We -- I'm confusing Aubrey Lee

18   with -- you -- the Aubrey Brown was -- she's the one

19   with the ER, with the ambulance.

20             And Aubrey Lee was the one that got fired

21   for -- he said no reason.  He got walked out.

22        Q.  Okay.  In your charge you put Audrey Lee was

23   the one in the ER, in the ambulance whose badge wasn't

24   deactivated.  But it was Aubrey Brown?

25        A.  No.  No.  No.  Audrey Lee is the woman.  Yes.

Page 319

1    Because I get confused with -- Audrey Lee is the woman.

2    Aubrey Brown is the guy.  Yeah.

3         Q.  So Audrey Lee --

4         A.  Yeah.  We've already talked about that.  You're

5    right.  You got everything right.  Except for Aubrey

6    Brown is -- it's the guy that got walked out.

7         Q.  He got walked out by who?

8         A.  By -- he said Matt.

9         Q.  Does he have any knowledge about your claims?

10        A.  He knows about what -- everybody knows about my

11   stuff at work.

12        Q.  I meant, has he witnessed, has he -- what would

13   he testify to about your claims, if anything?

14        A.  About my claims, that -- about my claims?

15        Q.  Yes.

16        A.  About my claims, that he's been a victim as

17   well.

18        Q.  Okay.

19        A.  And we just out there -- we just -- minorities

20   are only being targeted at work.

21        Q.  What about Robert Flores, what would he testify

22   to regarding your claims?

23        A.  Robert Flores, he just said that he was -- he

24   knew I had knowledge for the lead position.

25        Q.  He knew that you had what?  Knowledge?

Page 320

1    A.   Knowledge for the lead position and, yes.

2    Q.   That you could be a lead -- a leadman?

3    A.   Yes.

4    Q.   Okay.  What about Jonathan Simms?

5    A.   Jonathan Simms, he witnessed whenever Alfonso

6    approached me in the roadway.

7         And he was also a victim of mistreatment

8    when they put him to do a teardown.  And he feared for

9    his life and so he quit.

10   Q.   What is Jonathan's -- what is Jonathan's

11   national origin?

12   A.   I think he -- I don't know.  He told me he came

13   from Hawaii.  He's from Hawaii.

14   Q.   So he's a Caucasian male?

15   A.   He's -- he's really tall.  He's like -- like

16   Samoan, I think.  One of the people --

17        THE REPORTER:  He's what?

18        THE WITNESS:  Samoan.

19        MS. ASHTON:  Samoan.

20        THE WITNESS:  He's from Hawaii, yes.

21   Q.   (BY MS. ASHTON)  Are any of the individuals you

22   list on here Caucasian?

23   A.   For my witnesses?  Only Billy Poe.

24   Q.   Is Billy on here?

25   A.   No.  I just run into him last -- last week.

Page 321

1      Q.   Okay.   What about Carl Mitchell?   What do you

2  think Carl is going to testify to?

3      A.   Carl Mitchell, he's also been mistreated and

4  set up to be fired.

5      Q.   Does he have knowledge of your specific claims?

6      A.   He's heard a lot of -- whatever has happened to

7  me.   Everybody knows at my job.

8      Q.   What about Ricardo Delgado --

9      A.   Ricardo --

10     Q.   -- does he have knowledge of your specific

11  claims, personal knowledge?

12     A.   I don't remember him.   I think yes, because

13  Jackie used to harass him outside, and he know he used

14  to harass me inside, too.

15     Q.   Okay.   Does he have knowledge of your specific

16  claims?

17     A.   Yes.   When Jackie -- he worked with us when

18  Jackie used to harass me in -- in the production, the

19  flowline.

20     Q.   Is he one we've already talked about?

21     A.   Yes.   Yes.   Yes.

22     Q.   Lonnie Robison, is he the one we already spoke

23  about?

24     A.   Yes.

25     Q.   Monica Trevino, does she have knowledge of your

Court Reporting Cost Containment     1-866-318-1233
A Veritext Company     www.veritext.com

Page 322

1    specific claims?

2         A.  Just being a victim only.  And she's aware of

3    what happened to me, and that's it.

4         Q.  Joey Khammanee, is that the Joey we spoke

5    about?

6         A.  Yes.  When he got cornered by Jackie and Peter.

7         Q.  Glenda Randall, we spoke about Glenda; right?

8         A.  Yes.  Yes.

9         Q.  Patrick Bouton?

10        A.  He's also a victim from Jackie.

11        Q.  Thomas Simmons?

12        A.  He got set up to be fired.  He -- he's a

13   witness that whenever I went to the ambulance, he's the

14   first --

15             Jackie told him, they were referring to me,

16   "don't let this person in."

17             The day I went to the ambulance, he's a

18   witness where Jackie told him that they're referring to

19   Edgar Reyna, not to --

20        Q.  But your name was never mentioned; correct?

21        A.  To him, yes.

22        Q.  To him?

23        A.  Yes.  Jackie mentioned it to him.

24        Q.  And he told you that Jackie mentioned it to

25   him?

Page 323

1          A.   Yes.  Yes.

2          Q.   Adrian Campbell?

3          A.   Adrian Campbell is -- she's just a witness

4     that's been through racism at work.

5          Q.   Cesar Rios.  I think we spoke about Cesar;

6     right?

7          A.   Yes.

8          Q.   Jamie Tamez.

9          A.   Tamez.  Yes.

10         Q.   We spoke about Jamie?

11         A.   Yes.

12         Q.   And Nam Lee we spoke about?

13         A.   Not because he -- he harassed Gustavo.  That

14    was it.

15         Q.   Nam Lee harassed Gustavo?

16         A.   Yes.

17         Q.   Why is he on your witness list?

18         A.   Witness list --

19         Q.   Why is he somebody with knowledge of relevant

20    facts of your claims?

21         A.   Claim.  Because -- because he was involved in

22    the rig -- whenever we brought up Nam Lee.  Remember?

23    The rig with Cesar?  They gave him -- they took --

24         Q.   Have we already talked about?

25         A.   They took -- they took my trainer and gave it

Page 324

1    to him.

2          Q.   Okay.  Nereida Villareal, what did she know?

3          A.   Nereida, she knows.  Everybody knows at work

4    about my case.

5          Q.   But what personal knowledge does she have of

6    your claims?

7          A.   That they were treating me -- they were putting

8    me to clean.  She saw when they were putting me to

9    clean.

10         Q.   Okay.  Niko Feagainaalii?

11         A.   Niko was supposed to be the guy that was going

12   to replace me.

13         Q.   Okay.  But you don't know that yourself?

14         A.   Yes.

15         Q.   Is that correct?

16         A.   Yes, I don't know that myself.

17         Q.   Desmond Johnson?

18         A.   Desmond Johnson, he's a victim, too.

19         Q.   Jamie or Jamie Soliz?

20         A.   That's one of the guys that was going to

21   replace me, too.

22         Q.   Is this the California guy?

23         A.   They're both from California.  Niko and him are

24   from California.

25         Q.   Okay.  So you were told Jamie was going to

Page 325

1    replace you, too?

2         A.   Yes.

3         Q.   Kelton White, we spoke about Kelton; right?

4         A.   Yes.

5         Q.   Okay.  Phoung Nguyen.  P-H-O-U-N-G,

6    N-G-U-Y-E-N.

7         A.   Phong.  Yes.  He also witnessed the way they

8    used to treat me on the flowline.

9         Q.   Razi Mashhadi?

10        A.   Razi Mashhadi was the lady that accused me of

11   stealing.

12        Q.   Noe Bedoy, we talked about; right?

13        A.   Yes.  He also experienced Jackie's behavior.

14   And he -- he tried to transfer, but they lost all --

15   they lost all his paperwork, like -- like he never

16   turned the paperwork to HR.  So what he did he email --

17   he emailed he's transferring.  And that's when he was

18   able to transfer to first shift.

19        Q.   So he did get to transfer?

20        A.   Yes.

21        Q.   Alfred Mireles, what does Alfred know?

22        A.   Alfred Mireles.  Alfred Mireles.  He's an

23   electrician.  He -- he -- I guess I heard -- I don't

24   know if he was there whenever Jonathan Simms and -- I

25   don't recall.  Alfred Mireles.  Yes.

Page 326

1          Q.   Jack Maxwell?

2          A.   Jack Maxwell.  Jack Maxwell.  I don't recall

3     Jack Maxwell.

4          Q.   Luis Martinez we spoke about; right?

5          A.   Yes.

6          Q.   Fernando Soto?

7          A.   Fernando Soto, yes.

8          Q.   We spoke about Fernando.

9               Jose Gonzalez?

10         A.   Yes, we spoke about Jose.

11         Q.   Skip, we talked about; right?

12         A.   Not really because that was the one whenever I

13    was going to get fired because he -- and I remember.

14               He was the one that put me on the overtime

15    list, and -- and somehow I didn't let Jackie know, and

16    Jackie got upset, said he's the one in charge.  I have

17    to let him know.

18               But he's -- he -- I told Skip if he had let

19    Jackie know.  But he said, yes, they talked about it in

20    the meeting and -- but Jackie didn't listen.  But he

21    just -- Jackie wanted to fire me for not telling him I

22    went in early with -- because Skip told me to go in

23    early.

24         Q.   Okay.  Hold on.  I heard two things, overtime

25    and going in early.

Court Reporting Cost Containment        1-866-318-1233
A Veritext Company                      www.veritext.com

Page 327

1          A.   Yes.

2          Q.   So Skip put you on the overtime list?

3          A.   Yes.

4          Q.   Did you get your overtime?

5          A.   Yes, I did get my time.

6          Q.   Okay.  And then you went in early, and Jackie

7     got mad at you for going in early?

8          A.   I went in early because he put me with the

9     tester.  A tester cannot be by himself.  He has to have

10    a helper.  So I was the tester's helper.

11         Q.   Okay.

12         A.   So the tester went at 11:00.  I had to go in at

13    11:00 with him.

14              So when Jackie got there later on, I told

15    something, and he saw me there, and he noticed I

16    didn't -- I wasn't -- not on the group.

17              He approached me and he told me that I

18    should have let him know that I was coming in early.

19    But I told him, Skip let him know in the meeting.  Skip

20    said they had a meeting, surprise meeting, so he was

21    aware.

22         Q.   Okay.  But you didn't get any -- you didn't get

23    in trouble for that?

24         A.   He just threatened to fire me.

25         Q.   Jackie threatened to fire you?

Page 328

1      A.   Yes.

2      Q.   But you did not get fired?

3      A.   I did not get fired.

4      Q.   You didn't get written up?

5      A.   I didn't get written up.

6      Q.   Mauri, last name unknown.

7      A.   Mauri.  Mauri.

8      Q.   M-A-U-R-I.

9      A.   I don't remember.

10     Q.   You don't remember?

11     A.   Huh-uh.

12     Q.   Harold Lacy?

13     A.   I know Harold Lacy was the manager.

14     Q.   What does Harold know about your -- your case?

15     A.   I don't know.  I don't know what he knows about

16  my case.

17     Q.   Are there any other witnesses who have relevant

18  information that we have not talked about?

19     A.   Just -- he's not here, Billy Poe is not here.

20     Q.   Oh, yeah.  Billy.

21     A.   I just run into Billy Poe.

22          THE REPORTER:  Excuse me.  I didn't

23  understand.

24          THE WITNESS:  Billy Poe.

25          MS. COLE:  I just ran into Billy Poe.

Page 329

1           THE WITNESS:  Yes.  I just ran into Billy

2    Poe.

3        Q.  (BY MS. ASHTON)  Billy Poe.  And what do you

4    believe Billy is going to testify about?

5        A.  He -- he witnessed Jackie's behavior in 2018

6    and told him to stop.

7        Q.  Anything else?

8        A.  And his testimony, what he's -- when management

9    share racist stuff about minorities, whatever they --

10   how they plan to treat minorities.

11       Q.  Okay.  Anything else?

12       A.  That's it.

13       Q.  Have we talked about all your claims against

14   Epiroc today?

15       A.  Yes, we have.

16       Q.  Okay.  Anything else that you would like to add

17   that you believe you forgot to mention?

18       A.  No, ma'am.

19           MS. ASHTON:  I pass the witness.

20           MS. COLE:  Let's take I get a quick

21   five-minute break.

22           THE VIDEOGRAPHER:  Off the record at

23   4:49 PM.

24           (Recess taken from 4:49 until 4:54.)

25           THE VIDEOGRAPHER:  We are back on the

Page 330

1    record at 4:54 PM, media 6.

2                        EXAMINATION

3    BY MS. COLE:

4        Q.  Mr. Reyna, on the day that Jackie confronted

5    you about the tickets, had -- had there been anything

6    leading up to that that caused to you believe that that

7    confrontation related to race?

8        A.  Yes.  Because the day before I was with Kevin

9    and Scott, and he asked them if they were going to the

10   picnic, and they said no, because I was going to bring

11   my uncles and aunts and cousins and everybody.

12       Q.  And when you says "he" asked, who?

13       A.  Kevin and Scott if they were coming.  Jackie

14   asked Kevin and Scott if they were going.

15       Q.  And then after Kevin and Scott responded about

16   your TOs and your uncles and aunts --

17       A.  Jackie laughed.

18       Q.  And then when he confronted you that day about

19   the tickets to the picnic, what did he say specifically?

20       A.  He said I was being selfish.  I had enough

21   tickets already.  I didn't need more than what I had.

22       Q.  And why did you think you were entitled to more

23   tickets?

24       A.  Because they -- they said it in the meeting.

25   See, he -- he read the notice aloud, that HR had more

Page 331

1    tickets, and everybody was more than welcome to go after

2    the stretches.

3         Q.  And did people decide to go?

4         A.  Yeah.  It was packed.  HR was packed.

5    Everybody getting -- they -- I only got like two or

6    three, and everybody was getting like six, more than

7    that.

8         Q.  When Jackie confronted you about the tickets,

9    did anybody try to step in?

10        A.  Only Thang Nguyen when he told him he shouldn't

11   be yelling at me like that.

12        Q.  So that was that day?

13        A.  That was that day, yes.

14        Q.  Did you ever have any interactions with Jackie

15   relating to your Spanish music?

16        A.  He would go around acting weird.  He would come

17   more often when I was playing custom music and he'd yell

18   "yeehaw."  And come more often.

19        Q.  And when you say "come," where would he come

20   to?

21        A.  To my work area.

22        Q.  And how did that make you feel?

23        A.  Uncomfortable.  And I would -- had -- I just

24   turned off the music.

25        Q.  Did you stop listening to Spanish music?

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

Page 332

1      A.  Yes.  I stopped listening to music.  I wouldn't

2  listen to music no more.

3      Q.  You told us at the very end of your testimony

4  about one occasion when Jackie threatened to fire you.

5           Were there other occasions where Jackie

6  threatened to fire you?

7      A.   In -- in that office about the tickets, he said

8  he -- I could -- he could fire me for that.

9           And in the test pad, he told me he could

10  fire me for that and for that -- whenever I went to the

11  meeting with the conference with the CEO and he told me

12  he could fire me for that, too, for not letting him

13  know.

14      Q.  And so even though you didn't receive anything

15  in writing, did that feel like discipline to you?

16      A.  Yes, I felt threatened.

17           MS. ASHTON:  Objection; leading.

18           Sorry.  Go ahead.

19      A.  I felt threatened.

20      Q.  (BY MS. COLE)  When Jackie would confront you,

21  describe for us what his body and face looked like.

22      A.  He looked mean.  His eyes turned red and his

23  face was like aggressive, and tone, his voice would

24  raise.

25      Q.  Would he -- would he -- would he invade your

Page 333

1    physical space?

2         A.   Yes.   Because the way he would come at me,

3    "Edgar," like that.  I remember.  I can still picture

4    his voice.

5         Q.   Did you ever see Jackie yell at -- I'm sorry --

6    raise his voice and be aggressive with other employees

7    the way he was with you?

8         A.   No.  I never seen it.

9         Q.   Did you ever hear Jackie tell other employees,

10   "I could fire you for that"?

11        A.   No.

12        Q.   Did you ever see Jackie say "yeehaw" and enter

13   a work area --

14        A.   No, only my --

15        Q.   -- when other people played music?

16        A.   No.  Only my work area.

17             MS. COLE:  I pass the witness.

18                  FURTHER EXAMINATION

19   BY MS. ASHTON:

20        Q.   Just a couple of follow-up questions.

21             About the Spanish music, when did you play

22   Spanish music?

23        A.   Like in 2018, whenever I was -- around that

24   time.

25        Q.   So after 2018 you never did again?

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                       www.veritext.com

Page 334

1          A.   I don't think.  I stopped -- I didn't -- I
2     stopped.
3          Q.   And you stopped because why?
4          A.   Because of the way he reacts.  He acts
5     different when you play Spanish music.
6          Q.   So you would play Spanish music; Jackie would
7     come in, and then what would happen?
8          A.   He would come more often and scream "yeehaw."
9     And keep -- he just kept micromanaging more than before.
10         Q.   Other than saying "yeehaw," did he make any
11    comments about the actual music being played?
12         A.   No, he didn't.
13         Q.   Okay.  Did anyone else play Spanish music?
14         A.   Noe Bedoy did.  But he noticed the way he was
15    acting, so it he turned it off.
16         Q.   When did Noe Bedoy --
17         A.   I think in --
18         Q.   -- play Spanish music?
19         A.   I don't remember the year that Noe played.  But
20    he -- Noe told me he -- he would see him act different
21    when -- every time he played Spanish music.
22         Q.   Did anyone else play any other type of music?
23         A.   Yeah.  Everybody plays music.
24         Q.   Was there any type of music that Jackie
25    enjoyed?

Page 335

1        A.  I don't know.

2        Q.  When he said "yeehaw," what did you think that

3   meant?

4        A.  I asked a co-worker one time.  He said it just

5   means that -- something about taking over -- I don't

6   know.  I don't know.  I don't know.

7        Q.  You don't know what it means?

8        A.  I don't know.  I just asked him -- I just

9   remember he said that it's something that they want to

10  come in and take over.

11       Q.  That was a co-worker's impression of what

12  yeehaw meant?

13       A.  Larry.  Larry.  Larry.  He's American, too.

14  He's the one that told me what it meant to him.

15       Q.  To Larry?

16       A.  Yes, to Larry.

17       Q.  All right.  But you never asked Jackie, Hey,

18  what does yeehaw mean?

19       A.  I never -- I never -- I was -- I was afraid to

20  ask Jackie stuff.  I never asked him that.

21       Q.  When Jackie said or threatened to fire you, I

22  just want to go back to that.

23            How many times did he do that?

24       A.  In the office with the tickets.

25       Q.  So that was in 2018?

Page 336

1      A.   Yes.

2      Q.   Okay.  When was the next time?

3      A.   In the test pad, whenever it was Skip.  And

4  then in the -- whenever I had the conference room with

5  the CEO, he told me -- one day he told me I shouldn't be

6  invited.

7      Q.   Okay.  So the second time was the test pad.

8  When was that?

9      A.   I don't know.  I can't recall the year.

10     Q.   What was the event that happened to cause

11  Jackie to say, "I could have fired you"?

12     A.   What do you mean?

13     Q.   What happened?

14     A.   He -- whatever I did to him was wrong, he said.

15  Not letting him know that I was coming earl upset him.

16  And that's why he said he could fire me for that.

17     Q.   So the words were, "I could have fired you for

18  that"?

19     A.   I can fire you for that.

20     Q.   I can fire you for that?

21     A.   I can fire -- yes.

22     Q.   But you were not fired?

23     A.   I was not fired.  I was just threatened.

24     Q.   Okay.  And what is this conference CEO

25  situation?

Page 337

1       A.   It was a conference room that Reagan sent an

2    invitation to Jackie, and Jackie gave it to Mark, and

3    Mark gave it to me.  And we went to the conference room,

4    and we -- the CEO was live talking.  And Matt was

5    present.  Tanya was present.

6              And they were talking about all the new

7    updates in the company.  But on my way back, that's when

8    Jackie approached me and said, where I had been all

9    those hours, and I should not be invited to that, to

10   that meeting.

11             And I told him, "You are the one that gave

12   the invitation to Mark, and Mark gave it to me.  You are

13   aware."

14             But he say, "I know.  But you should not be

15   in that meeting."

16             Plus he said that Matt -- Matt told him

17   that I was outside in the parking lot, too, but we were

18   taking a lunch break after the meeting.

19       Q.   But Jackie gave you an invitation to the

20   meeting?

21       A.   Yes.  He gave -- he gave it to Mark, and Mark

22   gave it to me.

23       Q.   Did Jackie want him to give to you?

24       A.   What do you mean?

25       Q.   Did Jackie want Mark to give you the

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

Page 338

1      invitation?

2          A.   Yes.  He gave it to the leadmen.  The leadmen.

3          Q.   So Jackie invited you to the meeting?

4          A.   Reagan Francis had put my name on the meeting.

5          Q.   But Jackie made sure you got it?

6          A.   He gave it to Mark, yes.

7               That's why I was confused.

8               And I told him, "You gave it to Mark, and

9      Mark gave it to me."

10         Q.   Right.

11         A.   Yes.

12         Q.   And what makes you think that he didn't want

13     you at the meeting because of your national origin?

14         A.   Because he -- he told me I shouldn't be

15     invited.

16         Q.   Is that the only reason why?

17         A.   That's the only reason, yes.

18         Q.   The CEO, what's his name?

19         A.   It was a lady.  I forgot the lady's name.  It

20     was a lady's name.  It was like --

21         Q.   Is it -- is there a new CEO or an --

22         A.   It's always been -- it's a lady.  At that time

23     it was a lady, I think, I remember.

24         Q.   Who was speaking?

25         A.   Yes.

Page 339

1      Q.  Okay.  Any other times Jackie said, "I could
2   have fired you"?
3      A.  Just those three times.
4      Q.  All right.  And then the last thing is Jackie
5   invaded your physical space.  Is that what I heard?
6      A.  Yes.
7      Q.  When did Jackie invade your physical space?
8      A.  All the time.
9      Q.  And how would he do that?
10     A.  Whenever he would come and tell me stuff.
11     Q.  What do you mean by "invading physical space"?
12     A.  Like he -- there's times -- like when I didn't
13  get the tester position, he would come to my work area
14  and say -- make fun of me.
15              "Oh, you didn't get the tester position but
16  your buddies did.  The ones you were training got the
17  tester position but you didn't.  When are you going to
18  move up?"
19     Q.  Well, when I -- to me invading physical space
20  means like he got close to you physically.  Is that what
21  you believe that means or --
22     A.  Yes.  Whenever -- whenever he told me about the
23  conference room.  Yes.  Yes.  Whenever he told me like
24  really aggressive that I should not be in that meeting.
25  That's why I was so confused.

Page 340

1           I told him, "You -- you were aware of it.

2     So why are you acting like this with me?"

3                And he just kept going.

4       Q.   Okay.  But -- so he talked closely to you?

5       A.   Not that close, but a loud voice.  You know, I

6     can tell he was like not the Jackie, you know.

7                MS. ASHTON:  I'll pass the witness.

8                MS. COLE:  No further questions.

9                THE VIDEOGRAPHER:  We're off the record at

10    5:04 PM.

11               MS. COLE:  He's going to read and sign.

12               MS. ASHTON:  Yes, read and sign.

13               MS. COLE:  Send it to Lisa Ventress's

14    office.

15               (The deposition concluded at 5:04 PM.)

16

17

18

19

20

21

22

23

24

25